NAME **Patrick Stanley Pawlicki**

PRISON NUMBER AN-9292

CURRENT ADDRESS OR PLACE OF CONFINEMENT **R.J. Donovan Correctional Facility**
**480 Alta Road, D18-105 Low**

CITY, STATE, ZIP CODE **San Diego, Califirnia 92179**

FILED

MAR 2 4 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

2254      1983
FILING FEE PAID
Yes ___ No ___
IFP MOTION FILED
Yes ___ No ___
COPIES SENT TO
Court ___ ProSe ___

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**PATRICK STANLEY PAWLICKI**
(FULL NAME OF PETITIONER)
**PETITIONER**

v.

**DANIEL PARAMO, WARDEN,**
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

**RESPONDENT**
and

The Attorney General of the State of
California, Additional Respondent.

Civil No _____
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

16 CV 0 7 2 1 AJB MDD

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:
   **Superior Court, County of San Diego, State of California**

2. Date of judgment of conviction: **April 2, 2013**

3. Trial court case number of the judgment of conviction being challenged:
   **SCD223454    and  SCD237383**

4. Length of sentence: **105 years plus 4 years**

CIV 68 (Rev. Jan. 2006)

cv

5. Sentence start date and projected release date: `Startdate: April 2, 2013`
`Counts 1 thru 8: Penal Code §288(a); Counts 1,2,3,4,&6 & 7:`
`Pen. Code §1203.066(a) (8); Projected release date = April 2,2122`

6. Offense(s) for which you were convicted or pleaded guilty (all counts):
`Counts 1 thru 8: Penal Code § 288(a); Counts 1,2,3,4, & 6 & 7;`
`Penal Code §1203.066(a) (8); Penal Code §1320.5; Penal Code §`
`12022.1 (b)`

7. What was your plea? (CHECK ONE)

   (a) Not guilty      ☒

   (b) Guilty          ☐

   (c) Nolo contendere ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)

   (a) Jury            ☒

   (b) Judge only      ☐

9. Did you testify at the trial?

   ☐ Yes  ☒ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:

    (a) Result: `Denied; reversed Count 5 as Not Guilty.`

    (b) Date of result (if known):

    (c) Case number and citation (if known): `D063728`

    (d) Names of Judges participating in case (if known):

    (e) Grounds raised on direct appeal:
       `I. APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO`
       `COUNSEL AT TRIAL, REQUIRING REVERSAL.`

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:

    (a) Result: `Denied`

    (b) Date of result (if known): `June 26, 2015`

    (c) Case number and citation (if known): `D063728`

    (d) Grounds raised:
       `I. APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO`
       `COUNSEL AT TRIAL, REQUIRING REVERSAL.`

CIV 68 (Rev. Jan. 2006)

cv

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition: NO

    (a) Result: `Will exhaust State and Federal remedies first.`

    (b) Date of result (if known):       `Not Applicable`

    (c) Case number and citation (if known):   `Not Applicable`

    (d) Grounds raised:


## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?

    ☐ Yes  ☒ No

15. If your answer to #14 was "Yes," give the following information:   `Not Applicable`

    (a) **California Superior Court** Case Number (if known):

    (b) Nature of proceeding:

    (c) Grounds raised:

    (d) Did you receive an evidentiary hearing on your petition, application or motion?

        ☐ Yes ☐ No     `Not Applicable`

    (e) Result:

    (f) Date of result (if known):

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?

    ☐ Yes  ☒ No

CIV 68 (Rev. Jan. 2006)

cv

**17.** If your answer to #16 was "Yes," give the following information:     `Not Applicable.`

    (a) **California Court of Appeal** Case Number (if known):

    (b) Nature of proceeding:

    (c) Names of Judges participating in case (if known)

    (d) Grounds raised:

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☐ No     `Not Applicable.`

    (f) Result:

    (g) Date of result (if known):

**18.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes ☒ No

**19.** If your answer to #18 was "Yes," give the following information:     `Not Applicable.`

    (a) **California Supreme Court** Case Number (if known):

    (b) Nature of proceeding:          `Not Applicable.`

    (c) Grounds raised:

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☐ No          `Not Applicable.`

    (e) Result:

    (f) Date of result (if known):

20. If you did **not** file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

> Petitioner's primary concern is to exhaust state remedies first, then advance to Federal District Court. At this time there is no need for a habeas corpus proceeding.


## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?

   X Yes ☐ No     (IF "YES" SKIP TO #22)

   (a) If no, in what federal court was the prior action filed?

   (i) What was the prior case number?

   (ii) Was the prior action (CHECK ONE):

      Denied on the merits? ☐

      Dismissed for procedural reasons? ☐

   (iii) Date of decision:

   (b) Were any of the issues in this current petition also raised in the prior federal petition?

     ☐ Yes ☐ No

   (c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?

     ☐ Yes ☐ No

---

**CAUTION:**

- **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present **all** other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

CIV 68 (Rev. Jan. 2006)

cv

## GROUNDS FOR RELIEF

22. **State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground.** (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

    (a) **GROUND ONE**:   APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL AT TRIAL, REQUIRING REVERSAL.

**Supporting FACTS**: Petitioner, PATRICK S. PAWLICKI, went through a series of counsel prior to trial, before he hired Raymundo Pacello, Jr., AKA "The Legal Baller." Pacello met Petition at the jail while Petitioner was in custody. Pacello convinced Petitioner that he was the best attorney for his defense. Later, at trial, Pacello proved to the court he was not a qualified lawyer to undertake this type of case, had little, if any, experience in criminal law, and the lawyer protested to the court that he will not represent "a child molester" because he has 2 daughters.

Pacello's lack of experience was represented by his almost complete absence of preparation of the case, and his extreme antagonism demonstrated towards Petitioner herein showed what can only be described as "the constructive denial of counsel."

The hired counsel, Pacello, was ineffective through the entire trial, resulting in Petitioner's imminent conviction and of whom the court forced Pacello to try to represent Petitioner. However, Petitioner attempted to have Pacello replaced with another lawyer but the court denied the request.

Herein was a prime example of a trial attorney who refused to represent a client that he did not believe in, and who was on his phone, or sleeping during most of the trial, and even worse, trial counsel Pacello introduced damaging evidence against his own client to ensure a conviction. Petitioner was denied his Sixth Amendment right to assistance of counsel, requiring complete reversal.

**Did you raise GROUND ONE in the California Supreme Court?**

☒ Yes ☐ No.   There was only one ground raised in the Supreme Court.

If yes, answer the following:

    (1)  Nature of proceeding (i.e., petition for review, habeas petition):   Petition for Review

    (2)  Case number or citation:   S 225378

    (3)  Result (attach a copy of the court's opinion or order if available):
          DENIED.   June 26, 2015

**(b)** GROUND TWO:     NOT APPLICABLE


**Supporting FACTS:**    NOT APPLICABLE


**Did you raise GROUND TWO in the California Supreme Court?**

☐ Yes ☒ No.    NOT APPLICABLE

If yes, answer the following:

(1)   Nature of proceeding (i.e., petition for review, habeas petition):

(2)   Case number or citation:

(3)   Result (attach a copy of the court's opinion or order if available):

**(c)** **GROUND THREE:**      NOT APPLICABLE

**Supporting FACTS:**      NOT APPLICABLE

**Did you raise GROUND THREE in the California Supreme Court?**

☐ Yes ☐ No.      NOT APPLICABLE

If yes, answer the following:

(1)    Nature of proceeding (i.e., petition for review, habeas petition):

(2)    Case number or citation:

(3)    Result (attach a copy of the court's opinion or order if available):

**(d)** **GROUND FOUR:**                    NOT APPLICABLE


**Supporting FACTS:**              NOT APPLICABLE


**Did you raise GROUND FOUR in the California Supreme Court?**

☐ Yes ☐ No.              NOT APPLICABLE

If yes, answer the following:

    (1)   Nature of proceeding (i.e., petition for review, habeas petition):

    (2)   Case number or citation:

    (3)   Result (attach a copy of the court's opinion or order if available):

**23.** Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes ☒ No

**24.** If your answer to #23 is "Yes," give the following information:   NOT APPLICABLE

    (a) Name of Court:

    (b) Case Number:

    (c) Date action filed:

    (d) Nature of proceeding:

    (e) Name(s) of judges (if known):

    (f) Grounds raised:

    (g) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes ☐ No

**25.** Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:   NOT APPLICABLE
    (a) At preliminary hearing . . . . . . . .   KERRY ARMSTRONG

    (b) At arraignment and plea . . . . . . .

    (c) At trial . . . . . . . . . . . . . . . . . . . .   Raymundo Pacello, Jr.
                            A hotel loft someplace in San Diego

    (d) At sentencing . . . . . . . . . . . . . .   Raymundo Pacello, Jr.

    (e) On appeal . . . . . . . . . . . . . . . .   Stephen M. Hinkle, Atty. at Law
                            11260 Donner Pass Rd., C-1 PMB 138
                            Truckee, CA  96161

    (f) In any post-conviction proceeding . William C. Lawrence
                            "Jailhouse Lawyer"

    (g) On appeal from any adverse ruling in a post-conviction proceeding:
                     not applicable

CIV 68 (Rev. Jan. 2006)
cv

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes   ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes   ☒ No

(a) If so, give name and location of court that imposed sentence to be served in the future:

NOT APPLICABLE

(b) Give date and length of the future sentence:

NOT APPLICABLE

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
☒ Yes   ☐ No

28. Consent to Magistrate Judge Jurisdiction

In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to procced before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☒ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

29. Date you are mailing (or handing to a correctional officer) this Petition to this court:

XXXXXXXXXXXXXXXXXX   March 17, 2016

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)


I declare under penalty of perjury that the foregoing is true and correct.  Executed on

___ March 17 _, 2016        *Patrick Stanley Pawlicki*

(DATE)                PATRICK  STANLEY  PAWLICKI
                      SIGNATURE OF PETITIONER

1  PATRICK STANLEY PAWLICKI, #AN-9292
   R.J. Donovan Correctional Facility
2  480 Alta Road, D-18-105 Low
   San Diego, CA  92179
3  Petitioner in Pro Se

4

5

6              UNITED STATES DISTRICT COURT

7            SOUTHERN DISTRICT OF CALIFORNIA

8  PATRICK STANLEY PAWLICKI,     )   CASE NO.:_____
                                 )
9                  Petitioner,   )   PETITION FOR WRIT OF HABEAS
                                 )   CORPUS
10 v.                            )   (28 U.S.C. §2254)
                                 )
11 DANIEL PARAMO, Warden,        )
                                 )
12                 Respondent.   )
                                 )

13

14 TO THE HONORABLE PRESIDING JUDGE OF THE UNITED STATES DISTRICT
   COURT, SOUTHERN DISTRICT OF CALIFORNIA;
15

16     I, PATRICK STANLEY PAWLICKI, hereinafter referred to as Pet-

17 itioner, respectfully submits this Petition for Writ of Habeas

18 Corpus following the exhaustion of the California State appeals

19 process, from which Petitioner desires to continue appealing the

20 decisions from the state courts and that each of his claims are of

21 viable Constitutional magnitude and must be corrected in the int-

22 erest of justice.

23                      INTRODUCTION

24     Petitioner was charged with the molestation of his disabled

25 daughter, as well as two step-children. He retained a series of

26 private attorneys to defend his innocence, spending an enormous

27 amount of money until eventually exhausting his and his family's

28 finances.  He finally went to trial with Raymundo Pacello, Jr.,

                              1

1  an attorney who utilizes the moniker "The Legal Baller."

2  Petitioner could not possibly have made a worse choice for an

3  attorney to represent such a delicate case.  Pacello, who was

4  given to spouting Latin homilies, misrepresented his legal back-

5  ground and his experience to both the Petitioner and the court.

6  Rather than an "experienced trial lawyer" with an "enormous supp-

7  ort staff," Pacello had never tried a sex crimes case, had only

8  tried one other criminal case, and operated his "law firm" out of

9  his loft apartment.  While the trial court asked several  direct

10  questions of Pacello relating to his experience, his preparation

11  for this case, and his interaction with Petitioner, Pacello hemmed

12  and hawed in response and either never answered those questions

13  or provided misleading answers, they were later exposed as mis-

14  truths.

15  There were over 8,000 pages of discovery that were generated

16  in this case.  There were over two days of hearings on in limine

17  motions completed with an earlier attorney.  It appeared Pacello

18  never looked at any of the discovery and never reviewed any of the

19  in limine rulings.  Pacello lacked a basic understanding of the

20  rules of evidence as his objections were continually overruled,

21  while those of the prosecution were continually sustained. He also

22  elicited highly damaging testimony during cross-examination of the

23  witnesses that had been ruled inadmissible by the court in the

24  earlier in limine motion hearings.

25  Pacello had no investigator and hired no experts due to a

26  "lack of funds," save one who testified to the impossibility of

27  one of the sexual acts using a bio-mechanical model.  When it was

28  suggested to Pacello that he apply to the County for funds to hire

2

1   either an expert or an investigator, he responded that he did not

2   want to inform the County of his trial strategy; clearly Pacello

3   had no understanding of the fact that his application for funds to

4   the County would not reveal his trial strategy or involve some

5   division of loyalty.  Pacello flatly stated that he was no prepared

6   and could not be prepared before trial.

7         Pacello also demonstrated an extreme level of antagonism to

8   Petitioner prior to trial.  One week before the scheduled trial

9   date Pacello asked the Court to be relieved due to conflict or,

10   in the alternative, for a continuance stating that he could not

11   possibly be ready for trial given the large amount of discovery.

12   Pacello explained his "conflict" to the Court ex parte in chambers.

13   While laced with hyperbole, his explanation of this "conflict"

14   came down to two factors.  The first was that he was incensed that

15   his client, Petitioner herein, had hired another attorney because

16   Petitioner had not seen or heard from Pacello since their initial

17   meeting at the jail.  For reasons unknown, Pacello was convinced

18   that this other attorney had been paid a huge sum of money, money

19   that should have gone to him, since he had been on the case with

20   a $4,000.00 retainer.  The second factor was that Pacello, who had

21   two young daughters of his own, could not represent a man who was

22   charged with molesting children.

23         Pacello worked himself into a frenzy over the idea of repres-

24   enting an alleged child molester, actually crying in front of the

25   court, despite knowing exactly what Petitioner had been charged

26   with at the time he took the case, and having no issue when he

27   took Petitioner's money.  Further, Pacello later stated that he

28   bill Petitioner $500.00 per hour, and had taken the case with

3

essentially no retainer thinking that Petitioner and his family were wealthy, and that he would be able to extract large sums of money from them. When he learned that he would not be receiving large sums of money, although he did later receive another amount of $5,000.00, he essentially turned against Petitioner.

Pacello did accomplish quite a lot at trial. He spent considerable amount of time during trial on his Smartphone, texting, sending messages and emails, and updating his Facebook page. This was because he not only had a very busy practice to manage, but he also, as he freely admitted, had a very active social life that he certainly was not going to curtail simply because he was in trial. Pacello's representation of Petitioner was not just ineffective, but was so ineffective that it warrants REVERSAL under a per se basis of prejudice.

Petitioner wanted to go to trial with his new counsel, but the trial judge refused to allow new counsel to substitute into the case unless she would be ready for trial in ONE WEEK. The new counsel, intended to replace Pacello, stated quite accurately, that could not possibly be ready for trial in this case and be ready in one week. Petitioner must remind this court that there were 8,000 pages of discovery that had to be reviewed, a challenge beyond the capacity of any human being.

The Court was made aware of Pacello's lack of preparation at this hearing. Petitioner's new trial lawyer informed the court in an ex parte hearing in chambers that Pacello had done no preparation for trial; had not even looked at the discovery in this case. As it turned out, despite Pacello's representation two months earlier that he had an "enormous" support staff that could

4

review and prepare the case, but he had only hired a paralegal one week before and put the paralegal to task with preparing the case, including reviewing over 8,000 pages of discovery. As a result, Pacello was no more prepared for trial than the new attorney. The court REFUSED the substitution of counsel. This ruling made by the court was REVERSIBLE ERROR.

Finally, the court admitted substantial propensity evidence, under Evidence Code section 1108. Petitioner thus makes the argument that Evidence Code section 1108 is UNCONSTITUTIONAL for the purposes of Federal review.

STATEMENT OF APPEALABILITY

This appeal is from a final judgment and sentence after a jury trial, and made appealable pursuant to 28 U.S.C., section 2254.

STATEMENT OF THE CASE

In Regards to Case No. SCD237383

An information was filed on December 1, 2011, charging the Petitioner herein with "failure to appear" while out on bail (Penal Code §1320.5), and an "out on bail enhancement." (Penal Code §12022.1, subd. (b).) (7 CT p. 1677.) On February 1, 2012, Petitioner entered a plea of guilty to the charge and admitted the enhancement. (7 CT p. 1688.) On April 2, 2013, Petitioner was sentenced to the middle termof two (2) years in state prison consecutive to Case No. SCD 223454, with an additional two years consecutive for the enhancement. (7 CT p. 1759.)

Petitioner filed a timely Notice of Appeal from the judgment in both cases on April 10, 2013. (6 CT p. 1507.)

///

///

5

1     In Regards to Case No. SCD 223454

2     An amended information was filed October 27, 2011, and amend-

3 ed by interlineation on November 8, 2012, and again on November

4 26, 2012, charging Petitioner with Counts one through eight with

5 lewd acts with a child. (Penal Code §288, subdivision (a). It was

6 further alleged with respect to Counts one through four, and Counts

7 six and seven, that Petitioner had substantial sexual contact with

8 the victim. (Penal Code section 1203.066, subdivision (a)(8)), and

9 that Petitioner committed the acts against two or more victims.

10 (Penal Code §667.61, subd. (b)(c)(e).) (4 CT pp. 870-876.)

11     On November 7, 2012, trial began. (7 CT p. 1597.) On December

12 12, 2012, the jury found Petitioner NOT GUILTY on Count five, and

13 GUILTY on the balance of the counts; the jury further found all of

14 the enhancements to be true. (7 CT p. 1649.)

15     On April 2, 2013, the Court denied Petitioner's motion for a

16 new trial and sentenced Petitioner to fifteen years to Life to run

17 consecutive on each of the seven counts, for a total indeterminate

18 sentence of 105 years to life.  Petitioner was given credit for

19 598 days of pre-sentence custody, consisting of 520 actual days

20 and 78 conduct days pursuant to Penal Code section 2933.1) (7 CT

21 at p. 1675.)

22                   STATEMENT OF FACTS

23 Prosecution's case

24     A.  Specific Evidence as to the Charges.

25     Petitioner's daughter Bonnie was born with Down's Syndrome,

26 in January, 1994. (15 RT pp. 1799-1800.)  The mother was Lucie

27 Prince, Petitioner's second wife. (15 RT p. 1772.)

28     In November 2003, Petitioner married his third wife, a woman

named Tammy Sutton.  Sutton had two children; Michael who was 11 years old, and Christina who was 12 years old.  Sutton and her two children moved in with Petitioner in his Santa Ysabel home in San Diego County, from their home in Ohio. (15 RT pp. 1921-1924.)

One day Michael heard a noise and walked into the master bed-room of Petitioner's house. Michael observed Bonnie (the daughter with Down's Syndrome) bent over the toilet in the master bedroom, and observed Petitioner "doing it doggie style."  Petitioner's penis was "penetrating" Bonnie. (15  RT pp. 1940-1941.)  This in-cident formed the basis for the charges in Count six.

Petitioner observed Michael and "came after [him] with a belt." Michael fell down on his stomach and Petitioner pulled his pants down, then inserted his penis into Michael's rectum. (15 RT pp. 1941-1942.)  This incident formed the basis for the charges in Count seven.

Christina stated that she, her brother Michael, and their mother, Tammy Sutton, came out to California to meet Petitioner in April, 2003, and stayed with him for a week or two. (16 RT pp.2002-2004.)  Petitioner, Tammy, Bonnie, and Christina all slept in the same bed together, with Christina sleeping closest to Petitioner. (16 RT pp. 2010-2011.)  On the second or third night they were there, Petitioner began to touch Christina on her breasts and her vagina.  (16 RT p. 2016.)

When Tammy, Michael, and Christina moved in with Petitioner after the November, 2003, wedding, Petitioner continued to touch Cristina under her clothing on her vagina and her breasts, begin-ning about one week after the wedding. (16 RT pp. 2028-2030.) Petitioner would also put Christina's hand on his penis.  This

1  incident happened on more than one occasion. (16 RT pp. 2031-

2  2033.)  About one month after the wedding Petitioner had inter-

3  course with Christina. (16 RT pp. 2033-2034.)  These incidents

4  formed the basis for the charges in counts one through four.

5      Petitioner would drive Christina and Bonnie to school.

6  Christina stated that Petitioner would put his hand under Bonn-

7  ies skirt on her vagina. (16 RT p. 2037.)  This incident formed

8  the basis for the charge in count eight.

9      Cynthia Kuelbs, a pediatrician, looked at examinations of

10  Bonnie done in 2000 and 2009.  There was a "relative defect" in

11  her hymen in 2009.  That defect could be from a prior injury, or

12  could be normal. (19 RT pp. 4231-4234.) Kuelbs said that most

13  children who have been molested have no sign of injury. (19 RT

14  p. 4225.)

15      B.  Disclosure.

16      In 2007 Gerald Heinbaugh was working as a counselor at the

17  Belmont Pines in Ohio. (17 RT p. 3566.)  He interviewed Michael

18  who told him he had been anally raped by his step-father. (17 RT

19  pp. 3572-3573.)  Heinbaugh did not report this to the authorities

20  as he thought it had already been disclosed. (17 RT p. 3576.)

21      In 2009, social worker Michelle Edwards was interviewing

22  Michael when he told Edwards he had observed Petitioner anally

23  penetrating Bonnie in the bathroom. (17 RT pp. 3524-3527.) Then

24  Michael stated he had been anally raped by Petitioner. (17 RT p.

25  3528.)  Edwards stated that Michael had previously disclosed

26  this incident in 2004 and 2007.  Edwards reported this 2009 dis-

27  closure to the local authorities. (17 RT pp. 3529-3531.)

28      In 2009, Faline Fisher was working with Christina in Ohio as

a therapist.  Fisher was treating Christina for depression.
Christina had been cutting herself. (16 RT p. 2043, 17 RT pp.
3606-3609.) Christina disclosed to Fisher that she had been sex-
ually abused in San Diego by her step father. (17 RT pp. 3609-
3611.)  Fisher reported this disclosure to Colleen Collins, with
Child Protective Services in Ohio. (17 RT p. 3614.)

Jayme Bernfield, a clinical psychologist, stated that trau-
matized children often resort to cutting, and that depression is
common. (20 RT pp. 4407-4408.)  Dr. Anthony Urquiza, a psycholo-
gist, stated that a misconception about child abuse is that a
child that has been abused will report the abuse right away.
(21 RT p. 4703.)  Urquiza stated that a delay in reporting abuse
is common because the child is afraid. (21 RT p. 4704.)  Often
children who delay reporting abuse tell their story over a per-
iod of time, and often have mental health problems. (21 RT pp.
4711-4717.)

C. Corroborating Evidence as to the Charges.

Justine Stout was 17 years old at the time of trial, and
was related to Lucie Prince. (14 RT p. 1712-1713.) She overheard
an argument between Petitioner and his fourth and current wife
Judy where Judy said that she did not want Petitioner staying
with Justine alone in the house, because Petitioner had "raped
a girl." (14 RT p. 1730.)  Justine believed the girl in question
was Christina.  (14 RT p. 1738.)  During a conversation with the
Petitioner herein, Petitioner told  her that "Tammy made him have
sex with his daughter.  Her daughter." (14 RT p. 1741.)

Joy Burke went to work for Petitioner in 2008, at age 19.
At a trade show dinner Petitioner ordered wine for Joy. (15 RT

pp. 1747-1749.)  Joy thought that Petitioner was a "little too intimate" with Bonnie, as he would kiss her on the lips.  (15 RT p. 1751.)

Todd Fichter was a neighbor of Petitioner who occasionally babysat for Bonnie and Petitioner's young daughter Isabella. (18 RT pp. 3850, 3855.)  Fichter stated that Petitioner talked about sex every day, and discussed oral sex with his wife. (18 RT pp. 3858-3859.)  Fichter observed Petitioner playing pornography on the television in his house. (18 RT p. 3864.)

Petitioner came over to Fichter's house one morning and told Fichter a story in which he had intercourse with a female.  He thought he was having intercourse with his then wife Tammy, but when he opened his eyes he realized it was Christina. Petitioner was "grinning ear to ear" and seemed proud of the incident. (18 RT pp. 3868-3869.)

Petitioner's current wife, Judy, stated that Petitioner had admitted to having sex with Christina, and stated that he would touch Christina's breasts. (18 RT pp. 3957-3958.)

Rhonda Bradbury, the wife of a friend of Petitioner, stated that Petitioner told her that Christina had slipped into his bed one night; Petitioner thought it was Tammy and then realized it was Christina.  Petitioner acted like this was "pleasurable." (19 RT p. 4306.)

Bradford Holt, a friend of Petitioner, stated that he had observed Petitioner showering with Bonnie several times. (20 RT p. 4432.)  Holt also stated that Petitioner told him that Christina masturbated him one night, and Petitioner thought it was Tammy masturbating him. (20 RT p. 4435.)  Sean Pawlicki, the son

10

1  of Petitioner, said that Petitioner told him that Christina "was

2  jerking him off." (20 RT p. 4527.)  Petitioner also stated that

3  he played with Christina's breasts, and said they were firmer

4  than Tammy's. (20 RT p. 4547.)

5      Dameon Cunningham, who was formerly Megan Cunningham, stat-

6  ed that Petitioner told her on one occasion that Michael was

7  bleeding anally, :from medication." (17 RT p. 3657.)

8              D. Jail  Recordings and Inmate Testimony.

9      Jeffrey Miller, a DA investigator, played a series of rec-

10  orded telephone calls from the jail where Petitioner was making

11  an effort to exclude his current wife, Judy, from his business.

12  (16 RT p. 2146.)  Miller stated that Thomas Craig, Victor Austin,

13  and Steven Broyles were all  inmates at the jail that were housed

14  at one time or another with Petitioner.  (16 RT pp. 2149-2151.)

15      Thomas Craig was housed with Petitioner in jail for several

16  months.  Petitioner stated that his wife was the reason he was

17  in jail, and she was trying to take over his business. (16 RT pp.

18  2194-2195.)  Petitioner referred to his wife as a "Filipino mail

19  order bride." (16 RT p. 2196.)  Petitioner told Craig that he

20  could move into his house when Craig was released, and wrote a

21  note to his landlord that Craig could live in the house.  Petit-

22  ioner wanted Craig to put some methamphetamine to "discredit"

23  her. (16 RT pp. 2198-2199, 2206-2207.)  On one or two occasions

24  Petitioner said he would like to kill his wife. (16 RT p. 2200.)

25      Petitioner drew a map to "Maryann's" house that was located

26  on the property.  Petitioner said that Maryann didn't believe in

27  banks and had a lot of money around.  He told Craig he could take

28  it easily.  (16 RT p. 2204.)

1   Kevin M. Foster was jailed with Petitioner.   Petitioner said

2   he would give Foster a job. H wanted Foster to go out to his house

3   and take some computers and hard drives. (19 RT pp. 4148-4152.)

4   Petitioner told Foster he would pay him $1,000.00 and gave him

5   directions to his house. (19 RT pp. 4155-4156.)  Foster was re-

6   leased but later went back into custody.   Petitioner was upset

7   that the computers were not taken from his house.   Petitioner

8   then indicated that he would pay Foster $2,500.00 to burn down

9   his house. (19 RT pp. 4158-4159.)   Petitioner stated on  one

10   occasion that he would love  to see his wife "knocked off," and

11   would pay $10,000.00 to the first person that could accomplish

12   the task.  (19 RT pp. 4160-4161.)

13   Kevin G. Foster, the father to Kevin M. Foster, got a phone

14   call from Petitioner in jail around Christmas.  He originally

15   thought the phone call was from his son, who had been housed with

16   Petitioner.  It appeared Petitioner thought he was talking to

17   Kevin M. Foster. (19 RT 4128-4129.)   Petitioner first talked to

18   Foster about a job in "plastics," stating that he had  machinery

19   on his property. (19 RT p. 4142.)  "Patrick" then wanted Foster

20   to burglarize his home in Ramona and take two laptop computers.

21   He gave directions to Foster and said that Foster could  take any

22   jewelry or artwork that he found.  (19 RT pp. 4130-4131.)  Foster

23   was paid the $1,000.00, but never made it to Petitioner's house.

24   (19 RT pp. 4133, 4136.)

25   Steven Broyles was in a cell with Petitioner, when Petition-

26   er made a statement, "it would be easier if they were just gone."

27   (20 RT pp. 4623, 4627, 4631.)  Petitioner wanted Broyles to kill

28   the two complaining witnesses. (20 RT p. 4635.)  He also wanted

12

1  Broyles to kill his wife Judy, using zip ties to strangle her.
2  Petitioner said he would pay Broyles $100,000.00. (20 RT pp.
3  4633-4634.)  Petitioner also stated he would sell a vintage car
4  to bail out Broyles. (20 RT p. 4632.)

5      Victor Austin met Petitioner in a dorm at the jail. He stat-
6  ed that  Petitioner talked about that you could have sex with a
7  14 year old in a brothel in the Philippes.  (20 RT pp. 4658-4659)
8  Petitioner said he would give Austin a job. (20 RT p. 4660.)  He
9  also wanted Austin to have to make his wife disappear by going
10  to Vegas during a trade show. (20 RT pp. 4660-4661.)

11             E.   Search Warrant and The Hotel Incident.
12      A search warrant was executed at Petitioner's house.  A dep-
13  uty sheriff found a number of photographs and negatives of a
14  nude Hispanic female, that carried a development date of Sept-
15  ember 2008.  A dildo and a magazine with nude pictures was also
16  found. (19 RT pp. 4110, 4112-4116, 4121.)

17      Sean Pawlicki stated that in 2008 Petitioner told him that
18  he met a girl and he took her to a hotel to take pictures of her,
19  and maybe to model for Petitioner's company. (20 RT. p. 4550.)
20  Petitioner said the girl told him she was 18, but Petitioner
21  thought she was 16.  They had sex at the hotel and Petitioner
22  later showed Sean provocative pictures of this girl. These were
23  the same pictures recovered during the execution of the  search
24  warrant. (20 RT pp. 4551, 4555.)

25      Jeffrey Miller looked at these photos and used them to lo-
26  cate the hotel, a Holiday Inn.  (21 RT p. 4753.)  He determined
27  that the photos were taken in room 205 of the hotel, and said the
28  license plate on the hotel reservation came back to a car that

1  was registered to Petitioner. (21 RT pp. 4756, 4759-4760.)

2  Talitha Fausto checked Petitioner into a room on September 2, in

3  2008. (20 RT p. 4609.)  Michael Kelley checked Petitioner out of

4  the room that same day. )20 RT pp. 4499, 4505, 4506.)

5           F.  Other Evidence.

6      In 2003, Heather Draper was a junior in High School and was

7  working as a hostess at a cafe that Petitioner would frequent

8  with his children. (14 RT pp. 1494-1495.)  She went to work at

9  age 17. (14 RT p. 1498.)  Petitioner would "check her out."

10 This made Draper feel uncomfortable two or three different times.

11 (14 RT . 1502.)

12     In 1966, Teresa Hilty, the younger sister of Petitioner's

13 girlfriend Jan, was 11 years old. (14 RT 1510-1511.) Petitioner

14 would "talk sexual" to her and wanted to show her his penis. (14

15 RT p. 1514.)  Petitioner would frequently touch her breasts and

16 "French kiss" her, as well as grab her crotch and butt.) (14 RT

17 pp. 1516-1519.) This went on until 1969, when Petitioner and Jan

18 got married.  (14 RT pp. 1513, 1515.)

19     From 1969 to 1975 Petitioner's approaches to Hilty became

20 more "adult," involving pornography and requests to have sex.

21 (14 RT p. 1522.)  Even after Hilty got married, Petitioner would

22 continue to make passes at her. (14 RT p. 1540.) Hilty said that

23 Petitioner and Jan were "swingers," and Petitioner wanted  to

24 have a "threesome" or a "foursome" with her. (14 RT p. 1543.) It

25 was "very common" for Petitioner to solicit Hilty for group sex.

26 (14 RT p. 1546.)

27     Alina Zentz, 37 years old at the time of trial, dated Petition-

28 er's son Sean when she was 13 years old until she was was 15.

(14 RT pp. 1567, 1570.)  She stated that Petitioner talked about sex in front of her wondered if his son had "taken her virginity." This talk went on when she was no longer dating Sean, until she was 17 years old.  (14 RT pp. 1572, 1575.)  She stated that Petitioner would try and kiss her on the lips, and that 95% of what he said was perverted. (14 RT p. 1580.)

Mindy McFarland is Sean's ex-wife.  She stated that she and Sean moved in with Petitioner after they were  married, and lived there about five months. (14 RT pp. 1608, 1610, 1612.) She stated that Petitioner made sexual comments "all the time." (14 RT p. 1634.)  On one occasion Petitioner pinned McFarland up against a stove and said "something sexual." (14 RT p. 1618.) On another occasion Petitioner walked in on McFarland when she was topless, then walked out. (14 RT p. 1659.)  On yet another occasion, McFarland was coming out of the shower when Petitioner pushed her up against a wall; McFarland pushed Petitioner away. (14 RT pp. 1622-1623.)  McFarland and Sean left Petitioner's house two days after this incident.  (14 RT p. 1626.)

Madison Cozart was 16 years old at the time of trial.  Her aunt was Lucie Prince, Petitioner's second wife. (14 RT pp. 1686-1687.)  At age 11, while at Petitioner's house, Petitioner would make sexual comments.  (14 RT p. 1696.)  Petitioner would have Cozart come into his bedroom, where pornography was being played on the television.  (14 RT p. 1702.)  Cozart stated that Petitioner would talk to her about sex with his fourth wife Judy, whom he bought on the internet.  (14 RT. p. 1704.) Justine Stout, 17 years old at the time of trial, stated that Petitioner would make sexual comments in front of her and would turn on pornography.

15

1   (14 RT. pp. 1712, 1722, 1724.)

2      Lucie Prince was Petitioner's second wife. She stated that
3 her father sold her to other men to be molested from the age of
4 nine to the age of thirteen. (15 RT pp. 1764-1765.) She met
5 Petitioner when she was 18 years old. She went to work for Pet-
6 itioner and immediately began a sexual relationship with him.
7 They married 10 days after they met. (!% RT pp. 1768-1770,
8 1772.)

9      Bonnie was born with Down's Syndrome in 1994. Bonnie could
10 not talk but was capable of feeding, dressing and showering her-
11 self. Petitioner blamed Prince for Bonnie's disability. (15 RT
12 pp. 1799-1801.)

13      Prince stated that Petitioner talked about sex all the time,
14 including threesomes and swinging. (15 RT p. 1803.) Petitioner
15 also read the Bible daily. (15 RT p. 1802.) Brad Holt was one
16 of Petitioner's best friends and Prince had a voluntary "three
17 way" with Petitioner and Brad Holt. (15 RT pp. 1806-1858.)
18 Prince also had a one-year affair with Petitioner's son, Sean,
19 during her marriage to Petitioner. She and Petitioner got div-
20 orced after Petitioner learned of the affair. (15 RT pp. 1847-
21 1848.) Sean acknowledged that he had a relationship with Prince.
22 (20 RT. p. 4513.)

23      After the divorce, Prince lived in a house on Petitioner's
24 property that previously had belonged to Petitioner's mother.
25 (15 RT p. 1818.) She worked for Petitioner in exchange for rent
26 and entered into a romantic relationship with Megan Cunningham.
27 (15 RT pp. 1821-1822.)

28      After the divorce Petitioner restricted access to her child-

ren. (15 RT p. 1827.)  In May 2009, Petitioner called Prince and said that Child Protective Services had taken Bonnie from him. (15 RT pp. 1832-1833.)  Prince obtained custody of Bonnie. (15. RT p. 1838.)  She admitted that Petitioner was "very kind and loving" to his children. (15 RT p. 1863.)

Judy Sutton was the mother of Tammy Sutton, Petitioner's third wife.  (15 RT p. 1896.)  Tammy had brain surgery when she was three years old, as her skull was crushing her brain.  The surgery left her with brain damage and disabilities. (15 RT pp. 1898-1899.)  Tammy doesn't work and receives disability. (15 RT p. 1902.)

Tammy met Petitioner on a "Christian Mingle" website.  She returned to Ohio from California after about four months. (15 RT pp. 1904, 1906-1907.)  Sutton stated that neither Christina or Michael seemed the same, with Christina not as loving and more aggressive, and Michael wetting himself and crying in the corner. (15 RT pp. 1907-1909.)  Sutton acknowledged that Christina had claimed she was molested twice in 2001.  (15 RT p. 1913.)

Dameon Cunningham was formerly Megan Cunningham. (17 RT pp. 3525-3626.)  As a girl, she met Petitioner when she was 16. (17 RT p. 3626.)  She stated that Petitioner wanted her to have a threesome with him when she was 16.  (17 RT p. 3630.)  Petitioner gave her $500.00 on one occasion to take Lucie Prince out and get her drunk so that Petitioner, Cunningham, and Prince could have a threesome.  (17 RT p. 3631.)  Petitioner stated on another occasion that he put a hole in the wall of his late mother's house so he could see if Megan and Prince were having sex. (17 RT p. 3633.)  Judy Pawlicki stated that Petitioner had  hidden a

17

camera in the house so he could watch Lucie and Megan having sex. (18 RT p. 3955.)

Megan worked on and off for Petitioner when she was living with Prince. (17 RT p. 3639.)  Petitioner told her that the Bible said that once you had your period you were ready for sex. (17 RT p. 3644.)  She said that Petitioner would regularly grab her and make hip thrusting motions from behind. (17 RT p. 3645.) Petitioner would also grab her breasts all the time. (17 RT p. 3646.)  Petitioner would take Bonnie into the shower and would play pornography on the television. (17 RT pp. 3651, 3659.) Petitioner also told Megan that Christina and Michael had been molested by their father, and "probably liked it." (17 RT pp. 3664-3667.)

Judy Pawlicki stated that she met Petitioner on the internet when she was living in the Philippines, and married Petitioner on June 10, 2006. (18 RT pp. 3925-3926.)  Their house in the city of Ramona had central heat but it wasn't always working. They would use a heater in the bedroom.  (18 RT p. 3929.)

Petitioner would say sexual things in front of other people. There was pornography on the television every day, and Petitioner would watch pornography and masturbate with Bonnie in the room. (18 RT pp. 3937-3940.)

In 2009 Bonnie was taken into protective custody.  Petitioner, Judy, and their infant daughter Isabella went to the Philippines.  Petitioner and Judy returned to the United States, leaving Isabella with her relatives.  Petitioner stated that if Isabella came back she would be taken by Child Protective Services. (18 RT pp. 3942-3943.)

18

By 2010, she and Petitioner had moved, as their house was foreclosed on. (18 RT pp. 3948-3849.) On October 27, 2011, Petitioner signed over his business to Judy. She was to pay the sum of $75,000.00 for the business. (18 RT pp. 3944, 3962.) In January 2012, Judy took a trip to the Philippines. When she returned her computer and legal papers were missing. The computer contained business leads. Petitioner said he had someone take it. (18 RT pp. 3950-3952.)

Judy denied ever having sex with Petitioner's son Sean. (18 RT p. 3876.) She said that Petitioner talked to his friend "Joe" about having his "prison buddies" hurt Sean. (18 RT pp. 3955-3956.)

G. Michael Bradbury was a dentist that had known Petitioner in high school, and then reconnected again at a 20 year high school reunion. (19 RT pp. 4262-4263.) Petitioner made some molds for Bradbury. (19 RT p. 4263.) Two of Bradbury's young children saw pornography on the television at Petitioner's home. (19 RT p. 4265.)

Petitioner was interested in "mother daughter" sex relationships. (19 RT p. 4272.) He told Bradbury that he wanted to "fuck" Megan Cunningham. (19 RT p. 4273.) He also told Bradbury that he wanted to grab Bradbury's wife's tits. (19 RT p. 4274.)

Bradbury purchased Petitioner's late mother's house at an auction several years before the trial for $90,000.00. (19 RT pp. 4268, 4280.) He also purchased another piece of property from Petitioner that had a 400 square foot cabin on it for $25,000.00. This was in 2009 when Petitioner needed money. (19 RT pp. 4281-4283.) Petitioner and Judy lived with Bradbury for four to six

19

1  months after Petitioner's house was lost to foreclosure. (19 RT

2  p. 4285.)

3      Petitioner left a message for Bradbury in 2009 that he had

4  to go "AWOL." His current attorney, Mr. Lorandos, told him that

5  he would be taken off bail and committed. (19 RT pp. 4275-4276.)

6      Rhonda Bradbury was Bradbury's wife. She said that Petition-

7  er would make sexual comments in front of her; she would tell him

8  to "shut up." (19 RT pp. 4302, 4304.) On October 24, 2011, Pet-

9  itioner told her he would have to leave the country and that he

10 was going to China. (19 RT pp. 4308-4309.) She got a call from

11 Petitioner about four days later asking her to deed a piece of

12 property owned by Petitioner to a neighbor for $65,000.00. (19 RT

13 p. 4333.)

14     Brad Holt met Petition in 1988 or 1989 and became friends.

15 (20 RT p. 4418.) He stated that Petitioner play pornography on

16 television a few times when Holt was around. (20 RT p. 4425.)

17 Petitioner talked about religion a few times, and talked about

18 sex a lot. (20 RT p. 4426.) Petitioner told Holt that he  had

19 six with a 16-year-old Mexican prostitute. He sent Holt pictures

20 of the girl; Holt ripped the pictures up. (20 RT pp. 4428-4429.)

21     Holt stated that Petitioner asked him to take a power of

22 attorney to act on Petitioner's behalf. Petitioner stated that

23 if Holt did not accept the power of attorney Petitioner would

24 make up a story that Holt was involved in the molestation of

25 Christina. (20 RT p. 4431.)

26     Holt was at a trade show in Las Vegas when he observed the

27 Petitioner pour "crystal meth" from a Visine bottle into a girl's

28 drink. Petitioner said that crystal meth makes a girl "horny."

1    (20 RT pp. 4543-4544.)

2         Sean stated that Petitioner made "some comment" about his

3    kissing girl friend Alina Zentz, when Sean was 13. (20 RT pp.

4    4511-4512.)  Petitioner made sexual comments to all of Sean's

5    girlfriends.  (20 RT pp. 4512-4513.)  Petitioner often made sex-

6    ual comments in front of "everybody." (20 RT p. 4546.)  Sean

7    observed Petitioner in bed with Brad Holt on several occasions.

8    He suspected that Petitioner was homosexual.  (20 RT p. 4603.)

9         Petitioner gave Sean a power of attorney in 2009, shortly

10   before Petitioner went to the Philippines.  Petitioner said he

11   was under investigation and was being "railroaded." (20 RT pp.

12   4515, 4519-4520.)

13   The Defendant's Case

14        Debra Hagen taught Bonnie in school.  She thought Petitioner

15   was a good influence and one of the best teachers for Bonnie.

16   (22 RT pp. 5039-5040.)  Bonnie won awards for her art in school,

17   and Hagen did not think anything was inappropriate was going on

18   and never noticed any signs of abuse.  (22 RT pp. 5043, 5045,

19   5047.)  She stated the Petitioner was not embarrassed by Bonnie

20   but instead was very proud of her.  (22 RT p. 5051.)

21        Jack Culp had done business with Petitioner for over 20

22   years.  He never heard Petitioner make sexual comments in front

23   of women.  (22 RT p. 5079.) Petitioner worked for Charles Dow in

24   the late 70's for three or four years.  Petitioner was a very

25   good employee and Dow never heard him make sexual inappropriate

26   comments.  (22 RT pp. 5091, 5094.)

27        Larry Green had been Petitioner's brother in law for forty

28   years, and never heard Petitioner make sexually crude comments.

                              21

(22 RT pp. 5098-5099.)  He stated that he and his wife Christina and Michael over to their house on several occasions and they "had to be watched."  (22 RT p. 5101.)  Christina and Michael got into the Greens' clothing, papers, curio cabinets, and jewelry boxes. (22 RT p. 5102.)  Green said that Christina and Michael were "untrustworthy, greedy, and liars."  (22 RT p. 5115.)

Green stated that Petitioner was very loving to his family. (22 RT p. 5121.)  He loved Bonnie and went out of his way to include her in activities. (22 RT p. 5114.)  Green never saw pornography at Petitioner's house. (22 RT p. 5121.)

Lynda Green is Petitioner's sister.  She stated that Christina and Michael were not trustworthy.  Michael took items out of her curio cabinet and Christina took a ring from a jewelry box (23 RT pp. 5308, 5317.)  She felt that Petitioner was an "excellent family man."  (23 RT p. 5325.)

Rhonda Matlock rented a place from Petitioner from 2008 to 2010. (22 RT p.  5150.)  Petitioner had a great relationship with Bonnie, and Matlock never heard Petitioner make any sexual comments. (22 RT pp. 5151-5152.)  Matlock acknowledged that she had once "drank meth" with Petitioner and Judy Pawlicki.  (22 RT p. 5168.)

Laurence Logan had known Petitioner for 52 years.  He said that Bonnie was Petitioner's "little princess" and that Petitioner never made a sexually crude joke. (23 RT pp. 5392, 5398.) Gretchen Anderson was the principal at New Life Christian Academy,  where Bonnie was a student.  She stated that Bonnie thrived at school. (23 RT pp. 5411, 5415.)  Petitioner was very involved with  his children and she never heard him make a crude comment. (23 RT p. 5417.)

1    Thomas Anderson was the pastor at New Life Church. He

2    stated that Petitioner was very proud of Bonnie, and he never

3    observed anything inappropriate. (23 RT pp. 5426, 5429.) Magene

4    Quirk was a neighbor of Petitioner for 34 years. She stated

5    that Petitioner was a wonderful husband and father, and she

6    never heard Petitioner make an inappropriate comment. (23 RT

7    pp. 5439, 5444, 5446.)

8        Gene Doxey had known Petitioner from church for 30 years.

9    Petitioner was a loving, caring father, who never made a crude

10   sexual joke. (23 RT pp. 5464, 5470.) Judith Doxey, Gene's

11   wife, had known Petitioner for 32 years. He was proud of

12   Bonnie and a loving father. She never heard Petitioner make a

13   sexually crude remark. (23 RT pp. 5506, 5508, 5511.) Carl

14   Erwin had known Petitioner for 29 years and thought Petitioner

15   was a loving father. (23 RT pp. 5523, 5530.)

16       Dr. Peter Francis had qualified as an expert witness in

17   biomechanics 800 times. (24 RT p. 5648.) He stated that given

18   a male height of 70 to 71 inches, and a female height of 48

19   inches, it would have been a highly improper biomechanical act

20   for Petitioner to have penetrated Bonnie as Michael observed.

21   (24 RT pp. 5654-5655.) Petitioner would have to stoop extremely

22   low for penetration to occur, and it would be uncomfortable and

23   extremely unstable. (24 RT p. 5655.)

24   <u>SCD 237383</u>.

25       Petitioner was ordered to appear for a court hearing on

26   October 28, 2011. He failed to appear in court. (21 RT pp.

27   4764-4765.) Petitioner was later located and arrested in the

28   state of Georgia. (21 RT p. 4769.)

                                23

ARGUMENT I.

**PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AT TRIEL, REQUIRING REVERSAL.**

A.  Introduction.

Petitioner went through a series of counsel prior to trial before finally hiring Raymundo Pacello, Jr., AKA "The Legal Baller."  Petitioner met Pacello at the jail while Petitioner was in custody.  Pacello convinced Petitioner that he was the best attorney for his defense.

Petitioner could not possibly have made a worse choice. Pacello was certainly arrogant and egotistical, qualities that arguably make for a good trial attorney.  He was, however, given to espousing Latin homilies, qualities which made him look silly.

Silly was not his fatal quality however; a complete lack of experience, despite representations to the contrary, was his downfall.  That lack of experience may not, in itself, have doomed Petitioner's defense, but if it did not then surely the almost complete absence of preparation and the extreme antagonism demonstrated towards Petitioner completed what can only be described as the constructive denial of counsel.

B.  This Issue May Be Heard on Federal Appeal.

Ordinarily an issue of competence of counsel is raised on habeas corpus, rather than with appointed counsel on appeal. Since the record on Petitioner's appeal often does not fully illuminate the reasons for trial counsel's actions or omissions, Petitioner's appellate counsel could not find any satisfactory explanation for trial counsel's poor performance, thus the issue may be considered on his direct appeal. (**People v. Mendoza Tello**

24

1  (1997) 15 Cal.4th 264; In re Jones (1996) 13 Cal.4th 552;

2  People v. Nation (1980) 26 Cal.3d 169; People v. Pope  (1979

3  23 Cal.3d 412, 426.)  Further, the court in this case heard a

4  motion for new trial where competency of counsel was at issue,

5  and conducted an evidentiary hearing where Pacello, among others

6  testified.  The record adequately shows counsel's deficient per-

7  formance in his representation of Petitioner.

8      C.  The Standard of Review.

9      This issue arguably raises a pure question of law, and

10  consequently is reviewed de nova by the Courts of Appeals. (See;

11  People v. Cromer (2001) 24 Cal.4th 889, 894.)  It may be argued

12  that the trial court determination under review involved a

13  mixed question of law and fact.  Mixed questions are those in

14  which the "historical facts are admitted or established, the

15  rule of law is undisputed, and the issue is whether the facts

16  satisfy the [relevant] statutory [or constitutional] standard,

17  or to put it another way, whether the rule of law as applied to

18  the established facts is or is not violated. (Ornelas v.United

19  States (1996) 517 U.S. 690, 696-697 [116 S.Ct. 1657, 1662, 134

20  L.Ed.2d 911], quoting Pullman-Standard v. Swint (1982) 456 U.S.

21  273, 289, fn. 19 [102 S.Ct. 1781, 1791, 721 L.Ed.2d 66]; see

22  also Townsend v. Sain (1963) 372 U.S. 293, 309, fn. 6 [83 S.Ct.

23  745, 756, 9 L.Ed.2d 770]["mixed questions of fact and law...

24  require the application of a legal standard to the  historical-

25  fact determinations"].)  Appellate courts should also use inde-

26  pendent, de novo review, for the mixed question determinations.

27  (People v. Cromer, supra, 24 Cal.4th 889, 900.)

28  ///

25

D.  The Applicable Law and Analysis.

1.  The Applicable Law.

Under both the Sixth Amendment to the United States Constitution and Article I, section 15, of the California Constitution, a criminal defendant has the right to assistance of counsel. "An accused's right to be represented by counsel is a fundamental component of our criminal justice system.  Lawyers in criminal cases are necessities, not luxuries.'  Their presence is essential because they are the means through which the other rights of the person on trial are secured.  Without counsel, the right to trial itself would be 'of little avail.'"  (United States v. Cronic (1984) 466 U.S. 648, 653 [104 S.Ct. 2039, 80 L.Ed.2d 657.].)

The right also guarantees the right to effective representation, not just some bare assistance. (McMann v. Richardson (1970) 397 U.S. 759 [90 S.Ct. 1441, 25 L.Ed.2d 763]; People v. Ledesma (1987) 43 Cal.3d 171, 215.)  "That a person who happens to be a lawyer is present at trial alongside the accused...is not enough to satisfy the constitutional command."  (Strickland v. Washington (1984) 466 U.S. 668, 685 [104 S.Ct. 2052, 80 L.Ed.2d 674.].) In other words "because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits." (Evitts v. Lucey (1985) 469 US 387, 395 [105 S.Ct. 830, 83 L.Ed.2d 821].)

The right to counsel thus encompasses "the right to effective assistance of counsel. [Citation]." (United States v. Cronic, supra, 466 U.S. at p. 654); the Sixth Amendment requires "counsel acting in the role of an advocate." (Id., at p. 656.)

26

Generally, a defendant claiming the incompetence of trial counsel must show that both counsel's assistance was deficient and that this deficient performance prejudiced his case. (Strickland v.Washington, supra, 466 U.S. 668; People v. McDermott (2002) 28 Cal.4th 946, 988.)  However, in United States v. Cronic, supra, 466 U.S. 648, the Supreme Court held that per se reversal is required when counsel has entirely failed to 'subject the prosecution's case to meaningful adversarial testing..." (Id, at p. 659.)  The fundamental question is whether the "process [has lost] its character as a confrontation between adversaries."  (Id., at pp. 656-657.) If so, then it is not necessary to demonstrate actual prejudice. This exception to the prejudice requirement may arise in several different contexts.  "Most obvious," the Cronic court noted, "is the complete [(i.e., actual)] denial of counsel." (Id, at p. 659.) Of course, that is not at issue here.  But the Cronic court also noted the possibility of a constructive denial of counsel, when, although counsel is present, "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." (Id., at p. 654, fn. 11.)  That is precisely what happened here in this instant cause and matter.

Because courts "normally apply a 'strong presumption of reliability' to judicial proceedings," in cases of "mere 'attorney error,'" defendants are required to overcome  the presumption by "showing how specific errors of counsel undermined the reliability of the finding of guilt." [Citation.] (Roe v. Flores-Ortega (2000) 528 U.S. 470, 482 [120 S.Ct. 1029, 145 L.Ed.2d 985].)  Where defendants are "actually or constructively

27

1  ...denied the assistance of counsel altogether," however, "'no

2  specific showing of prejudice [is] required' because 'the adver-

3  sary process itself [is] presumptively unreliable.'" (Id., p.483.)

4      Whether a defendant is required to show actual prejudice or

5  whether the court presumes prejudice "turns on the magnitude of

6  the deprivation of the right to effective assistance of counsel."

7  (Roe v. Flores-Ortega, supra, 528 U.S. at p. 482.)  As the Supreme

8  Court explained, though the circumstances in which prejudice will

9  be presumed are narrow, "Cronic instructed that a presumption of

10 prejudice would be in order in 'circumstances that are so likely

11 to prejudice the accused that the cost of litigating their eff-

12 ect  in a particular case is unjustified.' [Citation.]" (Florida

13 v. Nixon (2004) 543 U.S. 175, 190 [125 S.Ct. 551, 160 L.Ed.2d

14 565].)

15                2.   The Lower Court Proceedings.

16     The most illustrative method of analyzing Pacello's repres-

17 entation of Petitioner is to start at the beginning, when Pacello

18 made his first appearance.

19                August 8, 2012.

20     The court set up this hearing "because I received a document

21 from somebody named Raymundo Pacello trying to set a motion to

22 continued this case for October 1st.  Mr. Pacello is not  the

23 attorney of record in this case, Mr. Pacello has not made an

24 appearance  on this case, Mr. Pacello apparently is not here,

25 and so I'm kind of at a loss as to what's going on from the def-

26 ense side."  (AUG 13 RT p. 411.)

27     Pacello had filed a document with the court on July 10, 2012

28 titled "Notice of Retained Counsel and Notice of Motion  to

                               28

1  Continue," indicating that he had been retained by Petitioner,

2  Patrick Stanley Pawlicki, but had not reviewed any of the disc-

3  overy associated with the case.  The document did not set  a

4  hearing date, nor did it contain any authority for either the

5  substitution or the continuance. (AUG 3 CT pp. 593-594.)

6      The appointed defense counsel indicated that he had spoken

7  to Pacello and it was Pacello's intention to take over the case.

8  (AUG 13 RT p. 411.)  Pacello was not present in court. The clerk

9  then indicated that "I guess he's finished his depo and he's on

10 his way, E.T.A. 20 minutes."  The court then took a short recess.

11 (AUG 13 RT pp. 412-413.)

12     Pacello then made his appearance.  When the court indicated

13 that he had never made a motion to substitute into the case,

14 Pacello replied that "I filed points and authorities requesting

15 that I be substituted in." (AUG 13 RT p. 413.)  The court con-

16 firmed that the above referenced document was the document filed

17 by Pacello.  (AUG 13 RT pp. 413-414.)  As noted, the  document

18 cites no authority nor does it request that Pacello be substit-

19 uted into the case.  (AUG 3 CT pp. 593-594.)

20     The court chided Pacello for "filing something in a case

21 where yoy have no authority to file, where Mr. Pawlicki is rep-

22 resented by other counsel--I have no idea what the State Bar

23 thinks about those kinds of things, but I know what I think about

24 it, and that is that you have no business filing any papers."

25 (AUG 13  RT p. 415.)  Suffice it to say, the stage was set for

26 the balance of the representation of Petitioner by Pacello.

27     The court ordered the filing withdrawn and said it would not

28 consider a motion for continuance because it was not filed by

counsel of record. The court could not understand why Pacello, as a licensed attorney doing retained work would not understand that after being retained by a client he had to be recognized by the court as counsel. The court could also not understand why, after being retained "around the 23rd of June," Pacello did not make a motion to substitute in at that point. (AUG 13 RT p. 415.)

Pacello then stated that he would be "ready and able" to go to trial on October 29. He stated "I have spent a lot of time with Mr. Pawlicki. I'm intimately familiar with details of the case." (AUG 13 RT p. 416.) The court again chided Pacello and zeroed in on his preparation of the case. Pacello stated that in the six weeks after being retained and prior to filing his document on July 10, 2012, he was "acclimating myself with the facts of the case." (AUG 13 RT p. 418.) The court pointed out that the document indicated that he hadn't done anything, had not reviewed any of the discovery, and asked if Pacello was lying to him. (AUG 13 RT p. 418.) Pacello stated that his client "has significant documents," and that he "had intimate conversations multiple times" with Petitioner. He acknowledged that he had not received nor reviewed any of the discovery which totaled 8,000 pages. (AUG 13 RT pp. 416, 418-419.) Pacello stated, "I've been trying cases for 12 years, your Honor. I can try the case if I need." (AUG 13 RT p. 419.)

Pacello told the court, "I have an enormous caseload. I do not just do criminal defense. I do all areas of law, Your Honor. I do family law, I do personal injury, I do business--." (AUG 13 RT p. 420.) Later Pacello stated, "I have an enormous staff. I have paralegals that can provide me trial notebooks, and I can

1    get this thing done and try the case."  (AUG 13 RT p. 421.) The

2    court then had the following exchange with Pacello:

3            Court: "Have you ever tried a case like this, Mr. Pac-
                ello?"
4
        Pacello: "I've handled other case like this, Your Honor."
5            Court: "Child molest cases where there's a possibility
                of a life sentence?"
6
        Pacello: "Yeah.  It hasn't--I haven't had to go to
7                trial."

8            Court:  "You have gone to trial?"

        Pacello: "Not on this particular--I haven't tried this
9                particular case.  The court didn't ask me if
                I tried it.  The court just asked me if I
10               handled it."

11           Court:  "Okay. Let me change the question and ask
                whether or not you've tried a case."
12
        Pacello:  "No. But I've been trying cases for 12 years,
13                Your Honor.  If you're a true lawyer, your
                skill set transfers to any courtroom on any
14               issue. Genuinely, that is my firm belief."

15           Court:  "How many cases have you tried in terms of
                felony trials to a verdict?"
16
        Pacello:  "I can't even articulate that to the court
17               because it's been---I don't know how many
                years, Your Honor.  I've---"

18           Court:  "How many years have you tried this year,
                felonies to a verdict, jury trials?"
19
        Pacello: "As of this calendar year, I haven't had to
20               try any of my cases."

21           Court:  "Okay.  How many did you do last year?"

        Pacello: "Your Honor, I can---I don't know.  I have
22               such a busy practice.  I mean, if you want
                me to go through the annals of my case files
23               and articulate that, I can."

24               "But I can tell you this much.  I'm ready,
                willing, and able to proceed.  I am a trial
25               attorney.  I've been doing it since 2000.  I
                tried my first jury trial six months after
26               getting my license to practice law."

27               "I'm not afraid of a jury.  I know the rules of
                evidence, and I will not commit an affront to
28               the court and embarrass myself.  I have no
                problem trying this case." (AUG 13 RT pp.422-23)

31

1   The court told Pacello that the last two attorneys on this
2   case had filed motions to withdraw claiming they hadn't been
3   paid.  Pacello replied that he would not ask to withdraw "second-
4   ary to pecuniary interests."  The court allowed the substitution
5   of attorneys.  (AUG 13 RT p. 424.)

6                    October 2, 2012.

7       This was the date set for in limine motions.  The prosecutor
8   filed three motions; Pacello filed no response but instead filed
9   a motion to continue.  He stated that he could not respond to the
10  prosecutor's motions because he was still receiving discovery.
11  (8 RT pp. 100-1101.)  Pacello stated that he had been given
12  10,000 pages of discovery less than 60 days prior to trial.  He
13  then "hired a paralegal who [has] spent hundreds of hours on this
14  case." (8 RT p. 1102.)

15      Pacello later stated, "How could I have reasonable presence.
16  Your Honor, to know that there were 10,000 pages and new stuff
17  coming as we speak as I'm preparing this case for trial."  The
18  court replied, "How could you not know, sir? How could you not
19  know what the discovery was when you had the extensive conversat-
20  ions that you told me you had with Mr. Pawlicki? How is it that
21  you hadn't had discussions with his prior counsel that they could
22  inform you of what the extensive discovery was in this case?"
23  (8 RT p. 1104.)

24      The court then went through, verbatim, Pacello's earlier
25  representations to the court that he would be ready by the trial
26  date.  (8 RT pp. 1105-1107.)  Pacello said he didn't ask for a
27  continuance at the time of the earlier hearing because he feared
28  that "it was a tentative armor of this court or animus of this

                              32

1  court to deny Mr. Pawlicki the right to have me substituted in as
2  his retained counsel of record if I was seeking continuance at
3  the time that my motion was made.  So, I, as an advocate, zeal-
4  ously represented I would be ready so Mr. Pawlicki---"  The court
5  then stated, "It sounds like you misrepresented that you would be
6  ready."  Pacello replied, "I did not, Your Honor, because at the
7  time I didn't have 10,000 pages of discovery."  The court respond-
8  ed that the prosecutor had filed a response to his motion back on
9  July 25 that detailed precisely what the discovery was in this
10 case.  (8 RT p. 1108.)

11     The court wanted to talk "about your diligence, Mr. Pacello."
12 (8 RT p. 1110.)  The court noted that Pacello was hired on June
13 22.  (8 RT p. 1110.)  Pacello could have filed a motion to sub-
14 stitute into the case on June 23, but did not. (8 RT p. 1111.)
15 The court stated that it "made it abundantly clear that you were
16 not going to be allowed to substitute in on this criminal case
17 unless you were going to be ready for trial on the 29th of Oct-
18 ober."  (8 RT p. 1112.)  Pacello made it perfectly clear that he
19 would not be ready.  (8 RT pp. 1112-1113.)

20     The court wanted to know what Pacello had done in connection
21 with the case, including "what discovery you have reviewed your-
22 self."  (8 RT p. 1114.)  Pacello did not directly answer this
23 question, stating, "I gave all those documents to my paralegal to
24 prepare and organize, put them in binders and give me summaries."
25 (8 RT  p. 1116.)  Pacello asked for 60 days continuance. (8 RT p.
26 1117.)  With respect to the discovery Pacello stated, "I'm app-
27 roximately at page 4,640.  Half of that stuff has been put into
28 binders and summaries have been made. (8 RT p. 1118.)  Pacello

33

1 | also said that he had hired an investigator. (8 RT p. 1118.)  He
2 | did not, in fact.

3 |     The prosecutor pointed out that there was 8,168 pages of
4 | discovery, not the 10,000 pages mentioned by Pacello.  The boxes
5 | containing the discovery were received by Pacello on August 9,
6 | 2012.  (8 RT pp. 1118-1120.)

7 |     The court noted that Pacello did nothing on the case from
8 | the time he was hired on June 22 to the time he substituted into
9 | the case on August 8; that he "squandered all [the] time." (8 RT
10 | 1127-1128.)  The court went through all the representations Pac-
11 | ello had made back on August 8 where Pacello assured the court
12 | that he would be ready for trial.  (8 RT pp. 1127-1130.)

13 |     The court then said: "As far as your claim that you would be
14 | rendering ineffective assistance of counsel, that's something,
15 | sir, that you should have thought about when you accepted this
16 | case.  And it certainly isn't something you told me about when
17 | you accepted this case.  You will recall I asked you specifically
18 | what your experience was in trying this kind of a case. That was
19 | for you to internalize that, decide whether or not this was the
20 | case for you." (8 RT p. 1130.)  The court denied the motion for
21 | continuance.  (8 RT p. 1131.)

22 | October 19, 2012

23 |     Pacello filed a motion to withdraw from the case, stating,
24 | "I believe that there has been a severe foundational shot to the
25 | attorney-client relationship such that my continued representat-
26 | ion of Mr. Pawlicki would run afoul not only of my personal core,
27 | but my ethics and rules of professional conduct."

28 |     "The law is pretty clear that I cannot breach the attorney-

34

client relationship to articulate the nature and extent of that foundational issue, but I think it goes to the very core of trust and confidence, and given the heinous allegations and the nature of this case, if that is breached, then my role as advocate is put into compromise."  The court replied, "I have no idea what you just said."  (9 RT pp. 1201-1202.)

Pacello then stated that Petitioner had retained an attorney "without my knowledge."  The court replied, "Really?  Sort of like how you were retained by Mr. Pawlicki without Mr. Zehawi's knowledge?"  (9 RT 1202.)  Later Pacello stated, "I don't want anthing to do with this matter. He's chosed new counsel.  This rubs against my core.  I'm out." (9 RT p. 1204.)  The court and Pacello then went back into chambers.

Pacello explained that his defense was based on the trust he had in his client.  He has "two beautiful daughters" and in order to represent someone accused of child molestation he has to believe his client, has to "trust what he is telling me is true."  Pacello said that his conflict had nothing to do with Petitioner's entering into a relationship with another attorney.  However, "as a father myself with a family, I'd take a bullet for my kids.  Cold be the day before I represent someone that does something harmful to a child.  That foundation, Your Honor, has been shocked and I--I want nothing to do with this.  I cannot get up in  front of this court and basically misstate what I believe for the benefit of a defense of a man who  now I don't trust, Your Honor."  (AUG 14 RT pp. 431-432.)

Later Pacello said, "I apologize if I get emotional, Your Honor.  I mean, I can't imagine getting up and  defending someone

35

1  who did that, and when I look at my beautiful children--I'm tel-
2  ling you, Your Honor, this goes against everything that I'm
3  about, every single thing that permeates my cells, my heart and
4  soul.  I will never represent a child molester when I don't be-
5  lieve they're innocent.  I can't, Your Honor."  (AUG 14 RT p.433.)

6      Later Pacello says, "I  took on the case with the idea that
7  Mr. Pawlicki and everything he told me was correct."  The court
8  replied, "Oh, please."  Pacello said, "No, no, no.  I was altru-
9  istic, Your Honor.  He fooled me.  I believed him, okay? (AUG 14
10  RT p. 434.)  A little later it appeared that Pacello was crying.
11  (AUG 14 RT p. 434.)

12      The court then asked if Pacello would not represent anyone
13  who  wasn't guilty.  Pacello acknowledged that would put him out
14  of business.  The court stated that Pacello knew exactly what
15  Petitioner was charged with and Pacello said  he was previously
16  ready to proceed.  The court then said, "...until you determined
17  he was actually guilty of this?"  Pacello said  the issue wasn't
18  his self-determination of guilt or innocence, but on the trust
19  between an attorney and his client.  (AUG 14 RT pp. 435-436.)

20      The court indicated that it had not heard a conflict that
21  would justify withdraw from the case. (AUG 14 RT p. 443.) Pacello
22  stated, "I think, with all due candor, I would be committing a
23  fraud on the tribunal by continuing my representation of Mr. Paw-
24  licki."  (AUG 14 RT p. 444.)

25      Back in open court, the court asked Ms. Lacher, the new
26  attorney that Petitioner retained,  if she would be ready for
27  trial on November 7.  She replied, "No" and the court indicated
28  she could not substitute in.  (9 RT p. 1206.)  Lacher then asked

1   to go back in chambers and explain the need for both the contin-

2   uance and the substitution.  (9 RT p. 1207.)

3       After further discussion Pacello stated the he got the sense

4   that Lacher didn't think he was doing his job.  He then informed

5   Petitioner that he was bankrolling this  case, paying people out

6   of his own pocket. (9 RT p. 1211.)  Petitioner replied that he

7   didn't know that, and couldn't know that, as Pacello had not seen

8   Petitioner since he was retained.  (9 RT p. 1212.)  The court

9   cauthioned Petitioner NOT TO SPEAK.  (9 RT p.  1212.)  Lacher and

10  the court then went into chambers.

11      Lacher informed the court she had come into contact with

12  information of "ethical  violations and reportable actions that

13  should be reported to the State Bar."  She was informed and be-

14  lieved, from talking to another attorney, John Rodriguez, and a

15  paralegal, both working with  Pacello, that Pacello had never

16  opened the "physical file," and that nobody else had opened the

17  file either, they were sent to the jail to hold his [petitioner's]

18  hand."  (AUG 14 ART pp. 449-450.)  Lacher informed the court that

19  Pacello had no investigator, and informed the court that she had

20  spoken to attorney Rodriguez who told her he had reported Pacello

21  to the State Bar because he was concerned about the representat-

22  ion Petitioner was receiving from Pacello. (AUG 14 ART pp. 451-

23  452.)  Attorney Lacher indicated that, from talking to Petitioner

24  there was a number of material witnesses that could testify as

25  to the improbability or impossibility of the alleged claims. The

26  Petitioner's sister had prepared a binder with all of this in-

27  formation and witnesses, but Pacello had not received it because

28  he had not been to see Petitioner since he was initially retained.

1   Pacello did not have an expert, as he had stated to the court,

2   to look at the SART exams or to consider any of the investigative

3   reports done by Petitioner's previous counsel. (AUG 14 ART p.453.)

4   Lacher stated that, in asking around the legal community, "there

5   are a lot of cases out there that he's not prepared for that he

6   did the same thing."  (AUG 14 ART p. 454.)

7        The court indicated that he had discussed Pacello's exper-

8   ience in front of Petitioner and Petitioner insisted on having

9   Pacello as his attorney. (AUG 14 ART pp. 455-456.) Lacher stated

10  that "the court should be concerned with ineffective counsel."

11  The court replied, "You know, I don't know if he's going to be

12  ineffective or not.  He's a member of the State Bar apparently

13  in good standing, and I'm not going to assume that he's going to

14  be ineffective before the trial starts." (AUG 14 ART p. 457.)

15       After hearing further argument in open court the court held

16  a hearing with just Petitioner and Pacello.  Petitioner stated

17  that "he hasn't come to see me once.  He's had a guy come here,

18  another attorney that worked for him, and the other attorney is

19  telling me, 'Pat, he doesn't have a big office. Everything is in

20  his bedroom.  All the boxes of discovery don't look like they've

21  been opened.  There is no private investigator.'" (AUG 14 ART p.

22  464.)

23       Pacello stated that he had an investigator named Ernie Encin-

24  as.  (AUG 14 ART p. 467.)  When the court stated that it wasn't

25  unreasonable to visit Petitioner, Pacello stated, "I've been to

26  see Mr. Pawlicki several times."  When Petitioner disagreed and

27  the court asked when he had seen Petitioner, Pacello replied,

28  "I'll have to get the jail records."  Petitioner replied that

1  "he has not been to see me one time since the very first time he

2  signed on to this case." (AUG 14 ART pp. 468-469.)

3       Petitioner indicated he had paid Pacello $4,000.00 plus 50%

4  of the money recovered from a separate civil suit that Pacello

5  had filed on his behalf. Petitioner's sister had advanced the

6  attorney Lacher $70,000.00. When the court asked if Petitioner

7  expected a "gold plated defense" for $4,000.00, Petitioner said

8  that Pacello "sold me that." (AUG 14 ART p. 474.)

9       Pacello reiterated that he had met with Petitioner "several

10 times," and "multiple times." (AUG 14 ART p. 475.) Pacello then

11 said, "it's greater than one time, greater than two times, great-

12 er than three times." (AUG 14 ART p. 477.) Pacello acknowledged

13 that he was working out of his loft apartment, but had seven

14 people working out of the loft and two full time paralegals work-

15 ing on Petitioner's case. (AUG 14 ART p. 478.) Pacello acknow-

16 ledged that "I'm new to the criminal defense world, I'll grant

17 you that." (AUG 14 ART p. 480.) Pacello then said, "I've seen

18 Mr. Pawlicki three to four to five times. I'm not exactly sure."

19 (AUG 14 ART p. 481.)

20       The court said to Petitioner, "you are, I'm sure, familiar

21 with the phrase 'you made--you made your own bed." Petitioner

22 said, "right" and the court said "and that's what you've done."

23 (AUG 14 ART p. 483.) The court said to Petitioner that he had

24 requested Pacello to represent him "in no uncertain terms" and

25 was NOT going to allow a substitution of attorney. (AUG 14ART p.

26 483.)

27       Back in open court, the court denied the motion for Lacher

28 to substitute into the case, and denied the motion by Pacello to

1  withdraw from the case. (9 RT pp. 1242-1243.)  The court stated

2  that, because of Petitioner's actions in hiring and firing attor-

3  neys, he was getting close to forfeiting his right to counsel.

4  (9 RT pp. 1246-1247.)

5              November 14, 2012--First Day Taking Evidence

6      Pacello was 30 minutes late to court, as he was "spread a

7  little thin," and was admonished by the court.  (14 RT p. 1492,

8  7 CT p. 1609.)  Mindy McFarland testified as to several incidents

9  of inappropriate behavior on the part of Petitioner.  On his

10  cross-examination of McFarland, Pacello elicited several other

11  incidents of inappropriate behavior that the court had ruled

12  were to be excluded, that Petitioner had walked in on McFarland

13  as she was changing and that Petitioner had put his crotch into

14  her face. (4 RT pp. 637-638, 14 RT p. 1648.)  McFarland was fam-

15  iliar with  this ruling, but Pacello evidently was not. (14 RT p.

16  1649.)

17              November 28, 2012

18      Deputy Heather Czerwinski testified on direct that, during

19  the execution of a search warrant, she had uncovered nude photo-

20  graphs of a young Hispanic female. (19 RT pp. 4110, 4112-4118.)

21  Pacello, apparently unfamiliar with the results of that search

22  as shown in the discovery, elicited on cross-examination that she

23  had also recovered a dildo, and a magazine of nude photographs.

24  (19 RT p. 4121.)

25              November 29, 2012

26      Pacello elicited from Sean Pawlicki that Sean had observed

27  Petitioner in bed with Brad Holt "many times" and suspected that

28  his father was homosexual. (20 RT p. 4602-4603.)  At recess the

1 prosecutor pointed out that the court had prohibited an explora-

2 tion into homosexuality in limine (4 RT pp. 629, 688), but now

3 that "the door had been opened," the prosecutor wanted to elicit

4 testimony in that area.  The court granted the prosecutor's re-

5 quest. (20 RT pp. 4604-4606.)  Pacello was evidently unfamiliar

6 with the earlier ruling.

7       December 5 & 6, 2012

8     Pacello was late to court on both days, and was sanctioned

9 $250.00 by the court. (26 RT pp. 6133, 6135-6138.)

10       December 6, 2012

11     Just after the jury had retired to deliberate, Petitioner

12 attempted to inform the court that Pacello had been sleeping dur-

13 ing the trial. (26 RT pp. 6132-6133.)

14       Post Trial--March 29, 2013

15     After the verdicts were returned, Petitioner substituted

16 attorney Lacher for Pacello as his attorney.  Lacher brought a

17 motion for new trial alleging, among other grounds, that Pacello

18 was ineffective per se. (6 CT p. 1286.)

19     The court agreed to an evidentiary hearing on the issue.

20 There was a brief discussion over whether the court or any of

21 the jurors had observed Pacello sleeping during the trial. (AUG2

22 1 RT pp. 8-10.)

23     Joshua Callington was not a paralegal, who claimed that he

24 had worked for Pacello.  Not being a paralegal, he was assigned

25 to the instant case and sat at counsel's table throughout the

26 entirety of the trial.  (AUG 21 RT p. 22.)  Callington had been

27 hired by Pacello on October 12, 2012.  (AUG1 1 RT p. 73.)

28     Callington observed Pacello sleeping repeatedly during trial.

It was usually in the morning, always more than once at a time
and typically three times during a morning, approximately three
times a week throughout the trial.  (AUG2 1 RT pp. 25-27.)  On one
occasion Callington asked Petitioner to kick Pacello to wake him
up.  (AUG2 1 RT p. 29.)

Callington observed Pacello on his Smartphone approximately
65% to 70% of the mornings, texting, sending emails, and updating
his Facebook page. (AUG2 1 RT p. 30.)  This occurred primarily
during witness testimony. (AUG2 1 RT p. 36.)  Pacello would typ-
ically spend one to three minutes at a time on his Facebook page.
(AUG2 1 RT p. 38.)  Callington acknowledged that he never inform-
ed any court personnel of his observations, although it was ack-
nowledged that Petitioner told the court that Pacello was sleep-
ing. (AUG2 1 RT pp. 46, 66.)  Callington also acknowledged that
he had an employment lawsuit pending against Pacello. (AUG2 1 RT
pp. 42-45.)

Pacello stated that he had been an attorney for 13 years,
and had been doing criminal work for one and one half years.
(AUG2 1 RT p. 78.)  Pacello had tried Petitioner's case and one
other case. (AUG2 1 RT p. 79.)

Pacello acknowledged using his Smartphone during the trial.
(AUG2 1 RT p. 81.)  He needed his phone to manage his firm as
well as his "life" and "social calendar." (AUG2 1 RT pp. 80, 109-
110.)  He acknowledged reading and sending texts, reading  and
sending emails, and updating his Facebook page. (AUG2 1 RT p.83.)
During the trial his Smartphone was on the counsel table or be-
tween his legs, and he needed his phone so he could contact his
clients and deal with "pressing matters." (AUG2 1 RT p.85.) On

1 cross examination Pacello estimated he was on the phone for

2 less than 5% of the trial. (AUG2 1 RT p. 119.)  Pacello "did

3 not recall" sleeping during the trial. (AUG2 1 RT p. 87.)

4     Pacello detailed his conflict with Petitioner. He acknow-

5 ledged that he had a "problem: with defending Petitioner bec-

6 ause he had "two daughters," and he also questioned Petitioners

7 "veracity and credibility" after looking up Lacher on the State

8 Bar website.  He told the court that "if I thought for one see-

9 ond I would get up and risk everything I worked my hard life

10 for to defend someone that did that, then I'm a fool and can't

11 do it because it violates my conscience." (AUG2 1 RT pp.88-89.)

12 Pacello was upset because he had only been paid $9,000.00 and

13 Lacher had been paid $70,000.00.  (AUG2 1 RT p. 90.)

14     Later Pacello stated, "I detest child molestation, Ms.

15 Lacher.  I only agreed to defend Mr. Pawlicki at initio, which

16 means from the beginning, because I believed in his innocence.

17 Once that bedrock was shocked, my core kicked in and I looked

18 at the pictures of my daughters and I told the judge in an em-

19 otional state that if I ever found out anyone was touching a

20 little girl, I don't know what I would do as a man and a father.

21 So I didn't think I could continue with the representation

22 having that type of problem."  (AUG2 1 RT pp. 103-104.)

23     Pacello stated that "I found it very confounding that a

24 family that reportedly had loads of money was chincing, if you

25 will, on paying the lawyer that was representing Pat." (AUG2 1

26 RT p. 91.)  Pacello acknowledged that he informed Petitioner's

27 sister and brother-in-law that unless they paid him he would

28 not "bankroll" the hiring of experts for Petitioner's defense.

43

1  (AUG2 1RT pp. 91.)   Pacello acknowledged that he could have asked

2  for funds from the county, but elected to not pursue those funds.

3  (AUG2 1 RT pp. 91-92.)

4        Pacello acknowledged that his firm operated out of his loft

5  apartment and he had nine people working out of the loft. Calling-

6  ton worked out of his own home. (AUG2 1 RT p. 121.)   Pacello had

7  people move the case discovery from his loft to Callington's home

8  "to start reviewing them."  In actuality, the unopened disc went

9  directly to Lacher from Pacello. (AUG2 1 RT p. 122.)   The court

10  sustained a relevancy objection to a question as to whether Pac-

11  ello had personally reviewed any of the discovery. (AUG2 1 RT p.

12  122.)   Pacello stated, "I hired Mr. Callington specifically to

13  review the voluminous documents, prepare summaries for me, so I

14  could rely upon them as trial counsel." (AUG2 1 RT p. 124.)

15  Pacello acknowledged that it was Callington that prepared the

16  8,000 pages of documents in the case. (AUG2 1 RT p. 92.) He also

17  stated that he sent Callington to the jail "to pacify Mr. Pawl-

18  icki's requests for jail visits when I was unavailable." (AUG2 1

19  RT p. 124.)

20        3.  Analysis

21        In Cronic (United States v. Cronic, supra, 466 U.S. 648) the

22  defendant was indicted on mail fraud charges involving a "check

23  kiting" scheme whereby checks were transferred between a bank in

24  Florida and a bank in Oklahoma.  When the defendant retained

25  counsel, he withdrew shortly before the scheduled trial date, and

26  the District Court appointed a young lawyer with a real  estate

27  practice who had never participated in a jury trial to represent

28  the defendant, but the court allowed him only 25 days to prepare

44

for trial, even though the Government had taken over four and one-half years to investigate the case and had reviewed thousands of documents during that investigation.  The defendant was convicted, but the Court of Appeals reversed, because it inferred that the defendant's right to the effective assistance of counsel under the Sixth Amendment had been violated.  Finding it unnecessary to inquire into counsel's actual performance at trial, the court based its inference on the circumstances surrounding the representation of defendant, particularly (1) the time afforded for investigation and preparation, (2) the experience of counsel, (3) the gravity of the charge, (4) the complexity of possible defenses, and (5) the accessibility of witnesses to counsel. The Supreme Court, while reversing the lower court decision, utilized these five factors. (**United States v. Cronic**, **supra**, 466 U.S. 648.)

The holding in **Cronic** was reiterated by the United States Supreme Court in **Bell v. Cone** (2002) 535 U.S. 685, 696 [122 S.Ct. 1843, 152 L.Ed.2d 914.].)  The United States Supreme Court in **Bell** explained that it "identified three situations implicating the right to counsel that involved circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. [Citation.][] First and [m]ost obvious was the complete denial of counsel. [Citation.] A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at a critical stage, [citation],... [Fn. omitted.] Second, we pointed that a similar presumption was warranted if counsel entirely fails to subject the prosecution case to meaningful adversarial testing. [Citation.] Finally, we said...where counsel is called upon to render assistance under

45

1  circumstances where competent counsel very likely could not, the

2  defendant need not show that the proceedings were affected." (Id.,

3  at pp. 695-696.)

4      Under **Cronic** and **Bell**, prejudiced is presumed only under the

5  most egrigious conditions.  Error by counsel may be presumed in

6  the rare circumstances when counsel's actions undermined the re-

7  liability of the finding of guilty, such as, when counsel repeat-

8  edly slept through the guilt phase of the trial. (e.g., **Burdine v.**

9  **Johnson** (5th Cir. 2001) 262 F.3d 336, 345), counsel was intoxicat-

10  ed during the entire trial (e.g., **State v. Keller** (1929) 57 N.D.

11  645 [223 N.W. 698]), or counsel had an actual conflict of interest

12  affecting performance (**Cuyler v. Sullivan** (1980) 446 U.S. 335 [100

13  S.Ct. 1708, 64 L.Ed.2d 333.].).

14      These cases provide illustrations of deficient representation

15  but are no means exhaustive.  Each case must turn on the particul-

16  ar facts present.  As the court stated in **Strickland v. Washington**,

17  supra, 466 U.S. 668, "[n]o particular set of detained rules for

18  counsel's conduct can satisfactorily take account of the variety

19  of circumstances faced by defense counsel." (Id.,at 688-689.)

20  Rather, the courts must "judge the reasonableness of counsel's

21  challenged conduct on the facts of the particular case, viewed as

22  of the time  of counsel's conduct." (Id., at p. 690.)  With these

23  principles in mind we turn to the conduct of  Pacello in this case.

24          Misleading the Court

25      It is axiomatic that attorney's have a statutory duty to not

26  mislead the court. (**Bus. & Prof. Code, §6068, subd. (d).**) Pacello

27  misrepresented to the court both his experience in doing felony

28  criminal trials as well as the capability of  his firm to  handle

1  this case.

2      On August 8, 2012, at the time of his first appearance in

3  this case, the following exchange took place:

4      Court:  "How many cases have you tried in terms of felony

5  trials to a verdict?

6      Pacello:  I can't even articulate that to the court because

7  it's been--I don't know how many years, Your Honor.  I've--

8      Court:  How many have you tried this year, felonies to a

9  verdict, jury trials?

10     Pacello:  As of this calendar year, I haven't had to try any

11 of my cases.

12     Court:  Okay.  How many did you do last year?

13     Pacello:  Your Honor, I can--I don't know.  I have such a

14 busy practice.  I mean, if you want me to go through the annals

15 of my case files and articulate that, I can."  (AUG 13 RT p. 423.)

16     Nearly eight minths later, on March 29, 2013, Pacello acknow-

17 ledged that he had only tried one other criminal case. (AUG2 1 RT

18 p. 79.)  Pacello deliberately misled the court on August 8, 2012;

19 he did not need to gothrough "the annals of my case files" to re-

20 call that he had only tried one other felony criminal case.

21     On August 8, 2012, Pacello stated, "I have enormous staff, I

22 have paralegals that can provide me trial notebooks, and I can get

23 this thing done and try the case." (AUG 13 RT p. 421.) On October

24 2, 2012, Pacello stated he had hired a paralegal who [has]  spent

25 hundreds of hours on this case." (8RT p. 1102.)  Callington was

26 actually hired by Pacello on October 12, 2012. (AUG2 1 RT p. 73.)

27 While it is possible that Pacello had a different paralegal work-

28 ing on the case before Callington, Pacello said specifically that

it was Callington who "start[ed] reviewing the[m]" discovery. (AUG2 1 RT p. 122.)  Pacello stated, "I hired Mr. Callington specifically to review the voluminous documents, prepare summaries for me, so I could rely upon them as trial counsel." (AUG2 1 RT p. 124.)  At the time Pacello was working out of his loft apartment. (AUG2 1 RT p. 121.)

Therefore on August 8, 2012, Pacello did not have an "enormous staff" and paralegals that could work on this case, because he had to hire paralegals to work for him.  He hired Callington to review the discovery and prepare summaries on October 12, 2012, 17 days before the scheduled start of the trial, and after he had represented to the court 10 days before that date that he had "hired a paralegal who [has] spent hundreds of hours on this case." (8RT p. 1102.)  On March 20, 2013, Pacello acknowledged that it was Callington that prepared the 8,000 pages of documents in the case. (AUG2 1 RT p. 92.)  Therefore Pacello directly lied to the court on October 2, 2012, when he stated that he had "hired a paralegal who [has] spent hundreds of hours on this case." (8RT p. 1102.)  Callington was actually hired by Pacello on October 12, 2012. (AUG2 1 RT p. 73.)

On October 2, 2012, the court asked Pacello directly, "what discovery you have reviewed yourself." (8RT p. 1114.)  Pacello just dodged around this question and never answered it. On October 19, 2012, Petitioner informed the court that he was told "all the boxes of discovery don't look like they've been opened." (AUG 14 BRT p. 464.)  Pacello did not respond to this and, ironically enough, at the March 29, 2013 hearing, the court sustained a relevancy objection to a question as to whether Pacello had

48

reviewed any of the discovery. (AUG2 1 RT p. 122), even though the question certainly was relevant to the question of Pacello's preparedness, and had been asked previously by the court.

It stands to reason that Pacello was **not** familiar with the trial file in this case, as he was **not** familiar with the court's earlier in limine rulings; on two occasions he elicited testimony from a witness on cross examination that was damaging to Petitioner's case and had been specifically excluded by the court. (14RT pp. 1648-1649, 20RT pp. 4602-4606.) On a third occasion he elicited testimony on other items of a sexual nature that had been uncovered in a search warrant of Petitioner's house, evidence that had not been elicited by the prosecutor. (19RT p. 4121.) Pacello was evidently not familiar with the results of the execution of the search warrant, information that would have been contained in discovery.

On October 19, 2012, Petitioner complained that Pacello had not been to see him one time since he had been hired. (AUG 14 BRT p. 464.) When the court stated that it wasn't unreasonable to visit Petitioner, Pacello began dodging around the issue. He first stated, "I've been to see Mr. Pawlicki several times." When Petitioner disagreed and the court asked when he had seen Petitioner, Pacello replied, "I'll have to go get the jail records." (AUG 14 BRT pp. 468-469.) Pacello reiterated that he had met with Petitioner "several times," and "multiple times." (AUG 14 BRT p. 475.) Pacello then said, "it's greater than one time, greater than two times, greater than three times." (AUG 14 BRT p. 477.) Pacello later said, "I've seen Mr. Pawlicki three to four to five times. I'm not exactly sure." (AUG 14 BRT p. 481.)

1  Just like when he asked how many felony criminal trials he had
2  tried, Pacello never directly answered the court's question, and
3  merely hemmed and hawed around an answer.  Just like his need to go
4  through "the annals of my case files" to recall that he had only
5  tried one other case, Pacello needed to "get the jail records"  to
6  determine whether he had visited Petitioner.  Of note, on March 29,
7  2013, Pacello stated that he sent Callington to the jail "to pacify
8  Pawlicki's requests for jail visits when I was unavailable." (AUG2
9  1 RT p. 124.)  This question was never directly answered by Pacello
10  but Petitioner submits that Pacello's answers were misleading to
11  the court.

### The Effect of Pacello's Lack of Experience.

13  The lack of experience of trial counsel is one of the <u>Cronic</u>
14  factors.  (<u>United States v. Cronic</u>, <u>supra</u>, 466 U.S. 648.)  Pacello
15  appeared to have little understanding of the rules of evidence. He
16  abjected to questions often.  He was almost always overruled.  An
17  analysis of the entire record of the trial indicates that Pacello
18  objected 818 times during the trial.  Only 120 of those objections
19  were sustained; 698, or 85% of his objections were overruled.

20  He had difficulty complying with the rules of evidence in ask-
21  ing questions as well.  The prosecutor lodged 952 objections to his
22  questions and 756 of those objections, or 79%, were sustained.

23  Pacello's lack of experience and **lack of understanding** of the
24  charges, and the resources available to him, was evident long be-
25  for trial began.  Lacher attached a series of email exchanges to
26  her motion for new trial.  Pacello acknowledged each of these emails
27  saying, "I adopt and ratify each and every one of them." (AUG2 1 RT
28  p. 97.)

On June 16, 2012, Pacello wrote to Petitioner's sister Linda Green, stating that he had talked to Petitioner about "what appears to be the biggest bogus case ever crafted by the ever so aggressive District Attorney. Molestation without D.N.A., are you kidding me?" (6CT p. 1467.) Pacello was evidently unaware that many, if not most of the cases of child sexual abuse are not reported immediately and very rarely is DNA evidence produced, particularly, in a case such as this, where there is a six year lag between the alleged acts and the reporting by the victims. (16RT pp. 2002-2004, 17RT pp. 3529-3531, 3606-3609.) At minimum, Pacello should have realized after talking to Petitioner that it was highly unlikely that any DNA evidence existed in this case.

On September 10, 2012, Larry Green, Petitioner's brother-in-law, informed Pacello that the county would provide a free investigator if he filled out an application request. Pacello replied, "I prefer not to have the County know what the fuck I'm doing on Pat's behalf." (6GT p. 1479.) Pacello was evidently unaware that an investigator assigned by the County but working on Petitioner's behalf would not be reporting his or her findings to the County, but would instead be reporting his findings directly to Pacello, and only Pacello.

On October 25, 2012, Pacello wrote to Larry Green, Petitioner's brother-in-law, requesting additional funds. Pacello stated that he needed at least two expert witnesses, and "no criminal defense attorney in town would ever front $10,000.00 in expert fees." (6CT p. 1473.) At the March 29, 2013 hearing, when asked if he attempted to obtain any expert fees from the County, Pacello replied, "ancillary costs on a $22 million budget deficit I think are highly

51

1 | unlikely.  But yes, it's a possibility." (AUG2 1 RT pp. 91-92.)

2 | That Pacello could have requested funds from the county is be-

3 | yond dispute.  In Taylor v. Superior Court (1985) 168 Cal.App.3d 1217,

4 | the court of appeal held that a defendant is entitled to receive

5 | funds for ancillary services even if he is not being represented by

6 | a public defender.  Similarly, in Tran v. Superior Court (2001) 92

7 | Cal.App.4th 1149, the court of appeal held that the defendant was

8 | entitled to ancillary funds even where third parties were providing

9 | money for retained counsel.

10 | One of two things happened here.  Either Pacello was unaware

11 | prior to trial that he could have asked the County for expert fees,

12 | or he elected to not bother trying to obtain funds for experts and

13 | elected to proceed without at least  one of the experts he "needed"

14 | for Petitioner's defense.  Given the record, the former is more

15 | likely than the latter; Pacello was unaware he could have obtained

16 | funds for experts or an investigator from the County.

17 | The Lack of Preparation.

18 | Insufficient preparation for trial may be constitutionally

19 | ineffective assistance of counsel. (In re Gay (1998) 19 Cal.4th

20 | 771, 798; People v. Bolin (1998) 18 Cal.4th 297, 334; see Rules of

21 | Professional Conduct, Rule 3-110.) "To render reasonably competent

22 | assistance, an attorney in  a criminal case must perform certain

23 | basic duties. [Citations.]  Generally, the Sixth  Amendment and

24 | article I, section 15 require counsel's 'diligence and active part-

25 | icipation in the full and effective preparation of  his client's

26 | case.' [Citation] Criminal defense attorneys have a "'duty to in-

27 | vestigate carefully all defenses of fact and of law that may be

28 | available to the defendant...'" [Citation] This obligation includes

52

conferring with the client 'without undue delay and as often as necessary...to elicit matters of defense...' [Citation]."'"People v. Pope, supra, 23 Cal.3d 412, 424-425, overruled on another ground in People v. Berryman (1993) 6 Cal.4th 1048, 1081, fn. 10.)

It appears from the email exchange that Pacello was retained shortly after June 16, 2012. (6CT p. 1467.) This was roughly four and a half months before the trial date. Pacello made his first appearance in the case on August 8, 2012, seven and a half weeks later. He stated then he had been "acclimating myself with the facts of the case." (AUG 13 RT p. 418.) The court stated that his filing indicated that he hadn't done anything, had not reviewed any of the discovery, and asked if Pacello was lying to him. (AUG 13 RT p. 418.) Pacello stated that his client "has significant documents" and that he "had intimate conversations multiple times" with Petitioner. He acknowledged that he had not received nor reviewed any of the discovery which totaled 8,000 pages. (AUG 13 RT pp. 416, 418-419.) It was only the next day that he obtained the over 8,000 pages of discovery. (8RT pp. 1118-1120.)

On October 2, 2012, some two months after his initial appearance, Pacello sought a continuance. He was unprepared for the "10,000 pages" of discovery that had been generated in the case, although he had "hired a paralegal who [has] spent hundreds of hours on this case." (8RT p. 102.) The truth was he didn't actually hire Callington to review the discovery and prepare summaries until October 12, 2012, 17 days before the scheduled start of the trial, as it was Callington that prepared the 8,000 pages of documents in the case. (AUG2 1 RT pp. 73, 92.) Pacello never said that he ever reviewed any of the discovery himself, despite being asked

1 the question, and got a paralegal working on the case 17 days before
2 trial, and some 118 days after the email exchange with Linda Green
3 where she agreed to send his retainer.

### The Extreme Antagonism Shown By Pacello to Petitioner.

5   A criminal defendant is guaranteed the right to the assistance
6 of counsel by the Sixth Amendment to the United States Constitution
7 and article I, section 15 of the California Constitution.  This con-
8 stitutional right includes the correlative right to representation
9 free from any conflict of interest that undermines counsel's loyalty
10 to his or her client.  (See Glasser v. United States (1942) 315 U.S.
11 60, 69-70 [62 S.Ct. 457, 86 L.Ed. 680]; People v. Douglas (1964) 61
12 Cal.2d 430, 436-439.)  "It has long been held that under both Cons-
13 titutions, a defendant is deprived of his or her constitutional
14 right to the assistance of counsel in certain circumstances when,
15 despite the physical presence of a defense attorney at trial,  that
16 attorney labored under a conflict of interest that compromised his
17 or her loyalty to the defendant."  (People v. Rundle (2008) 43 Cal.
18 4th 76, 168, disapproved on other grounds in People v. Doolin
19 (2009) 45 Cal.4th 390, 421, fn. 22.)

20   While Pacello had no problem taking Petitioner's money at the
21 beginning of the case, shortly before trial he had worked himself
22 into a frenzy of revulsion at the idea of actually defending Petit-
23 ioner.  Pacello explained that his defense was based on the trust
24 he had in his client.  He had "two beautiful daughters" and in
25 irder to represent someone accused of child molestation he had to
26 believe his client to "trust what he is telling me is true."
27 "Cold be the day before I represent someone that does something
28 harmful to a child.  That foundation, Your Honor, has been shocked

1  and I--I want nothing to do with this.  I cannot get up in front of
2  this court and basically misstate what I believe for the benefit of
3  a defense of a man who now I don't trust, Your Honor." (AUG 14 RT
4  pp. 431-432.)

5      Later Pacello said, "I apologize if I get emotional, Your Honor.
6  I mean, I can't imagine getting up and defending someone who did
7  that, and when I look at my beautiful children--I'm telling you,
8  Your Honor, this goes against everything that I'm about, every single
9  thing that permeates my cells, my heart and my soul.  I will never
10 represent a child molester when I don't believe they're innocent.
11 I can't, Your Honor." (AUG 14RT p. 433.)

12     Of course nothing had changed from the time Pacello had first
13 spoken to Petitioner,  Pacello had stated at the time of his first
14 appearance in the case, "I have spent a lot of time with Mr. Paw-
15 licki.  I'm intimately familiar with the details of the case."
16 (AUG 13 RT p. 416.)  What appears to have changed is that when it
17 actually came to trying the case, to actually defending Petitioner,
18 Pacello had decided that he couldn't do it.  He was perfectly clear
19 that representing Petitioner went against his core principals.

20     Pacello was also incensed at the ideal that Petitioner had
21 hired another attorney, although it appears likely that Petitioner
22 had hired another attorney because he hadn't seen Pacello since he
23 hired him and was informed by others working for Pacello that Pac-
24 ello had done no preparation for the case. (AUG 14BRT p. 464.)
25 Pacello explained at the March 29, 2013 hearing that he had noted
26 when he termed to be "ethical violations" on the part of Lacher
27 after reviewing her State Bar profile, "and I felt very concerned
28 about continuing representating someone that would consort with

55

1   someone of your character, Ma'am." (AUG2 1 RT p. 130.) Coming from

2   Pacello, whose own "ethical violations" in this case are well docu-

3   mented, that demonstrates a lack of touch with reality. At the very

4   least Petitioner had demonstrated in this argument that Pacello was

5   absolutely the wrong attorney for this case.

6       What really happened here was that Pacello had thought he had

7   struck the mother lode when he met Petitioner. Despite his repres-

8   entation to the court that he wasn't in this case for the money

9   (AUG 13RT p. 424), Pacello revealed his true colors when he later

10  stated that "I found it very confounding that a family  that report-

11  edly had loads of money was chincing, if you will, on paying the

12  lawyer that was representing Pat." (AUG2 1 RT p. 91.)

13                    The Lack of Attention at Trial.

14      Under the Sixth Amendment of the United States Constitution a

15  criminal defendant is entitled to the assistance of counsel at all

16  critical stages of the proceedings. (People v. Ortiz (1990) 51 Cal.

17  3d 975, 982.) That right includes the right to have an attorney

18  who pays attention to the trial in Javor v. United States (9th Cir.

19  1984) 724 F.2d 831, the court stated "Today we conclude that when

20  an attorney for a criminal defendant sleeps through a substantial

21  portion of the trial, such conduct is inherently prejudicial and

22  thus no separate showing of prejudice is necessary. (See Holloway

23  v. Arkansas (1978) 435 U.S. 475, 489-491 [98 S.Ct. 1173, 55 L.Ed.2d

24  426; cf. Rinker v.County of Napa (9th Cir. 1983) 724 F.2d 1352,

25  1354)(per curiam). [¶] Javor's sixth amendment right to counsel was violated

26  not  because of specific legal errors or omissions indicating incompetence, but

27  because he had no legal assistance during a substantial portion of

28  his trial. The magistrate's finding of no actual prejudice is not

1  controlling because regardless of counsel's participation when pre-

2  sent, when a defendant is tried in the partial absence of counsel,

3  he is prejudiced as a matter of law.  [¶] Prejudice is inherent in

4  this case because unconscious or sleeping counsel is equivalent to

5  no counsel at all.  The mere physical presence of an attorney does

6  not fulfill the sixth amendment entitlement to  the assistance of

7  counsel,..." (<u>Javor v. United States</u>, <u>supra</u>, 724 F.2d at pp. 833-

8  834.)

9       While Pacello denied sleeping during trial (AUG2 1RT p. 87),

10  he freely admitted using his Smartphone during the trial. (AUG2 1

11  RT p. 81.)  He needed his phone to manage his firm as his "life"

12  and "social calendar."  (AUG2 1 RT pp. 80, 109-110.) He acknowledged

13  reading and sending texts, reading and sending emails, and updating

14  his Facebook page. (AUG2 1RT p. 83.) He was dealing with "client

15  calls, insurance companies, other attorneys, the whole gamut."

16  (AUG2 1RT p. 110.)  During the trial his Smartphone was on the

17  counsel table or between his legs, and he needed his phone so he

18  could contact clients and deal with other "pressing matters."

19  (AUG2 1RT p. 85.)  On cross examination Pacello estimated he was on

20  the phone for less than 5% of the trial. (AUG2 1RT p. 119.)  The

21  court acknowledged that it had observed Pacello using his Smart-

22  phone during the trial. (32RT p. 7971.)

23       To borrow a colloquialism, "that ain't right."  Petitioner

24  was entitled to the undivided attention of his attorney and no

25  competent attorney would freely acknowledge communicating with

26  other clients and setting up dates for the evening <u>during</u> the

27  trial.  While the court suggested that attorneys in 2013 looked at

28  their phones during trial (32RT p. 7955), Petitioner submits that

57

the time Pacello spent on his Smartphone was no different than if
that time had been spent outside of the courtroom or sleeping; this
is nothing more than "a  partial absence of counsel." (<u>Javor v.</u>
<u>United States</u>, <u>supra</u>, 724 F.2d at p. 834.) If Pacello was only list-
ening to 95% of the witness testimony, as he admitted (AUG2 1 RT p.
119), or as little as 60% of the witness testimony, as was suggested
(AUG2 1 RT p.  30), it was a clear breach of his responsibility to
his client.

(Fn.:  Callington stated that Pacello's use of his Smartphone
during trial took place primarily in the morning. (AUG2 1 RT p. 30.)
The court later stated that Callington had said Pacello was using
his Smartphone for 65% to 70% of the day (32RT p. 7971), but this
misstates the testimony.)

E. Conclusion.

This is a lengthy record case and it is difficult to distill
what happened over 2,000,000 words--the length of the record--into
a 25,000 word brief.  There is no bright line that acts as a divis-
ion between competency, incompetency as measured under <u>Strickland</u>,
or such incompetency to amount to the constructive denial of counsel
under <u>Cronic</u>.

There are certain basic requirements that everyone might agree
are required in competent counsel.  Counsel must be honest, and can-
not mislead the court or anyone else.  Counsel must have sufficient
experience to handle the task he is hired for.  Counsel must adeq-
uately prepare for trial.  Counsel must meet with the defendant to
discuss possible defenses and trial strategy.  Counsel  must zeal-
ously represent the interests of  his client.  Counsel must  pay
attention during trial; sleeping and/or accomplishing other tasks

1  unrelated to the case at hand during the trial can never be consid-

2  ered acceptable. (See, generally, People v. Pope, supra, 23 Cal.3d

3  412, 424-425.)  Even taking the most generous interpretation of his

4  performance, Pacello fails on all accounts.

5      Pacello misrepresented his experience and his capability to

6  the court.  He did no preparation for the case until the very last

7  minute, and then did not familiarize himself with either the disc-

8  overy or the prior court rulings.  He stated  in no uncertain terms

9  that he was unprepared for trial, and decided to "wing" it.  He was

10  virulently hostile to Petitioner before trial, both because he did

11  not feel he was paid enough money and because he was morally and

12  ethically incapable of defending someone accused of child molestat-

13  ion.  His representation of Petitioner at trial demonstrated both

14  his lack of experience and his lack  of knowledge of the rules of

15  evidence.  He showed up late to court on three occasions. He brought

16  in evidence to the detriment of his client that had been previously

17  excluded by the court.  He freely acknowledged using his Smartphone

18  to send and receive texts, send and receive emails, and to update

19  his Facebook page, all during trial, and dismissed this lapse by

20  explaining that he had to manage both a busy practice and an active

21  social life.

22      This case is  one where Petitioner suffered a constructive

23  denial of counsel when, although counsel is present, "the perfor-

24  mance of counsel [is] so inadequate that, in effect, no assistance

25  of counsel is provided." (United States v. Cronic, supra, 466 U.S.

26  648, 654, fn.11.)

27      Reversal is warranted.

28  ///

## II.

**THE COURT COMMITTED REVERSIBLE ERROR BY REFUSING PETITIONER THE COUNSEL OF HIS CHOICE**

A. <u>Introduction</u>.

On October 29, 2012, the court refused to allow Petitioner to substitute Lacher as his attorney for trial, as "it will result in the disruption of the orderly processes of justice." (9RT p. 1242.) The court noted that numerous prior trial dates had been vacated and that it felt Petitioner was verging on committing misconduct. The substitution of Lacher would require a continuance and the court would not allow any more continuances. (9RT pp. 1242-1252.)

Under the circumstances of this case, the court's ruling was reversible error. Pacello was unprepared for trial, something the trial court had been apprised of by both Lacher and Petitioner. Pacello was virulently antagonistic towards Petitioner, something the trial court had been apprised of by Pacello. The court's ruling meant that Petitioner went to trial with a wholly incompetent attorney, whose failings have been well documents in Argument I, <u>infra</u>, as well as an attorney that stated that his moral and ethical beliefs prevented him from defendant Petitioner. The court was required to balance the competing values of the need to speedily determine that Pacello was **not** the attorney for this case, the court should have realized that the request for substitution was not for the purpose of further delaying the trial, but because Petitioner had a well founded concern that Pacello was incompetent. Lacher stated in chambers that "the court should be concerned with ineffective counsel." The court replied, "You know, I don't know if he's going to be ineffective or not. He's a member of the State Bar apparently in good standing, and I'm not going to assume that he's

1   going to be ineffective before the trial starts." (AUG 14ART p.457.)

2   The evidence was already there for all to see.

3   B.   The Standard of Review.

4       The denial of a motion to discharge retained counsel may not be

5   reversed absent a showing the order was an abuse of discretion.

6   (People v. Ortiz, supra, 51 Cal.3d 975, 983-984.)

7   C.   The Court Committed Reversible Error By Denying Petitioner the
       Right to Proceed With Counsel of His Choice.

8

9       A criminal defendant's right to the effective assistance of

10   counsel includes the right to retain counsel of his or her choice.

11   (People v. Gzikowski (1982) 32 Cal.3d 580, 586.) Indeed, the right

12   to counsel of one's choice is so fundamental that a criminal defend-

13   ant need not demonstrate actual prejudice resulting from the erron-

14   eous deprivation of that right; REVERSAL IS AUTOMATIC. (People v.

15   Ortiz, supra, 51 Cal.3d 975, 988.) However, the right is not abso-

16   lute, and a trial court retains discretion to deny a motion to sub-

17   stitute appointed counsel where the substitution "(1) would cause

18   '"significant prejudice."' to the defendant, e.g., by forcing him to

19   trial without adequate representation, or (2) is untimely and would

20   'result in..."disruption of the orderly processes of justice unreas-

21   onable under the circumstances of the particular case."'" (See.

22   People v. Lara (2001) 86 Cal.App.4th 139, 155, quoting from People

23   v. Ortiz, supra, 51 Cal.3d 975, 982.)

24       The court was clear that it was basing its ruling on the sec-

25   ond circumstance contemplated in Lara, that the request was untime-

26   ly. (9RT p. 1242.) Under those circumstances the courts needs to

27   engage in a balancing test, weighing the competing interests of the

28   state against the interests of the defendant. "While we have

1 | "recognized competing values of substantial importance to trial

2 | courts, including the speedy determination of criminal charges, the

3 | state should keep to a 'necessary minimum its interference with

4 | the individual's desire to defend himself in whatever manner he

5 | deems best, using any legitimate means within his resources.'

6 | [citations]. A criminal defendant's right to decide how to defend

7 | himself should be respected unless it will result in 'significant

8 | prejudice' to the defendant or in a 'disruption of the orderly pro-

9 | cess of justice unreasonable under the circumstances of the parti-

10 | cular case.' [Citation.] In other words, we demand of trial

11 | courts a 'resourceful diligence directed toward the protection of

12 | [the right to counsel] to the fullest extent consistent with effect-

13 | ive judicial administration.'" (Peope v. Ortiz, supra, 51 Cal.3d

14 | 975, 982-983.)

15 | In Lara, the court discussed at length what does and does not

16 | constitute a """disruption of the orderly process of justice un-

17 | reasonable under the circumstances of the particular case."""

18 | (People v. Lara, supra, 86 Cal.App. 4th at p. 155.) For example,

19 | there is no disruption where the defendant brings his or her

20 | difficulties with counsel to the court's attention at the first

21 | superior court hearing following arraignment, makes a request to

22 | substitute counsel two weeks before trial, the prosecution witnes-

23 | es are law enforcement officers and there is no evidence a contin-

24 | uance would prevent their appearance, and nothing points to the

25 | defendant's desire to delay trial. (Id. at pp. 159-160, discussing

26 | People v. Stevens (1984) 156 Cal.App.3d 1119.) The same is true

27 | where a request to substitute counsel is made after declaration of

28 | a mistrial and well before commencement of the second trial. (See;

1  People v. Lara, supra, 86 Cal.App.4th at p. 161, discussing People

2  v. Ortiz, supra, 51 Cal.3d 975.)

3      In contrast, when a defendant requests substitution of counsel

4  at "'literally the moment jury selectdion [is] to begin'" and the

5  court is satisfied defense counsel is ready and able to defend vig-

6  orously and competently, the disruption necessitated by substituting

7  counsel can be unreasonable under the circumstances at hand.

8  (People v. Lara, supra, 86 Cal.App.4th at p. 160, discussing People

9  v. Lau (1986) 177 Cal.App.3d 473.)  Simimarly, where the request is

10 made on the first day of trial, thus necessitating disruption, and

11 the defendant's explanation of his or her dissatisfaction with

12 present counsel suggests the true motivation is to delay the trial,

13 the disruption may again be deemed unreasonable under the circum-

14 stances at hand. (People v. Lara, supra, 86 Cal.App.4th at p. 161,

15 discussing People v. Turner (1992) 7 Cal.App.4th 913.)

16     In limited circumstances, however, a request to substitute

17 counsel made on the eve of trial nonetheless may be deemed timely.

18 In Bland v. California Department of Corrections (9th Cir. 1994)

19 20 F.3d 1469, disapproved on other grounds in Schell v. Witak

20 (9th Cir. 2000) 218 F.3d 1017, 1025, defense counsel had been held

21 in contempt for failing to appear, then subsequently failed to

22 appear at a continued hearing, prompting defendant's request for

23 substitution. (Id., at pp. 1474-1475.)  At that time, the trial had

24 already had been continued once.  More importantly, immediately

25 after denying defendant's request, the court granted another cont-

26 uance and effectively postponed the trial for another six weeks to

27 two months, and present defense counsel had not yet prepared for

28 trial.  (Id., at p. 1476.) Under these circumstances, the court

1  concluded the request for substitution was timely. (**Ibid.**)  Simi-

2  arly, in **Lara**, the defendant requested substitution on the scheduled

3  first day of trial, but there was no evidence that he did so for

4  purposes of delay.  To the contrary, the record "strongly suggest[ed]"

5  that present defense counsel "had not consulted with [defendant]

6  during numerous continuances, and [defendant] was unaware of the

7  nature of [counsel's] preparation until the moment the trial  was

8  finally set to begin. [Defendant] was faced with the start of a

9  trial in which he faced a possible third strike sentence, and he

10  was clearly upset that counsel did not seem prepared. Under the cir-

11  cumstances, [defendant] informed the court of his concerns at the

12  first possible opportunity." (**People v. Lara**, **supra**, 86 Cal.App.4th

13  at pp. 162-163.)

14     With these principles in mind, an examination of the record is

15  in order.  On March 12, 2013, the court filed an order denying a

16  motion for additional time to prepare a new trial motion. (6CT pp.

17  1430-1436.)  In this order the court summarized its view of the his-

18  tory of the case, tracing both the history of attorneys hired and

19  fired by Petitioner herein, as well as the history of trial dates

20  set in the case.  The court also set out the reasoning behind var-

21  ious rulings made during the history of the case.  Petitioner, while

22  not agreeing with the court's conclusions as to the reasons for

23  Petitioner's actions, acknowledges this order accurately reflects

24  the history of this case.

25     The court stated firmly, "defendant has endeavored to delay the

26  processing of this case at every possible stage. His primary tools

27  for injecting delay have been the hiring and firing of retained

28  counsel necessitating continuances to allow counsel to prepare.

1 (6CT p. 1430.)

2     Petitioner protested the October 19, 2012 hearing, that he was

3 not trying to delay his trial, and still maintains that position.

4 However, for purposes of this argument only, let's assume the court

5 is correct; that at the time of the October 19, 2012 hearing the

6 Petitioner had delayed his trial to that point by hiring and firing

7 various attorneys. With that in mind let's examine the October 19,

8 2012 hearing to determine if Petitioner had legitimate reasons for

9 asking for a substitution of attorneys.

10     This hearing began with Pacello filing a motion to withdraw

11 from the case. In chambers with the court, Pacello stated, "Cold

12 be the day before I represent someone that does something harmful

13 to a child. That foundation, Your Honor, has been shocked and I--

14 I want nothing to do with this. I cannot get up in front of this

15 court and basically misstate what I believe for the benefit of a

16 defense of a man who now I don't trust, Your Honor." (AUG 14 RT pp.

17 431-432.)

18     Later Pacello said, "I apologize if I get emotional, Your Honor.

19 I mean, I can't imagine getting up and defending someone who did

20 that, and when I look at my beautiful children--I'm telling you,

21 Your Honor, this goes against everything that I'm about, every

22 single thing that permeates my cells, my heart and my soul. I will

23 never represent a child molester when I don't believe they're inno-

24 cent. I can't, Your Honor." (AUG 14 RT p. 433.) Pacello concluded,

25 "I think, with all due condor, I would be committing a fraud on the

26 tribunal by continuing my representation of Mr. Pawlicki." (AUG 14

27 RT p. 444.)

28     The right to assistance of counsel, guaranteed by the Sixth

65

1   Amendment to the United States Constitution and article I, section

2   15 of the California Constitution, which includes the correlative

3   right to representation free from any conflict of interest that

4   undermines counsel's loyalty to his or her client.  "It has been

5   held that under both Constitutions, a defendant is deprived of his

6   or her constitutional right to the assistance of counsel in certain

7   circumstances when, despite the physical presence of a defense att-

8   orney at trial, that attorney labored under a conflict of interest

9   that compromised his or her loyalty to the defendant." (**People v.**

10  **Rundle**, **supra**,  43 Cal.4th 76, 168.)  "'As a general proposition,

11  such conflicts "embrace all situations in which an attorney's loy-

12  alty to, or efforts on behalf of, a client are threatened by  his

13  responsibilities to another client or a third person or his own

14  interests. [Citation.]"'" (**People v. Doolin**, **supra**, 45 Cal.4th 390,

15  417.)

16      Here Pacello (and not Petitioner) has clearly described  a

17  conflict, a conflict so extreme that Pacello believes he would be

18  committing fraud by continuing to represent Petitioner. Pacello's

19  representations do not appear to be driven by any actions attrib-

20  utable that could be associated with a desire on the part of the

21  Petitioner to delay his trial; this is simply Pacello informing

22  the court that he is incapable of defending Petitioner.  That is a

23  conflict "in which an attorney's loyalty to, or efforts on behalf

24  of, a client are threatened by his...own interests." (See; **People**

25  **v. Doolin**, **supra**, 45 Cal.4th 390, 417.)

26      Next, Lacher, the new attorney, went back into chambers with

27  the court.  Lacher informed the court that she had come  into con-

28  tact with information of "ethical violations and reportable actions

66

1  that should be reported to the State Bar." She was informed and

2  believed, from talking to another attorney, John Rodriguez, and a

3  paralegal, both working with Pacello, that Pacello had never opened

4  the "physical file," and that nobody else had opened the file either

5  as they were sent to the jail to hold his [petitioner's] hand."

6  (AUG 14 ART pp. 449-450.)   Lacher informed the court that Pacello

7  had no investigator, and informed the court that she had spoken to

8  Rodriguez who told her he had reported Pacello to the State Bar be-

9  cause he was concerned about the representation Petitioner was re-

10  ceiving from Pacello. (AUG 14 ART pp. 451-452.)   Lacher indicated

11  that, from talking to Petitioner, there was a number of material

12  witnesses that could testify as to the improbability or impossibili-

13  ty of the alleged crimes.  Petitioner's sister had prepared a binder

14  with all of this information and witnesses, but Pacello  hadn't re-

15  ceived it because he hadn't been to see Petitioner since he was

16  initially retained.  Pacello did not have an expert to look at the

17  SART exams or to consider any of the investigative reports done by

18  prior counsel. (AUG 14 ART p. 453.)   Lacher stated that, in asking

19  around the legal community, :there are a lot of cases out there

20  that he's not prepared for that he did the same thing." (AUG 14 ART

21  p. 454.)

22       Lacher has therefore apprised the court that Pacello may be

23  unprepared for the case, that he hasn't even opened the file some

24  days before trial. (AUG 14 ART p. 454.)

25       Later the court held a hearing with just Petitioner and Pacello.

26  Petitioner stated that "he hasn't come to see me once.  He's had a

27  guy come here, another attorney that worked for him, and the other

28  attorney is telling me, 'Pat, he doesn't have a big office.

67

1  Everything is in his bedroom.  All the boxes of discovery don't look

2  like they've been opened.  There is no private investigator.'"

3  (AUG 14 BRT p. 464.)

4      Therefore, Petitioner has informed the court that he has two

5  concerns, one being that Pacello has not been to see him a single

6  time after he was retained, and the second being that he has been

7  informed that Pacello hasn't even opened the boxes of discovery in

8  the case.  This second point is the same as that made by Lacher, in

9  the earlier hearing in chambers that Petitioner was not privy to.

10     The court did inquire as to whether Pacello had been to visit

11  Petitioner, stating "it [isn't] unreasonable to visit appellant."

12  Pacello just dodged around the issue.  He first stated , "I've been

13  to see Mr. Pawlicki several times."  When Petitioner disagreed and

14  the court asked when he had seen Petitioner, Pacello replied, "I'll

15  have to go get the jail records." (AUG 14 BRT pp. 468-469.) Pacello

16  reiterated that he had... "met with Petitioner several times," and

17  "multiple times."  (AUG 14 BRT p. 475.) Pacello then said "it's

18  greater than one time, greater than two times, greater than three

19  times." (AUG 14 BRT p. 477.)  Pacello later said, "I've seen Mr.

20  Pawlicki three to four to five times. I'm not exactly sure. (AUG

21  14 BRT p. 481.)

22     The court never did obtain a clear answer from Pacello as to

23  how many times he had seen Petitioner.  The court never pressed

24  Pacello on the concerns expressed by both Petitioner and Lacher,

25  that Pacello had not prepared the case.  The court did say to Pet-

26  itioner, in essence, "you've made your own bed--now go lie in it."

27  (AUG 14 BRT p. 483.)  The court also said to Petitioner that he had

28  requested Pacello to represent him "in no uncertain terms" and was

68

1 NOT going to allow a substitution of attorney. (AUG 14 BRT p. 483.)

2     Back in open court, the court denied the motion for Lacher to

3 substitute into the case, and denied the motion by Pacello to with-

4 draw from the case, citing the age of the case. (9 RT pp. 1242-1243.)

5 The court stated that because of Petitioner's actions in hiring and

6 firing attorneys, he was getting "close" to forfeiting his right to

7 counsel. (9 RT pp. 1246-1247.) Petitioner protested that he knew

8 nothing about the law, only got one hour at midnight every four

9 days [from the jail] to contact someone, and "I had no one to talk

10 to or reference to other than Mr. Pacello, and he sounded good."

11 (9 RT p. 1252.)

12     Therefore the position of the court would be that substituting

13 attorneys would further delay the trial, something that Petitioner

14 had done repeatedly before.  The position of Petitioner would be

15 that he had hired an attorney who "sounded good," but who hadn't

16 visited him, hadn't prepared the case, and unknown to Petitioner

17 but known to the court, was virulently antagonistic to Petitioner.

18     There is no question that substituting attorneys would further

19 delay the case, a case that had already been greatly delayed, but

20 was that Petitioner's purpose here?  In Lara, the defendant request-

21 ed substitution on the scheduled first day of trial but there was

22 no evidence that he did so for purposes of delay.  To the contrary,

23 the record "strongly suggest[ed]" that present defense counsel "had

24 not consulted with [defendant] during the numerous continuances,

25 and [defendant] was unaware of the nature of [counsel's] preparation

26 until the moment the trial was finally set to begin. [Defendant] was

27 faced with the start of a trial in which he faced a possible third

28 strike sentence, and he was clearly upset that counsel did not seem

1  prepared.   Under the circumstances, [defendant] informed the court

2  of his concerns at the first possible opportunity." (**People v. Lara**

3  **supra**, 86 Cal.App.4th at pp. 162-163.)  Isn't that exactly what has

4  happened here?  The record strongly suggests that Pacello had not

5  visited with Petitioner sinc he was retained; Petitioner clearly

6  stated so and Pacello dodged around the question.  The record also

7  suggests that Pacello was not prepared for this case; the  court did

8  not make this inqury of Pacello despite being informed by both Lach-

9  er and Petitioner.  The defendant in Lara was facing 36 years to

10  life; Petitioner was facing 120 years to life.

11      The court in Lara cited **People v. Lau**, **supra**, 177 Cal.App.3d

12  473, as an example of a request for substitution of counsel that was

13  untimely.  In Lau, defendant and an accomplice were charged with

14  attempted murder and assault.  Defendant was represented by private-

15  ly retained counsel.  Defendant's attorney did not appear for the

16  scheduled first day of trial and could not be located. Counsel did

17  appear the next day and explained that he believed a negotiated plea

18  disposition could be reached.  Counsel stated a plea agreement was

19  defendant's best option based on his objective evaluation of the

20  evidence. The prosecutor clarified that any negotiated disposition

21  required a plea agreement by both defendants, and the accomplice

22  refused to plea guilty.  Defendant immediately moved to discharge

23  retained counsel and claimed a conflict of interest existed because

24  coulsel believed he was guilty.  However, counsel assured the court

25  he would defend his client as best he could, and the court agreed

26  the attorney would not have been doing his job if he had not ex-

27  pressed his evaluation of the likelihood of prevailing.  The trial

28  court denied defendant's motion to discharge his retained  counsel

because there was no legally sufficient reasons supporting the motion, particularly given the late date it was being made. (Id., at pp. 477-478.)  The court noted the basic problem was defendant's disagreement with counsel's analysis and evaluation of the case against him, but found that such a difference of opinion did  not justify substitution of attorneys, "'particularly in a two defend-ant case at this point in time.'"  (Id.,  at p. 479.)

Lau held that the trial  court properly denied the defendant's request to discharge his retained counsel. The court satisfied itself that defense counsel was ready and able to defend vigorously and competently, therefore the disruption necessitated by substit-uting counsel was unreasonable under the circumstances at hand. (People v. Lau, supra, 177 Cal.App.3d 473, 479.)

In Lau, the trial court satisfied itself "that defense counsel was ready and able to defend vigorously and competently;" the trial court in this immediate case did no such thing.  Despite being advised that Pacello had not prepared the case, the court in this case did not inquire into that area and, essentially told Petition-er he was stuck with Pacello. (AUG 14 BRT p. 483.) Instead of est-ablishing Pacello's competency, the court essentially said "we'll wait and see."  (AUG 14 ART p. 457.)

The court in Ortiz required the trial court to balance the need for the speedy determination of criminal charges against a defendant's right to represent himself as he sees best. "In other words, we deman of trial courts 'a resourceful  diligence directed toward the protection of [the right to counsel] to the fullest extent consistent with effective judicial administration.'" (People v. Ortiz, supra, 51 Cal.3d 975, 982-983.) Here that balance

1 | came down to the desire to not further delay an already oft delayed
2 | trial, versus requiring Petitioner to go to trial with an incompet-
3 | ent attorney.  When informed that Pacello was likely incompetent
4 | the court replied, "You know, I don't know if he's going to be inef-
5 | fective or not.  He's a member of the State Bar apparently in good
6 | standing, and I'm not going to assume that he's going to be ineffect-
7 | ive before the trial starts. (AUG 14 ART p. 457.)  Under the circum-
8 | stances of this case, where evidence of thatincompetency was present-
9 | ed to the court but the court did not investigate further, the court
10 | committed an abuse of discretion in denying the substitution of
11 | attorneys.

12 | The right to counsel of one's choice is so fundamental that a
13 | criminal defendant need not demonstrate actual prejudice resulting
14 | from the erroneous deprivation of that right; REVERSAL is automatic.
15 | (People v. Ortiz, supra, 51 Cal.3d 975, 988.)  REVERSAL in this case
16 | is therefore warranted.

17 | III.

18 | PETITIONER'S CONVICTIONS MUST BE REVERSED BECAUSE
   | THE COURT'S ADMISSION OF PROPENSITY EVIDENCE UNDER
19 | EVIDENCE CODE SECTION 1108 DEPRIVED HIM OF EQUAL
   | PROTECTION AND HIS DUE PROCESS RIGHT TO A FAIR
20 | TRIAL.

21 | A. Introduction.

22 | The trial court violated Petitioner's rights to equal protect-
23 | ion of due process when it admitted propensity testimony under the
24 | Evidence Code section 1108.  The court first held hearings where it
25 | rules certain propensity evidence would be admitted. (4 RT p. 606-
26 | 650.)  The evidence presented by Heather Draper, Teresa Hilty, Alina
27 | Zentz, Mindy McFarland, Madison Cozart, Justine Stout, Joy Burke,
28 | Dameon Cunningham, Brad Holt, and Sean Pawlicki was all, or in part,

72

1 about uncharged sexual acts against children to show propensity.
2 This evidence rendered Petitioner's trial fundamentally unfair, and
3 violated his due process and equal protection rights.

4   Petitioner acknowledges that the California Supreme Court rej-
5 ected a due process challenge to Evidence Code section 1108. (**People**
6 **v. Falsetta** (1999) 21 Cal.4th 903; see **People v. Jennings** (2000) 81
7 Cal.App. 4th 1301, 1313.)  Similarly, Petitioner acknowledges that
8 this Honorable Court is bound by the Supreme Court's decision in
9 **Falsetta** regardless of decisions from Federal Courts of Appeal as
10 long as the United States Supreme Court has not decided the issue.
11 (**Auto Equity Sales v. Superior Court** (1962) 57 Cal.2d 450; **People v.**
12 **Superior Court (Williams)** (1992) 8 Cal.App.4th 688, 702-703.) At this
13 point, the United States Supreme Court has yet to decide whether the
14 admission of propensity evidence violates due process or equal pro-
15 tection. (**Garceau v. Woodford** (9th Cir. 2001) 275 F.3d 769, 774;
16 reversed on other grounds in **Woodford v. Garceau** (2003)538 U.S. 202
17 [123 S.Ct. 1398, 155 L.Ed.2d 363]; see **Estelle v. McGuire** (1991) 502
18 U.S. 62, 75 fn. 5 [112 S.Ct. 475, 116 L.Ed.2d 385].) As a result,
19 Petitioner herein makes this argument to preserve it for federal
20 court review, as in this immediate cause and matter now before this
21 Honorable Court.

22   B.   The Standard of Review
23   This issues raises a.... question of law, and consequently is
24 reviewed de novo by the Courts of Appeals. (**People v. Cromer**, **supra**,
25 24 Cal.4th 889, 894.)

26   C.   The Trial Court Committed Error and Violated Petitioner's
        Due Process Rights When it Admitted Propensity Evidence
27      Under Evidence Code Section 1108.

28   In Petitioner's case herein, the trial court admitted testimony

73

1  that Petitioner had engaged in "inappropriate conduct" with other

2  children, under Evidence Code section 1108.  The trial court found

3  that this evidence was relevant and probative of the charged offen-

4  ses.  It also found that the prejudicial affect of the evidence did

5  not outweigh its probative value. (4RT p. 606-650.)

6      However, this evidence violated Petitioner's due process rights.

7  The Due Process Clause "guarantees the fundamental elements of fair-

8  ness in a criminal trial." (Spencer v. Texas (1967) 385 U.S. 554,

9  563, 564 [87 S.Ct. 648, 17 L.Ed.2d 606.].)   Moreover, the "primary

10 guide in determining whether the principle in question is fundament-

11 al is...historical practice." (Montana v. Egelhoff (1996) 518 U.S.

12 37, 43 [116 S.Ct. 2013, 135 L.Ed.2d 361.].) Prior to the enacement

13 of Evidence Code sections 1108 and 1109, California and common law

14 prohibited the use of "bad acts" as evidence to prove a defendant's

15 propensity to commit the charged crime. (People v. Falsetta, supra,

16 21 Cal.4th at P. 913; People v. Johnson (2000) 77 Cal.App.4th 410,

17 410, 420; People v. Hoover (2000) 77 Cal.App.4th 1020, 1027-1028.)

18 Similarly, federal law codified the same prohibition. (Spencer v.

19 Texas, supra, 385 U.S. 554, 560-561; McKinney v. Rees (9th Cir.1993)

20 993 F.2d 1378, 1380-1386.)

21     In People v. Falsetta, supra, 21 Cal.4th at p. 917, the Calif-

22 ornia Supreme Court rejected a due process challenge to Evidence

23 Code section 1108 and this Court is bound to follow that decision.

24 (Auto Equity Sales v. Superior Court, supra, 57 Cal.2d 450.) But,

25 Petitioner urges this Honorable Court to revise these rulings in

26 light of a newer Ninth Circuit case which holds that the lower court

27 violated due process clause when it admitted other crimes evidence

28 to infer criminal propensity. (Garceau v. Woodford, supra,275 F.3d

74

769, 782, conc. Opn. O'scannlain, J., citing Natali & Stigali, Are You Going to Arraign His Whole Life?: How Sexual Propensity Evidence Violates the Due Process Clause (1996) 28 Loyola U.Chi.L.J.1, 12-13, reversed on other grounds in Woodford v. Garceau, supra, 538 U.S. 202.)

While the rule of stare decisis dictates that precedent must be followed, the rule is a flixible one. (See People v. Mendoza (2000) 23 Cal.4th 896, 924; Sierra Club v. San Joaquin Local Agency Forma-tion Com. (1999) 21 Cal.4th 489, 503-504; Moradi-Shalal v. Fireman's Fund Ins.Cos. (1988) 46 Cal.3d 287, 296.)  Courts are permitted to revisit issues where the prior opinion relates to a matter of cont-inuing concern in the community.  Similarly, courts should revisit a decision where "subsequent developments indicate an earlier decis-ion was unsound, or had become ripe for reconsideration." (Id. at p. 297; see also People v. Anderson (1987) 42 Cal.3d 1104, 1138-1141.)  Here, the Ninth Circuit's decision in Garceau is such a "subsequent development." (Ibid.)

It is true that California courts are not bound by the decis-ions of lower federal courts, particularly when the United States Supreme Court has yet to rule on the issue.  However, the lower federal court's decisions "are persuasive and entitled to great weight." (People v. Bradley (1969) 1 Cal.3d 80, 86; Etcheverry v. Tri-Ag Service Inc. (2000) 22 Cal.4th 316, 320-321.) In People v. Soto (1998) 64 Cal.App.4th 966, 987-988, the court noted that Evid-ence Code section 1108 is based on Rules 413, 414 and 415 of the Federal Rules of Evidence.  As a result, the federal courts' decis-ions were particularly compelling in determining the admissibility of Evidence Code section 1108 evidence. (Accord, People v. Falsetta

1 | supra, 21 Cal.4th at p. 912.)

2       The United States Supreme Court has approved the introduction
3  of other crimes evidence for a limited number of reasons.  This evi-
4  dence can be offered to prove intent, identity, an element of the
5  offense, malice, motive, common plan or design, and to impeach or
6  rebut defense evidence.  Admission of other crimes evidence for any
7  other reason arguably violates due process in the absence of a lim-
8  iting instruction. (Spencer v., Texas, supra, 385 U.S. 554, 560-561)

9       However, the United States Supreme Court has yet to decide
10 whether the use of uncharged offenses to prove defendant's propens-
11 ity to commit crimes violates due process. In Estelle v. McGuire,
12 supra, (1991) 502 U.S. 62, 75, fn. 5, the court failed to reach
13 this issue stating, "we express no opinion whether a state law would
14 violate the Due Process Clause if it permitted the use of 'prior
15 crimes' evidence to show propensity to commit a charged crime."
16 But several federal circuit courts have found that the  admission
17 of other crimes evidence for purposes other than "to show conduct
18 in conformity therewith" without  a limiting instruction violates
19 a  defendant's due process rights. (Garceau v. Woodford, supra,
20 275 F.3d at p. 774; see e.g., Panzavecchia v. Wainwright (5th Cir.
21 1981) 658 F.2d 337, 341; Murray v. Superintendent, Ky. State Peni-
22 tentiary (6th Cir. 1981) 651 F.2d 451, 453.)

23       In McKinney v. Rees, supra, 993 F.2d 1378, 1384, the Ninth Cir-
24 cuit  held that where no permissible inferences could be drawn from
25 other crimes evidence, the admission of such evidence violates due
26 process.  (See also Jammal v. VanDeKamp (9th Cir. 1991) 926 F.2d
27 918, 920.)  The court also deemed propensity or "bad character"
28 evidence "contrary to firmly established principles of Anglo-Americ-

1   an jurispredence."  (McKinney v. Rees, supra, 993 F.2d at p. 1380-

2   1386.)  In Garceau, the court stated that even where there is a

3   permissible inference to be drawn from other crimes evidence, the

4   admission of such evidence violates due process rights if the jury

5   is "invited to draw the additional inference of criminal propensity."

6   (Garceau v. Woodford, supra, 275 F.3d at p. 776.)

7        However, another panel of the Ninth Circuit approved the use of

8   propensity evidence in sex offense cases.  In United States v. LeMay

9   (9th Cir. 2001) 260 F.3d 1018, 1027, the court upheld the constit-

10  utionality of Federal Rule of Evidence, Rule 414, on which Evidence

11  Code section 1108 is largely based.  In Le May, the appellate court

12  concluded that Rule 414's admission of propensity evidence in child

13  molestation cases did not violate due process.  The evidence was

14  admissible because the court was required to weigh its probative

15  value against its prejudicial effect under  Rule 403. (Id., at pp.

16  1026-1027.)

17       Despite the conflict between the holdings in Garceau and LeMay,

18  as of this date, the Ninth Circuit has not yet resolved the dispar-

19  ity between the decisions through an en banc decision. However, the

20  reasoning in Garceau is more persuasive in light of the historical

21  analysis.

22       In People v. Falsetta, supra, 21 Cal.4th at p. 903, the Calif-

23  ornia Supreme Court acknowledged the longstanding rule against the

24  admission of propensity evidence.  However, the court refused to

25  find that rule to be a "fundamental unalterable constitutional

26  principle" given the specific "ambivalence" about prohibiting other

27  sex crimes evidence in sex offense cases. (Id., at p. 914; People

28  v. Fitch (1997) 55 Cal.App.4th 172, 179-181.) But prior to Falsetta,

77

1 trial courts were prohibited from admitting this evidence to prove

2 propensity. This type of evidence could only be admitted to prove

3 common plan or scheme, motive intent, knowledge, identity, or, in

4 sex cases, lack of consent. (Evidence Code §1101, subd. (b).)

5     Moreover, the "substantial protections" afforded defendants by

6 Evidence Code sections 1108 and 1109 often prove illusory. (People

7 v. Falsetta, supra, 21 Cal.4th at p. 915.) In Falsetta, the court

8 found that Evidence Code section 1108 would guard against "undue

9 unfairness in its limited exception to the historical rule against

10 propensity evidence." Evidence Code sections 1108 and 1109 are sup-

11 posed to limit other prior offenses to those indisputably relevant

12 to demonstrating a propensity to commit similar crimes. But there

13 is no de facto limitation. Unlike Rule 414 of the Federal Rule of

14 Evidence, the Evidence Code section 1108 and 1109 categories of

15 "similar" offenses are so broadly defined that the uncharged offen-

16 ses may have no tendency in reason to show propensity to commit the

17 current crime. For example, in People v. Escobar (2000) 82 Cal.App.

18 4th 1085, 1093-1094, a five year old incident of mutual physical

19 contact was used to show defendant's propensity to shoot his wife.

20 In this case a nearly 40 year history of completely different con-

21 duct involving children was used to show Petitioner's propensity

22 to molest his daughter and step-children.

23     Similarly, Evidence Code section 352 does not act as a suffic-

24 ient limit on the admission of propensity evidence. The standards

25 for admission and review under Evidence Code section 352 are insuf-

26 ficient. In fact, the standard is so lax that it is impossible in

27 many cases to properly review a trial court's decision for an abuse

28 of discretion. (See People v. Taylor (2001) 26 Cal.4th 1155, 1169

78

1  ["a court need not expressly weigh prejudice against probative

2  value or even expressly state that it has done so, if the record as

3  a whole shows the court was aware of and performed its balancing

4  functions under section 352."].)  Contrary to the federal rules,

5  it cannot be said that trial courts make the sort of "reasoned, re-

6  corded" statements of its [] decision needed "'because of the sens-

7  itive nature of the balancing test set in these cases...'" (See;

8  United States v. Castillo (10th  Cir. 1998) 140 F.3d 874, 884,

9  quoting United States v. Guardia (10th Cir. 1998) 135 F.3d 1326,

10  1331-1332.)  Nor has Evidence Code section 352's safeguard  been

11  particularly reliable. (See e.g., People v. Harris (1998) 60 Cal.

12  App.4th  727, 736-737 ["probative of what?"].)

13      Consequently,  Evidence Code sections 1108 and  1109 do  not

14  provide defendants sufficient protection that these sections do pro-

15  vide is sorely inadequate.  As a result,  the admission of propens-

16  ity evidence, under Evidence Code section 1108 deprived Petitioner

17  of due process.

18      D.  The Trial Court Committed Error And Violated Petitioner's
           Equal Protection Rights When It  Admitted Propensity
19         Evidence Under Evidence Code Section 1108.

20      The equal protection clause of the Fourteenth Amendment to the

21  United States Constitution declares: "No state shall...deny to any

22  person within its jurisdiction the equal protection of the laws."

23  California's Constitution similarly states: "A person may not be...

24  denied equal protection of the laws." (Cal.Const., art. I, §7,

25  subd. (a).) "'"The equality guaranteed by the equal protection

26  clauses of the federal and state Constitutions is equality under

27  the same conditions, and among persons similarly situated.  The

28  Legislature may make reasonable classifications of persons  and

79

1  other activities, provided the classifications are based upon some

2  legitimate object to be accomplished."'" (People v. Rhodes (2005)

3  126 Cal.App.4th 1374, 1383, quoting People v. Spears (1995) 40 Cal.

4  App.4th 1683, 1687.) "' The concept of the equal protection of the

5  laws compels recognition of the proposition that persons similarly

6  situated with respect to the legitimate purpose of the law receive

7  like treatment.'" (In re Gary W. (1971) 5 Cal.3d 296, 303.)

8       As the California Supreme Court recently explained, "'"The first

9  prerequisite to a meritorious claim under the equal protection

10  clause is a showing that the state has adopted a classification

11  that affects two or more simarly situated groups in an unequal man-

12  mer." [Citations.] This initial inquiry is not whether persons are

13  similarly situated for all purposes, but "whether they are similarly

14  situated for purposes of the law challenged." [Citation.]'" (See;

15  People v. McKee (2010) 47 Cal.4th 1172, 1218-1219, quoting Cooley v.

16  Superior Court (2002) 29 Cal.4th 228, 253.)

17       Being similarly situated with others who receive different

18  treatment under the law does not necessarily mean that the challeng-

19  ed statute violates equal protection guarantees. Instead, a finding

20  that a defendant is similarly situated requires the court to deter-

21  mine whether the statutorily authorized difference in treatment

22  withstands the appropriate level of scrutiny. In resolving equal

23  protection issues, the United States Supreme Court has used three

24  levels of analysis. Distinctions in statutes that involve suspect

25  classifications or touch upon fundamental interests are subject to

26  strict scrutiny, and can be sustained only if they are necessary to

27  achieve a compelling state interest. Classifications based on gen-

28  der are subject to an intermediate level of review. But most

1  legislation is tested on to determine if the challenged classific-

2  ation bears a rational relationship to a legitimate state purpose.

3  (See Romer v. Evans (1996) 517 U.S. 620, 635 [116 S.Ct.1620,  134

4  L.Ed.2d  855]; Kasler v. Lockyer (2000) 23 Cal.4th 472, 481-482;

5  Warden v. State Bar (1999) 21  Cal.4th 628, 641.)  If a statute

6  neither implicates a fundamental right nor operates to the singular

7  disadvantage of a suspect class, only a rational relationship to a

8  legitimate state  purpose is necessary to uphold the constitutional

9  validity of the legislation, (Kubik v. Scripps College (1981) 118

10  Cal.App.3d 544,  552; Niedle v. Worker's Comp. Appeals Bd. (2001)

11  87 Cal.App.4th 283, 288-289.)

12      In California, propensity evidence is admitted only in sex

13  cases (Evid. Code §1108), domestic violence cases (Evid.Code §1109),

14  and elder abuse cases (Evid. §1109).  However, it is excluded in all

15  other criminal prosecutions.  Consequently,  Evidence Code sections

16  1108 and 1109 violate the Equal Protection Clause.

17      The Legislation may make reasonable classifications among per-

18  sons, entities, and activities.  However, these classifications must

19  not be arbitrary.  And the classification must be based on some dif-

20  ferences between the classes which bears substantial relation to a

21  legitimate governmental objective. (In re Kapperman (1974) 11 Cal.

22  3d 542, 545; People v. Goslar (1999) 70 Cal.App.4th 270.)  When

23  specific classification impinges on a fundamental constitutional

24  rught, it is subject to strict scrutiny.  The state bears the burd-

25  en to establish not only that the classification is justified by a

26  compelling interest, but also that the distinctions drawn by the

27  statute are necessary to advance its purposes. (People v. Olivas

28  (1976) 17 Cal.3d 236, 251.)

1    Petitioner herein acknowledges that several courts have re-
2    jected an equal protection challenge to Evidence Code sections
3    1108 and 1109.  (People v. Jennings, supra, 81 Cal.App.4th at pp.
4    1310-1313; People v. Price (2004) 120 Cal.App.4th 224, 240-241;
5    People v. Waples (2000) 79 Cal.App.4th 1389, 1394-1395; People v.
6    Fitch, supra, 55 Cal.App.4th 172, 184-185.)  However, the reason-
7    ing in these cases is flawed.  For example, in Jennings, the court
8    initially determined that the defendant failed to demonstrate
9    "that domestic violence defendants are 'similarly situated' with
10   respect to all other criminal defendants." (People v. Jennings,
11   supra, 81 Cal.App.4th at p. 1311.)  However, the court failed to
12   explain in what way domestic violence defendants were different
13   or not "similarly situated" with other defendants.  In particular,
14   the court failed to address  how a defendant accused of a crime
15   in a domestic violence context is different from a defendant who
16   committed the same crime but was  not involved in a domestic vio-
17   lence relationship with the victim.

18   The Jennings court next discussed the equal protection anal-
19   ysis of Evidence Code section 1109.  The court assumed that domes-
20   tic violence offenders are similarly situated to other defendants.
21   However, the court rejected Petitioner's argument that strict
22   scrutiny applied.  The court found that Evidence Code section 1109
23   "does not infringe a defendant's right to due process, a fair
24   trial, or conviction by proof beyond a reasonable doubt." (see;
25   People v. Jennings, supra, 81 Cal.App.4th 1312, citing People v.
26   Falsetta, supra, 21 Cal.App.4th at p. 910-922.)  But the court's
27   admission of propensity evidence does in fact violate due process.
28   (See subsection C, ante.)  As a result, strict scrutiny should

1 | apply.  Under that standard, a statutory enactment cannot be up-
2 | held unless the government shows a compelling state interest
3 | which justifies the law and legitimizes the distinction drawn by
4 | the statutory classification. (Serrano v. Priest (1971) 5 Cal.3d
5 | 584, 587; People v. Terflinger (1978) 77 Cal.App.3d 302.) The
6 | state bears the burden to establish not only that the classificat-
7 | ion is justified by a compelling interest, but also that the dist-
8 | inctions drawn by the statute are necessary to advance its purpos-
9 | es.  (People v. Olivas, supra, 17 Cal.3d 236, 251.)
10 |     In Petitioner's case herein, the compelling state interest
11 | behind the introduction of evidence under Evidence Code section
12 | 1108 is the prosecution of sexual abuse offenses.  The Legislature
13 | has determined that "By their very nature, sex crimes are usually
14 | committed in seclusion without third party witnesses or substant-
15 | ial corroborating evidence.  The ensuing trial often presents
16 | conflicting versions of the event and requires the trier of fact
17 | to make difficult credibility determinations." (People v. Falsetta
18 | supra, 21 Cal.4th 903, 915.)  But the deficiency in the statute
19 | lies in the relationship between the interest and the means chosen
20 | by the Legislature in Evidence Code section 1108.  By permitting
21 | the virtual wholesale admission of prior sexual  abuse evidence,
22 | regardless of whether there were witnesses to the offense, the
23 | section is over-inclusive.
24 |     Conversely, Evidence Code section 1108 is also under-inclus-
25 | ive because the statute is limited to sexual abuse cases  despite
26 | the fact that other types of offenses are also often committed in
27 | secret.  For example, murder, particularly premeditated murder,
28 | typically is committed in a manner to avoid detection and in the

absence of witnesses.  Nevertheless, a defendant charged with
murder does not have to fear the admission of propensity evidence.
On the contrary, a defendant in a sexual abuse case will often
face the daunting task of not only defending against the current
charge, but also remote and minor past instances of sexual  abuse.
Given the lack  of precision between the ends sought to be accom-
plished by the Legislature and the imprecise means it has chosen
in Evidence Code section 1108, the statute fails to pass the
strict scrutiny test.  As a result, Evidence Code section 1108
violates equal protection and must be struck down as being
unconstitutional.

### CONCLUSION

As stated at the outset,  Petitioner could not have made a
worse choice for trial counsel.  Pacello's representation of the
Petitioner herein was not just ineffective, but was so ineffect-
ive that it warrants **remand for new trial**  and a complete  rever-
sal under a per se basis of prejudice.

Petitioner did recognize his mistake in hiring Pacello, and
wanted to go to trial with new counsel,  but the court refused
to allow the substitution citing delays that had taken place in
the case.  The court was made aware that Pacello may have been
unprepared for trial, but refused the substitution of counsel.

Therefore, the court's ruling was REVERSIBLE  ERROR.
Finally, the court admitted substantial propensity evidence,
under Evidence Code section 1108.  Petitioner makes the argument
that Evidence Code section 1108 is unconstitutional for the
purpose of Federal review.

///

84

1 Dated: March 17 , 2016.

2                               Respectfully submitted,

3

4                               *Patrick Stanley Pawlicki*

5                               PATRICK STANLEY PAWLICKI,
                                Petitioner in Propria Persona

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# VERIFICATION

## STATE OF CALIFORNIA
## COUNTY OF SAN DIEGO

( C.C.P. SEC. 446 & 2015.5; 28 U.S.C. SEC. 1746 )

I, Patrick S. Pawlicki DECLARE UNDER THE PENALTY OF PERJURY
THAT : I AM THE Declarant/Prisoner         IN THE ABOVE ENTITLED ACTION;
I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF AND THE SAME IS
TRUE OF MY OWN KNOWLEDGE , EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION, AND
BELIEF, AND AS TO THOSE MATTERS , I BELIEVE THEM TO BE TRUE.

EXECUTED THIS ___**17th**___ DAY OF **March, 2016** AT R.J.D.
STATE PRISON, 480 Alta Road, San Diego,  CA 92179

(SIGNATURE) *Patrick S. Pawlicki*
(DECLARANT/PRISONER)
PATRICK S. PAWLICKI

## PROOF OF SERVICE BY MAIL

(C.C.P. SEC. 1013 (a) & 2015.5; 28 U.S.C. SEC. 1746 )

I, Patrick S. Pawlicki , AM A RESIDENT OF R.J.D. STATE PRISON, IN THE COUNTY
OF S.D.   STATE OF CALIFORNIA; I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND AM/AM
NOT A PARTY OF THE ABOVE-ENTITLED ACTION. MY STATE PRISON ADDRESS IS: R.J. Donovan
Correctional Facility, 480 Alta Rd., D-18-105 L, San Diego, CA  92179

ON February    , 2016 I SERVED THE FOREGOING:

PETITION FOR WRIT OF HABEAS CORPUS

(SET FORTH EXACT TITLE OF DOCUMENT IS SERVED)
ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY(S) THEREOF, ENCLOSED IN A SEALED ENVELOPE
(S), WITH POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO
PROVIDED AT Richad J. Donovan Correctional Facility

| | |
|---|---|
| Office of the Clerk | Office of the Attorney General |
| United States District Court | 110 W. "A" Street, Ste. 1100 |
| Southern District of California | San Diego, CA  92101 |
| 221 West Broadway | |
| San Diego, CA  92101 | |

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS
REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO
ADDRESSED. I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

## Appellate Courts Case Information

### CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

Supreme Court

Change court

*Court data last updated: 03/09/2016 10:46 AM*

Docket (Register of Actions)

### PEOPLE v. PAWLICKI
### Case Number S225378

| Date | Description | Notes |
|------|-------------|-------|
| 03/30/2015 | Petition for review filed | Defendant and Appellant: Patrick Stanley Pawlicki Attorney: Stephen M. Hinkle     Court of Appeal record electronically imported. |
| 04/22/2015 | Record requested | |
| 04/27/2015 | Received Court of Appeal record | two doghouses ( volume 1 & 2 ) |
| 05/14/2015 | Time extended to grant or deny review | The time for granting or denying review in the above-entitled matter is hereby extended to and including June 26, 2015, or the date upon which review is either granted or denied. |
| 06/10/2015 | Petition for review denied | |
| 06/19/2015 | Returned record | 2 doghouses |

**Click here** to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy    © 2016
Judicial Council of California / Administrative Office of the Courts

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Patrick Stanley Pawlicki
AN-9292

**DEFENDANTS**
Daniel Paramo

**FILING FEE PAID**

MAR 24 2016

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b)** County of Residence of First Listed Plaintiff    San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Patrick Stanley Pawlicki
480 Alta Rd
San Diego CA 92179

Attorneys *(If Known)*

**COPIES SENT TO**

Pro Se

16CV0721 AJB MDD

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | ☐ 820 Copyrights | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | **LABOR** | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 710 Fair Labor Standards | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | Act | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 720 Labor/Management | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | | Relations | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | | ☐ 751 Family and Medical | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | | Leave Act | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | | ☐ 790 Other Labor Litigation | Act |
| | Medical Malpractice | | | ☐ 791 Employee Retirement | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | Income Security Act | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☒ 530 General | | ☐ 871 IRS—Third Party | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | | 26 USC 7609 | |
| | Employment | **Other:** | | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration | | |
| | | ☐ 560 Civil Detainee - | Actions | | |
| | | Conditions of | | | |
| | | Confinement | | | |

Above "SOCIAL SECURITY" section: ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g))

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28:2254
Brief description of cause:
Petition for Writ of Habeas Corpus

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
03/24/2016

SIGNATURE OF ATTORNEY OF RECORD
s/SKHoestenbach

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



PATRICK PAWLICKI AN9292
R J Donavan Correctional Facility
Facility D, Bldg D18-105
480 Alta Road
San Diego, CA 92179

Hasler
03/21/2016
US POSTAGE          PRIORITY MAIL
$06.80⁰
ZIP 92179
011D11648136

California Department of
Corrections and Rehabilitation

Legal
Mail

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
221 WEST BROADWAY
SAN DIEGO, CA 92101

Legal
Mail

RECEIVED

Legal
Mail



3/18/16

LEGAL MAIL