**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICK STANLEY PAWLICKI,<br><br>                          Petitioner,<br><br>v.<br><br>DANIEL PARAMO, Warden,<br><br>                         Respondent. | Case No.: 16cv0721-AJB (MDD)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Patrick Stanley Pawlicki (hereinafter "Petitioner") is a California state prisoner proceeding pro se with a Second Amended Petition for a Writ of Habeas Corpus. See 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") Petitioner was convicted in the San Diego County Superior Court on seven counts of committing a lewd act upon a child under 14 years of age, for which he was sentenced to 105 years-to-life in prison. (Second Amended Petition ["SAP"] at 1-2 [ECF No. 34].) He alleges his federal constitutional rights were violated because: (1) his trial counsel was so ineffective it amounted to a constructive absence of counsel within the meaning of United States v. Cronic, 466 U.S. 648, 658-59 (1984) (holding that denial of the right to be represented by counsel at a critical stage of a criminal trial mandates reversal

without any inquiry into prejudice) (claim one); (2) the denial of his request to substitute counsel two weeks before the trial was set to begin was the result of judicial bias which amounted to judicial misconduct (claim two); (3) prosecutorial misconduct occurred when the prosecutor withheld evidence, seized a computer hard drive without a warrant, and introduced irrelevant and inflammatory testimony of jailhouse informants, and when the investigating officer lied to Petitioner's friends and neighbors while interviewing them (claim three); (4) he is actually innocent (claim four); (5) he received ineffective assistance of trial counsel within the meaning of Strickland v. Washington, 466 U.S. 668 (1984) (holding that relief is available where counsel made errors so serious he was not acting as the counsel guaranteed by the Sixth Amendment, which prejudiced the defense by undermining confidence in the outcome of the trial) (claim five); (6) he was denied counsel of his choice by the denial of his motion to substitute counsel two weeks before trial was set to start (claim six); and (7) the introduction of evidence of his prior sexual misconduct with minors to show he had a propensity to commit the current offenses violated his rights to due process and equal protection (claim seven). (SAP at 6-9; Mem. of P&A in Supp. of SAP ["SAP Mem."] at 2-68 [ECF No. 34].)

Respondent has filed an Answer [ECF No. 50], with an attached Memorandum of Points and Authorities in support [ECF No. 50-1], along with two Notices of Lodgment [ECF Nos. 51, 58]. Respondent argues that claims two, three and five are procedurally defaulted, and claims two through six are untimely and unexhausted. (Mem. of P&A in Supp. of Answer ["Ans. Mem."] at 3-9, 12-22 [ECF No. 50-1].) Respondent also contends claims two through seven lack merit, and the state court adjudication of claim one, the only timely and exhausted claim, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (Id. at 9-22.)

Petitioner replies that he has exhausted his state court remedies by presenting all of his claims to the state supreme court in a habeas petition, that he can overcome any procedural bar by showing he is actually innocent, and that his claims merit habeas relief.

(Traverse at 1-10 [ECF No. 53].) He has also filed three Notices of Lodgment presenting additional evidentiary support for his claims. (ECF Nos. 56, 57, 59.)

For the reasons stated in this Report, the Court finds that state court remedies have been exhausted as to all claims, that all claims are timely, and that Respondent has not shown that claims two, three and five are procedurally defaulted. Federal habeas relief is unavailable as to claims one, six and seven because the state court adjudication of them is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Although it is unclear what level of deference is to be accorded the state court adjudication of the remaining claims, it is unnecessary to resolve that issue because they clearly fail under a de novo review. The Court recommends the Petition be denied.

# I. **PROCEDURAL BACKGROUND**

On October 28, 2009, a Complaint filed in the San Diego County Superior Court charged Petitioner with nine counts of committing a lewd act on a child under 14 years of age in violation of California Penal Code § 288(a). (Lodgment No. 1, Clerk's Transcript ["CT"] at 1-7 [ECF No. 51-1-8].) It was alleged that the acts were committed while the victims were under 18 years of age and the commencement of the criminal action occurred before the victims' 28th birthdays within the meaning of Penal Code § 801.1(a), that the offenses were committed against more than one victim within the meaning of Penal Code § 667.61 (b), (c) & (e), and that Petitioner had substantial sexual conduct with each victim within the meaning of Penal Code § 1203.066(a)(8). (Id.)

On October 30, 2009, Petitioner appeared with retained counsel Kerry Armstrong and was released on a one million dollar bail bond. (CT 1512.) A preliminary hearing was held on December 10, 2009, and a nearly identical eight-count Information was filed on January 5, 2010, dropping one count. (CT 9-15, 1518.) Petitioner was arraigned that day, and a trial date was set for June 15, 2010. (CT 1520.)

On April 1, 2010, the court granted Petitioner's request to substitute newly retained counsel Thomas Matthews for Armstrong, and a second trial date was set for October 5,

2010.  (CT 1521; Lodgment No. 5, Augmented Reporter's Tr. ["ART"] at 2-3 [ECF No. 51-14-26].)   On August 18, 2010, Matthews moved to be relieved on the basis that Petitioner said he had hired a new attorney and secretly recorded his conversations with Matthews' staff which contained "potentially serious charges of misconduct," and would refrain from contacting the authorities if Matthews refunded his retainer.  (Lodgment No. 3 at 1-10 [ECF No. 51-12].)  Matthews told the court that in his opinion Petitioner "has concocted this farcical scheme for the simple purposes of extorting me out of fees earned, and to potentially buy more time on his case by bringing in a third attorney."  (Id. at 6.)

On August 20, 2010, attorney Demosthenes Lorandos specially appeared and informed the court that he was ready to replace Matthews as retained counsel but only if there was a continuance until the next Spring.  (ART at 4-17.)  Lorandos said that Petitioner had accused a contract paralegal named Headly who worked for Armstrong and Matthews of misconduct, including breaching the attorney-client privilege by informing Petitioner's bail bondsman that Petitioner had a passport other than the one he turned in to the court and might be a flight risk, misrepresenting himself as an attorney, telling Petitioner "he had relatives in Louisiana, who, for $250,000, could eliminate the complaining witnesses," and threatening Petitioner if he disclosed the misconduct.  (CT 1523; ART 4-17, 38-44.)

The court granted Matthews' motion to be relieved, but stated that it had gotten "the slightest sense that this matter is being delayed by substituting attorneys any time [Petitioner] is unhappy with whatever his attorneys are telling him."  (ART 18-27.)  When Petitioner denied changing counsel to obtain delays, the court replied: "Frankly, I don't believe you.  I think you are manipulating the system.  You are trying to obtain a delay in the trial of charges that could land you in prison for life.  The understanding is going to be that you are going to have a new lawyer here on that next date or you're going to represent yourself."  (ART 26.)

On September 8, 2010, about eight months after Petitioner was arraigned, Lorandos appeared as retained counsel of record, asked for and was granted a continuance, and a third "firm" trial date was set for February 22, 2011.  (CT 1524; ART 35-90.)   On

December 27, 2010, the matter was assigned to the trial judge, Hon. Louis R. Hanoian, who presided over all further proceedings. (CT 1529.) On January 18, 2011, a discovery hearing was held and Lorandos' request for a continuance of the trial date due to the large amount of discovery and the need for investigation was granted, the February 22, 2011 trial date was converted to the date for a follow-up discovery motion, and a "soft" trial date was set for August 30, 2011. (CT 1530-31; ART 145-238.) On February 22-23, 2011, several discovery motions were heard, and a fourth trial date was set for September 27, 2011. (CT 1533-38.) A defense motion for a continuance was granted on August 19, 2011, and a fifth trial date was set for November 28, 2011. (CT 1541-43.) On September 6-7, 2011, the trial court heard about half the 50 pretrial motions filed in this case. (CT 1544-61.)

Petitioner failed to appear at a status conference on October 28, 2011, and a bench warrant was issued for his arrest. (CT 1563-64.) He appeared in court on November 15, 2011, following his extradition from Georgia. (CT 1566.) He was ordered held without bail after the prosecutor informed the court that Petitioner had been apprehended by bounty hunters hired by his bail bondsman while preparing to obtain false identification and board a cargo ship to China. (ART 253-54.) At that hearing, Petitioner said attorney Lorandos told him "this is the most corrupt court system in the country in San Diego, that the judge used to be a D.A. I believe you are innocent, but they are not going to let you have any evidence. The best thing to do is pack up your stuff and split and head to Georgia." (ART 258-59.) Petitioner said Lorandos also told him: "I want another $600,000 over the million you have given me or I am going to quit."[1] (ART 258-59.) A sixth trial date was set for January 9, 2012. (ART 260-61.)

Lorandos filed a motion to be relieved as counsel, contending Petitioner had fabricated the allegations against him. (Lodgment No. 3 at 11-16.) On November 18, 2011, a hearing was held on the motion to withdraw, although the motion was never argued

---

[1] Petitioner later said he paid Lorandos $640,000 (Lodgment No. 17 at 397 [ECF No. 58-2]), and still later said he paid him $425,000. (Lodgment No. 20 at 462 [ECF No. 58-5].)

because Petitioner fired Lorandos at that hearing and informed the court he was in the process of retaining attorney Vikas Bajaj. (CT 1567-68, 1663; ART 268-72.) The Office of the Public Defender was appointed pending retention of attorney Bajaj, who was never retained, and a status conference was set for December 15, 2011 to give Petitioner time to retain new counsel. (CT 1573-74; ART 272, 404.)

On December 15, 2011, nearly two years after Petitioner was arraigned, retained counsel Dante Pride substituted in for the public defender, and the January 9, 2012 trial date was converted to a status conference with the understanding that a "firm" trial date would be set at that time. (CT 1575; ART 375-81.) On January 9, 2012, a seventh trial date was set for June 18, 2012, and Pride was informed that there would be no further continuances. (CT 1576, 1663.) On February 1, 2012, Petitioner entered a guilty plea to failure to appear for trial while released on bail in violation of Penal Code §§ 1320.5 and 12022.1(b). (CT 1688-92.)

On March 22, 2012, Pride moved to withdraw as counsel on the basis that Petitioner had only paid 3% of his retainer. (Lodgment No. 3 at 17 [ECF No. 51-12].) Pride had informed the court upon being substituted in that he did not consider himself qualified to try the case and intended to hire a more experienced trial attorney while Pride handled the writs and motions, but was unable to hire a trial attorney due to Petitioner's failure to pay the retainer. (ART 382-86; Lodgment No. 6, Reporter's Transcript ["RT"] at 1247-48 [ECF No. 51-27-58].) On April 2, 2012, the court granted Pride's motion to be relieved, and appointed the public defender based on Petitioner's inability to pay Pride. (CT 1581, 1663.) Attorney Mel Epley appeared as Petitioner's appointed public defender, but on May 4, 2012, the public defender's office conflicted out because they represented the jailhouse informants who eventually testified at trial that Petitioner solicited them to destroy evidence and kill witnesses. (CT 1582-83; RT 1248.)

On May 14, 2012, the trial date was vacated and alternate public defender Zaki Zehawi was appointed. (CT 1584.) On June 5, 2012, an eighth trial date was set for October 29, 2012, and attorney Zehawi indicated that although he had not yet reviewed all

the discovery he would do everything he could to be ready to go to trial on that date. (CT 1585; ART 409.) Petitioner asked if he could still retain counsel, and the trial judge said: "Sure. Just make sure that counsel is ready to proceed with trial." (CT 1664; ART 415.)

On August 8, 2012, two years and seven months after the arraignment, and about 12 weeks before trial was set to begin, retained attorney Raymundo Pacello appeared and requested to be substituted in for alternate public defender Zehawi. (ART 411.) Zehawi informed the court that based solely on his heavy caseload, which included several cases with more serious charges which were set for trial before this one, he intended to request a continuance of the trial date until April 2013. (ART 412, 420.) Attorney Pacello indicated that he had spent a lot of time with Petitioner, was intimately familiar with the details of the case, was an experienced trial attorney with an "enormous staff," and was "ready, willing and able to proceed" to trial as scheduled. (ART 416-21.) The court asked Pacello about his experience in serious sex offenses and felony trials, confirmed Petitioner wanted Pacello as his chosen counsel, and granted Pacello's motion, but only after advising him that no further continuances would be granted and that two of Petitioner's previous attorneys had requested to be relieved for lack of payment. (CT 1587, 1664; ART 424.) Pacello said he had already been paid $9000, would not seek to be relieved for lack of payment even if he did not receive additional funds, and would be ready to go to trial as scheduled. (CT 1664; ART 424-27.)

On October 2, 2012, four weeks before trial was set to begin, Pacello sought a 60-day continuance based on the nearly 10,000 pages of discovery, and said it had become clear it would be difficult to proceed to trial on time despite having hired multiple people and having spent hundreds of hours preparing. (RT 1100-27.) The motion was denied, although the trial date was continued for a week to accommodate the judge's trial schedule, and a ninth trial date was set for November 7, 2012. (CT 1589; RT 1127-31, 1145.)

On October 19, 2012, about two weeks before trial, attorney Pam Lacher moved to substitute in for Pacello, and Pacello moved to withdraw as counsel of record. (CT 1590-91.) Lacher informed the court that Petitioner had contacted her five weeks earlier and

retained her to replace Pacello, but she was not ready to go to trial and asked for the same six-month continuance alternate public defender Zehawi wanted. (RT 1206-42.) Pacello stated that by retaining Lacher without first informing him and paying her $70,000 which should be spent on the defense, he had undermined the trust upon which the attorney-client relationship is based. (RT 1201-06.) Pacello then told the trial judge, in camera, apparently while crying, that Petitioner had "fooled" him into believing he was innocent, and that Pacello has "two beautiful daughters" and: "I can't imagine getting up and defending someone who did that, and when I look at my beautiful children . . . this goes against everything that I'm about, every single thing that permeates my cells, my heart and my soul. I will never represent a child molester when I don't believe they're innocent. I can't." (Lodgment No. 18 at 433-34 [ECF No. 58-3].) Pacello later admitted he would go out of business if he represented only innocent clients, and clarified that the issue was not his determination regarding Petitioner's guilt or innocence, but the trust between an attorney and a client. (Id. at 435-36.) The prosecutor opposed both motions on the basis that Petitioner had engineered the circumstances to further delay the trial. (RT 1227-28.)

The court denied Lacher's motion to substitute into the case because she could not be ready to go to trial as currently scheduled, noted that the six-month continuance Zehawi mentioned was based on upcoming trials on more serious cases and had never been formally requested, and denied Pacello's motion to withdraw because the reasons he provided in camera did not amount to a conflict of interest or a breakdown in the attorney-client relationship. (RT 1231-33, 1242-44.) The trial judge told Petitioner he could still fire Pacello but he would either have to represent himself or retain someone who was ready to go to trial, and Petitioner indicated he did not want to represent himself. (RT 1244, 1255.) The trial judge warned Petitioner that if his conduct in hiring and firing attorneys were to rise to the level of misconduct he risked forfeiting his right to counsel under King v. Superior Court, 107 Cal.App.4th 929, 944 (2003) ("Where a defendant engages in a course of misconduct towards counsel that is unprovoked and intended to cause counsel to withdraw and to delay or disrupt proceedings, and it reasonably appears that measures to

curtail the misconduct are inadequate or futile, the right to counsel may be forfeited. . . . [I]n instances where the misconduct does not rise to the most serious level, a warning should be given.") (CT 1591, 1664; RT 1244-1257.)

Jury selection began on November 8, 2012, and the trial lasted 14 court days before submission to the jury, ending on December 10, 2012, when the verdicts were reached. (CT 1597-1650.) It involved 44 prosecution witnesses (RT 1493-5034, 5830-35), 16 defense witnesses (RT 5039-5829), 8168 pages of discovery (RT 1118), 30 defense and 20 prosecution motions (Lodgment No. 2 at 601 [ECF No. 51-11]), and by Petitioner's count 818 defense objections of which 120 (15%) were sustained, and 954 prosecution objections of which 756 (79%) were sustained. (Lodgment No. 8 at 2, 59 [ECF No. 51-60].)

On December 10, 2012, after deliberating two days, the jury found Petitioner guilty of touching the breasts (count one) and vagina (count two) of his 12-year old stepdaughter Christina C. with his hand, forcing her to touch his penis with her hand (count three), and touching her vagina with his penis (count 4), touching the vagina of his 9-year old daughter Bonnie P. who suffers from Down syndrome with his penis (count 6), and touching her crotch with his hand (count 8), and touching his penis to the anus of Michael S., his 11-year old stepson (count 7). (CT 1646-59.) He was found not guilty on count five, touching Bonnie P. with his hand in bed. (CT 1655.) The jury returned true findings on the allegations that: (a) the acts were committed while the victims were under 18 years of age and the commencement of the action occurred before the victims' 28th birthdays, (b) the offenses were committed against multiple victims, and (c) Petitioner had substantial sexual conduct with each victim. (Id.)

On January 9, 2013, the date set for sentencing, Petitioner fired Pacello and Lacher substituted in as Petitioner's retained counsel. (CT 1660, 1665.) Lacher requested a six-month continuance in order to investigate and file a new trial motion based on ineffective assistance of Pacello. (Id.) The trial judge informed Lacher that allegations of ineffective assistance of counsel would not be entertained on a new trial motion because such claims were properly brought on habeas, and granted a three-month extension of time to file a new

trial motion. (CT 1665-67.) On February 14, 2013, the court denied Lacher's motion for reconsideration of her request for a continuance. (CT 1661.) Lacher filed a second motion for reconsideration on March 8, 2013 (CT 1666), and on March 12, 2013, the court issued a 7-page opinion denying the motion, which, as set forth below, the appellate court adopted as a procedural history of Petitioner's representation. (CT 1662-68.)

On March 25, 2013, Lacher again sought reconsideration of the denial of her motion for a continuance, arguing that she had been counsel of record for only 74 days, was not yet in possession of all the discovery, the trial proceedings had not yet been fully transcribed, and forcing her to file a new trial motion at that time would violate Petitioner's rights to effective assistance of post-trial counsel, due process, and a fair opportunity to present a motion for a new trial. (CT 1109-11.) The prosecutor opposed the motion, arguing that Lacher had not filed motion papers, and had not been diligent because she had delayed ordering the trial transcripts and had been given access to over 8000 pages of discovery but had only taken possession of 328 pages. (CT 1248-65.)

Lacher filed a motion that same day to disqualify the trial judge based on allegations that: (a) she previously appeared in the trial judge's court numerous times but had never been treated the way she was treated in this case, which included discourteous allegations of lack of diligence, a refusal to accommodate her schedule, a comment on her failure to file papers when she was not given an opportunity to do so, and a failure to hear oral argument on the second motion for a continuance, (b) the trial judge had formed an opinion that Petitioner hired and fired attorneys as a ploy to delay the proceedings without an adequate inquiry into the reasons for substitution of counsel, some of which occurred before he was assigned to the case, (c) the trial judge denied Petitioner his choice of counsel when he denied Lacher's pretrial motion to substitute for Pacello because the judge was aware that Pacello was unprepared, inexperienced and unqualified, and (d) the trial judge refused to give Lacher sufficient time to prepare a motion for a new trial, all of which led her to believe that the judge had violated three cannons of judicial ethics (integrity, impartiality and competency), and had lost the ability to remain impartial. (CT 1112-

1241.)  On March 26, 2013, the judge issued an order striking Lacher's verified statement of disqualification and finding no basis for disqualification.  (CT 1242-46.)

On March 28, 2013, Lacher filed the new trial motion which alleged that: (1) Pacello had a conflict of interest because he commented to Petitioner that child molestation goes against his core beliefs since he has two daughters, and was not paid, or was underpaid, because Petitioner paid Lacher while Pacello was representing him; (2) Pacello was essentially absent from trial because he spent the majority of his time during trial sleeping or using his cell phone to update his Facebook page, check emails, and read or send text messages; (3) the trial court erred when it refused to relieve Pacello prior to trial and threatened Petitioner with losing his right to counsel, thereby denying Petitioner his right to counsel of his choice; and (4) each of the foregoing resulted from a lack of impartiality of the trial judge.  (CT 1286-1481.)

On March 29, 2013, the court held an evidentiary hearing on the new trial motion at which four people testified: Pacello, paralegal Joshua Callington who sat with Pacello at the defense table throughout the trial, paralegal Jason Ahlering who worked in Pacello's office, and Juror No. 8.  (Lodgment No. 7 at 21-160 [ECF No. 51-59].)  As set forth in detail below, although Callington testified that he observed Pacello sleeping or using his cell phone 65 to 70 percent of the time during trial, he was impeached in several respects, whereas Pacello denied ever sleeping and said his cell phone use was de minimis, the trial judge and the prosecutor never noticed Paclleo asleep or inattentive, and none of the seven jurors who attended the new trial hearing observed Pacello sleeping during trial.  (Lodgment No. 7 at 21-160 [ECF No. 50-59].)

The motion for a new trial was denied on April 2, 2013.  (CT 1673.)  The trial judge found: (1) there was no conflict arising from funding because Pacello had been paid $9000 up front and had unequivocally represented to the court that he would not seek to be relieved for lack of further payment, and there was no conflict regarding Pacello's personal belief that he does not like child molestation because it did not affect his representation; (2) there was no credible evidence to support the allegations that Pacello was sleeping at

trial or using his cell phone so often that it amounted to a constructive absence from the trial within the meaning of <u>Cronic</u>, and even if counsel's conduct was deficient in any respect there was no prejudice under <u>Strickland</u> because the jury was entitled to and did believe the testimony of the victims, which was corroborated by Petitioner's own statements and a consciousness of guilt from his flight; (3) Petitioner was not denied counsel of his choice because he was not prevented from firing his retained counsel, and was merely warned that misconduct could result in the forfeiture of his right to counsel; and (4) there was no impartiality on the part of the trial judge. (RT 7966-77.) Petitioner was sentenced to 105 years to life on the sex offense counts, plus an additional six years on the failure to appear while released on bail count. (CT 1674; RT 7982-83.)

Petitioner appealed, alleging that: (1) the denial of his motion to substitute Lacher for Pacello before trial amounted to a denial of his right to counsel of his choice (claim six here); (2) he was denied due process and equal protection by the admission of evidence of prior sexual misconduct with minors because it was introduced to show he had a propensity to commit the crimes for which he was on trial (claim seven here); and (3) Pacello provided ineffective assistance because he: (a) misrepresented his background and experience to Petitioner and the trial court, (b) failed to prepare for trial, (c) lacked a basic understanding of the rules of evidence which resulted in eliciting damaging testimony which had been excluded in pretrial motions, (d) did not seek public funding to hire a second expert witness, (e) exhibited extreme antagonism to Petitioner arising from a conflict of interest involving Petitioner diverting defense funds by hiring and paying Lacher, or from Pacello's personal views on child molestation, and (f) spent a considerable amount of time during trial sleeping and using his cell phone (claims one and five here). (Lodgment No. 8 [ECF No. 51-60].) The appellate court affirmed. (Lodgment No. 11, <u>People v. Pawlicki</u>, No. D063728, slip op. (Cal.App.Ct. Feb. 24, 2015) [ECF No. 51-63].) As to the ineffective assistance of trial counsel claim, the appellate court addressed the allegations that Pacello slept and used his cell phone so often that it amounted to a constructive absence of counsel under <u>Cronic</u> (claim one here), but refused to address the remaining allegations of

ineffective assistance without prejudice to present them on state habeas because they were properly analyzed on habeas under <u>Strickland</u> (claim five here). (<u>Id.</u> at 31-32.)

On March 27, 2015, Petitioner filed a petition for review in the state supreme court presenting a single claim, alleging he was denied his right to counsel under <u>Cronic</u>, but asking the court to review the appellate court's parsing of the allegations of ineffective assistance and review trial counsel's performance as a whole. (Lodgment No. 12 [ECF No. 51-64].) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 13, <u>People v. Pawlicki</u>, No. S225378 (Cal. June 10, 2015) [ECF No. 51-65].)

On June 3, 2016, Petitioner filed a habeas petition in the state supreme court in which he raised claims one through six presented here, along with other claims. (Lodgment No. 14 [ECF No. 51-66].) On July 27, 2016, the state supreme court denied the petition with an order which stated: "The petition for writ of habeas corpus is denied. (See <u>People v. Duvall</u> (1995) 9 Cal.4th 464, 474; <u>In re Waltreus</u> (1965) 62 Cal.2d 218, 225; <u>In re Dixon</u> (1953) 41 Cal.2d 756, 759; <u>In re Swain</u> (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, <u>In re Pawlicki</u>, No. S234957, order (Cal. July 27, 2016) [ECF No. 51-67].)

## II.   **TRIAL PROCEEDINGS**

The following statement of facts is taken from the appellate court opinion affirming Petitioner's conviction on direct review. This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981). Direct citations to the record are provided below where necessary.

### A.   *Factual Summary*

Tammy S., the mother of Christina C. and Michael S., met defendant in 2003 through a Christian mingle Internet site. Christina C. was then 12 years old and her brother Michael S. was then 11 years old. The family lived in Ohio, where Tammy S. received public assistance because of a brain disability.

Tammy S. and her two children came to San Diego to meet defendant in April 2003. Defendant met the family at the airport and immediately proposed marriage to Tammy S. The family stayed at defendant's house, located in Santa Ysabel, for about a week. Also then living at defendant's house were his two children from another relationship, Bonnie P., then aged nine and Aaron P., then aged 10. Bonnie P. was born with Down syndrome and, according to her birth mother and defendant's former wife, Lucie P., Bonnie P. functioned at the level typical of a three- to seven-year-old child. Lucie P. lived with her partner in a separate house on defendant's property.

During their initial week-long visit with defendant, Christina C. testified she, her mom (i.e., Tammy S.), Bonnie P. and defendant all slept in the same bed in defendant's bedroom. Each night defendant slept next to Christina C., Bonnie P. slept on the other side of defendant and Tammy S. slept next to Bonnie P. (but not defendant). Christina C. stated they all slept in the same bed because it was cold outside and the bedroom was the only room heated.

Christina C. testified that on the second or third night of their visit, defendant touched her breasts and vagina. Christina C. did not then tell her mother about the touching because her mother seemed happy to be with defendant and because defendant told Christina C. not to tell anyone. When the visit ended, Tammy S. and her two children returned to Ohio to plan Tammy S.'s wedding to defendant and their permanent move to California. [¶] Tammy S. and defendant married in Las Vegas in November 2003. Also present at the wedding was Christina C., Michael S., Bonnie P., Aaron P. and one of defendant's friends, Brad Holt.

Christina C. testified after her mother and defendant married defendant continued to touch Christina C. in the vaginal and breast area. The touching occurred in the nighttime in the bed in defendant's bedroom. According to Christina C., the touching began about a week after the wedding, and she estimated defendant touched her sexually thereafter three or four times a week. Defendant's touching consisted of rubbing Christina C.'s breasts under her clothing, skin-to-skin, and putting his hand down her pants and rubbing her vagina and the inside of her vagina, skin-to-skin. Defendant also grabbed Christina C.'s hand and put it on his penis. Christina C. testified this touching was "common."

Christina C. testified the touching escalated into intercourse, including when her mother, Tammy S., was present in the room. Defendant also kissed Christina C. while touching her. About a month after the wedding, defendant

told Christina C. that she was a better wife to him than her mother. Defendant also told Christina C. that she was "good with (her) hands." Christina C. said she felt "dirty" when defendant touched her or made her touch him; that she did not then tell her mother about any of defendant's touching because her mother would not believe her; and that she did not know if her mother knew about defendant's touching because her mother often slept on the couch in the living room.

Christina C. also testified that sometimes defendant would roll over and she could feel "movements" between defendant and Bonnie P. Christina C. described how defendant also would take Bonnie P. into his bedroom, lock the door and then come out of the room about 20 minutes later in his underwear. Christina C. said it was "common" for defendant to take Bonnie P. into his bedroom alone. Christina C. saw defendant put his hand up Bonnie P.'s skirt, into her vaginal area, when they were in defendant's truck on their way to school.

Christina C. testified defendant made sexual comments about her in her presence and in the presence of others. For example, she testified defendant said, "I'm good with my hands, just ask Crissy" (i.e., Christina C.) when they were at a restaurant. Christina C., Tammy S., Michael S., Bonnie P., Aaron P. and Lucie and her partner were present when defendant made this comment. Christina C. understood this comment to reference defendant's touching of her at night. In response, Christina C. called defendant an "idiot." According to Christina C., her mother did not respond to defendant's comment.

Around this same time, defendant asked Christina C. if she carried condoms in her purse and, as noted, commented, including in front of Tammy S., that Christina C. was a better wife than her mother. According to Christina C., her mother said nothing when defendant made such comments. Defendant also commented that Christina C. had a "'nice butt'" after he made her and Bonnie P., but not the boys, pull down their pants (including underwear) when punishing them with a belt.

At some point, Christina C.'s maternal grandmother needed surgery. As a result, Tammy S. took Christina C. and Michael S. back to Ohio to live. Christina C. testified defendant did not stop touching her until they moved back to Ohio.

Michael S. testified he was 11 years old in 2003 when his mother, Tammy S., married defendant. Michael S. testified shortly after they moved in with defendant he heard noises similar to crying coming from defendant's

master bathroom.  When Michael S. walked inside the bathroom, he saw Bonnie P. "bent over" the toilet.  Defendant was standing behind Bonnie P. and his penis was penetrating Bonnie P.  Michael S. was "shocked" and stood "frozen" when he saw defendant having intercourse with Bonnie P.

Michael S. testified defendant hit him on the back with a belt buckle as he tried to walk away from defendant.  Michael S. fell to the ground. Defendant next put his forearm under Michael S. shoulder, pressed Michael S.'s face against the floor and got on top of Michael S.  Defendant next pulled down Michael S.'s pants and inserted his penis into Michael S.'s rectum. Michael S. testified it hurt.  Defendant continued to penetrate Michael S. for what seemed like "forever," then finished, and said, "'Just don't speak of anything.'"  After defendant left, Michael S. went to check on Bonnie P. Michael S. did not then tell his mother about the attack because he was embarrassed.

The record shows defendant bragged to others about having sexual contact with Christina C.  For example, when defendant and Justine C., a relative of defendant's former wife Lucie P., were alone in defendant's house, defendant told Justine C. that Tammy S. "made" him have sex with her daughter Christina C.

Justine C. also testified when she was about 10 or 11 years old, she and her "little cousin," who was not yet old enough to walk, were in defendant's bedroom when defendant showed them "porn" on the television.  According to Justine C., when they were all sitting on defendant's bed he put on a video of two naked "girls doing sexual things."  On another occasion defendant told Justine C. he secretly set up a video camera to catch Lucie and her partner, who, as noted, lived in a separate house on the same property, having sex.

Neighbor Todd Fichter testified that defendant talked about sex each time they were together, including in front of Fichter's wife; that defendant asked Fichter if he and his wife ever came to defendant's house at night and looked through the window to watch defendant and his new wife (not Tammy S.) having sex; and that on one occasion, defendant came unannounced to Fichter's house early in the morning and when Fichter said during their conversation that he had once lived with a former girlfriend who had a teenage daughter, defendant responded, "Are you into little girls? Are you into your own girls?"

With respect to this last conversation, Fichter testified that defendant talked about an "ex-girlfriend" from Ohio who had a daughter.  Defendant

said that the "mother and her daughter" both slept in his bed; that when they were all sleeping in the bed together someone touched him, which caused him to become sexually aroused; that he began to touch the person back, including "her breasts," and they engaged in sexual intercourse; and that when he opened his eyes he realized he had intercourse not with his "ex-girlfriend," but instead with her 12–year–old daughter.

Fichter testified that defendant described this incident in a "sickening, sadistic way" and that defendant was smiling from "ear to ear" as he told the story. According to Fichter, defendant made it clear he was "proud" to have had sexual intercourse with a 12 year old. Defendant also told Fichter during this same conversation that it was the "best sex ever" and the experience opened up his eyes to having sexual encounters with "younger women."

The record shows defendant also told his dentist and friend from high school, Michael Bradbury, that he was "very interested in mother-daughter sex relationships." Defendant told Dr. Bradbury he had married a woman from Ohio and, according to Dr. Bradbury, defendant was "giddy and happy and arrogant" about the fact this woman, who Dr. Bradbury later met, had a daughter. Dr. Bradbury testified defendant talked to him about having sex with a "variety of women," including Lucie's partner, who defendant said he wanted to "fuck." Defendant also told Dr. Bradbury in or around 2002 or 2003 that he wanted to grab Dr. Bradbury's wife's "tits," which led Dr. Bradbury to reprimand defendant.

Dr. Bradbury's wife, Rhonda Bradbury, testified that when Tammy S. and defendant were married Tammy S. came to the dental office for treatment. At some point later in time, after defendant met his then "new" wife, defendant told Rhonda that his marriage to Tammy S. had been short; that he sent Tammy S. back to Ohio because she was "lazy"; that her daughter (i.e., Christina C.) "had inappropriately revealed herself sexually to his son Sean"; and that Christina C. had "slipped" into bed with he and Tammy S. one night and he believed he was having sexual intercourse with Tammy S. when it turned out to be Christina C. Rhonda testified that defendant made it known he enjoyed the "mistake" and that, in her view, defendant knew it was not a "mistake" as he enjoyed having sexual intercourse with Christina C.

Defendant also told his friend and business partner, Brad Holt, about an incident when he was in bed with Christina C. and Tammy S. Holt testified that defendant said he was awakened when "somebody" began to fondle his penis. Defendant told Brad he initially thought it was Tammy S. touching him but then realized it was Christina C.

Defendant's son, Sean Pawlicki, testified defendant used to "joke around" about having sex with Christina C. Sean testified when he was 13 years old, defendant made sexual comments to one of Sean's girlfriends, and that as Sean got older, defendant continued to make such comments and/or advances to Sean's girlfriends.

In 2009, defendant told Sean that he was being investigated for child molestation and that he and his then new wife were moving to the Philippines with their young daughter. With regard to the investigation, defendant told Sean that while he had been sleeping, Christina C. had "jerk(ed) him off." Defendant also told Sean he "play(ed)" with Christina C.'s breasts, which defendant noted were "firmer" than Tammy S.'s.

## B. *Procedural Summary*

As discussed *post*, after the jury verdict defendant filed a motion to continue the probation and sentencing hearing, and he *only* received a three-month continuance of that hearing instead of the *six* months he requested, he then moved several times for reconsideration of that order. In denying defendant relief, the court in its March 12, 2013 order set forth the following procedural summary, which is highly relevant to the issues(s) on appeal:

"On March 8, 2013, defendant Patrick Pawlicki, filed a Second Motion for Reconsideration to allow a continuance of the sentencing date for counsel to file a motion for new trial on the ground of ineffective assistance of counsel. For the reasons set forth below, the motion is denied.

"This matter has been lingering in the San Diego Superior Court since October of 2009. Defendant has endeavored to delay the processing of this case at every possible stage. His primary tools for injecting delay have been his hiring and firing of retained counsel necessitating continuances to allow counsel to prepare.

"Defendant initially retained Kerry Armstrong as his attorney in 2009, and trial was set for June 15, 2010. Thomas Matthews was retained by defendant and substituted in for Mr. Armstrong in April 2010. The trial date was continued to October 5, 2010. Demosthenes Lorandos of Ann Arbor, Michigan, was retained, appearing for the first time on September 8, 2010. Trial was continued to February 22, 2011.

"The case was assigned for all purposes to Department 54 on December 27, 2010. On January 18, 2011, the February trial date was vacated and a

fourth trial date was set for September 27, 2011, providing counsel fully nine months to prepare. As the trial date approached defendant was granted another continuance until November 28, 2011 (fifth trial date). On October 25, 2011, prior to a final status conference scheduled for October 28, 2011, Mr. Lorandos filed a motion to withdraw, based, in part, on Lorandos' claim his fee had not been paid by defendant. Defendant failed to appear at the status conference on October 28, 2011. The $1,000,000 bail bond was ordered forfeited and a bench warrant issued. On October 31, 2011, the November trial date was vacated.

"Defendant was arrested outside of Atlanta, Georgia. When he appeared in San Diego on November 15, 2011, following his extradition from Georgia, a sixth trial date was set for January 9, 2011. At the hearing on Mr. Lorandos' motion to withdraw, defendant accused Lorandos of advising him to flee the jurisdiction at lunch prior to the status conference and further stated Mr. Lorandos was not worth the $600,000 he had been paid up to that point. Defendant fired Mr. Lorandos.

"The court appointed the Public Defender on November 28, 2011, to represent defendant while he endeavored to hire new counsel. On December 15, 2011, Dante Pride substituted in as retained counsel and the January trial date was vacated. On January 9, 2012, a seventh trial date was set for June 18, 2012. Counsel was told there would be no further continuances. On April 2, 2012, Mr. Pride filed a motion to withdraw as counsel for, among other reasons, defendant's failure to pay his fees. When defendant confirmed the failure to pay and claimed his inability to pay, the Court reappointed the Public Defender.

"The Public Defender was relieved when it was revealed that clients of the Public Defender were potential witnesses in the case against defendant. The Alternate Public Defender was appointed May 4, 2011, and confirmed May 14th. After checking for potential conflicts and finding none, an eighth trial date was set October 29, 2012. The parties were told no continuances would be granted. When defendant asked the Court if he would be allowed to hire retained counsel, the Court specifically told defendant he could hire anyone he wanted, but no continuances of the October 29th trial date would be granted to his retained counsel.

"On July 10, 2012, Raymundo Pacello filed a 'Notice of Retained Counsel' and motion to continue. The Court set a hearing for August 8, 2012, to determine if Mr. Pacello would be permitted to substitute in for the Alternate Public Defender. At the hearing the Court advised Mr. Pacello and

16cv0721-AJB (MDD)

defendant that no continuance of the case would be granted. Mr. Pacello represented to the Court he would be ready for trial and that he was an experienced trial attorney and he insisted he would be ready for trial without the need for a continuance. The Court (in)quired of Mr. Pacello about his experience in serious sex offense cases, felony jury trials and generally his qualifications to accept this case. (See, *People v. Ramirez* (2006) 39 Cal.4th 398, 424.) After this colloquy defendant was asked if he wished to substitute Mr. Pacello for the Alternate Public Defender. When defendant stated Mr. Pacello was his chosen counsel the Court allowed the substitution and confirmed the trial date.

"Mr. Pacello filed a motion to continue on September 17, 2012. The motion was heard on October 2nd, and the case was continued to November 8, 2012. On October 19, 2012, Mr. Pacello moved to withdraw as counsel and Pamela Lacher moved to substitute in. Both motions were denied. Defendant was warned that his conduct as it relates to the attempts to hire and fire could be construed to constitute misconduct such that he may ultimately forfeit his right to counsel. (*King v. Superior Court* (2003) 107 Cal.App.4th 929, 944.)

"Jury trial commenced in November of 2012. The taking of evidence took 13 court days. Verdicts were reached December 10, 2012, and sentencing was scheduled for January 9, 2013.

"On January 9, 2013, Ms. Lacher moved to substitute in for Mr. Pacello as retained counsel. Defendant confirmed his desire to hire Ms. Lacher and Mr. Pacello was relieved. The Court did not remove Mr. Pacello as counsel of record; defendant fired him and hired Ms. Lacher.

"Once Ms. Lacher was confirmed as counsel, she moved to continue the sentencing a minimum of six months. She argued that she was planning to file a motion for new trial, mainly on the issue of ineffective assistance of counsel and she needed to review all the discovery in the case, conduct additional investigation and also required a full transcript of the trial proceedings to prepare the motion.

"Because Ms. Lacher stated she needed six months to review all discovery, conduct additional investigation and obtain, read and digest a transcript of the trial proceedings, the Court determined a motion for new trial was not the appropriate vehicle to determine competence of trial counsel in this case. (*People v. Cornwell* (2005) 37 Cal.4th 50, 100-101.) In appropriate circumstances, a trial court should consider a claim of ineffective assistance

16cv0721-AJB (MDD)

of counsel in a motion for new trial, because '*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial court level.' (*People v. Smith* (1993) 6 Cal.4th 684, 695.) That process is appropriate where the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion. (*People v. Cornwell, supra,* at p. 101.) 'In appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is able to determine the effectiveness issue on such motion, it should do so.' (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; *People v. Cornwell, supra,* at p. 101.) This case does not present the situation where the issue can be decided based on the Court's observation of the trial alone.

"The issues related to the competence of defendant's *retained* attorney are issues which will require full airing in habeas corpus. This Court has no intention of holding an evidentiary hearing akin to full habeas corpus review in the context of a motion for new trial. There is no right to an evidentiary hearing in connection with a motion for new trial; the trial court has discretion to hold such a hearing. (*People v. Duran* (1996) 50 Cal.App.4th 103, 113.) Counsel was told that no evidentiary hearing would be held on the issue.

"Notwithstanding the Court's ruling it would not be taking evidence in connection with a motion for new trial on the competency of counsel issue, the Court granted counsel almost 3 months to prepare and file defendant's motion for new trial.

"Current counsel has been in defendant's employ at least since October 19, 2012, when she tried to substitute in as counsel of record prior to trial. She was employed by defendant when the jury reached its verdicts on December 10, 2012. At no time during the trial did counsel attempt to contract with the court reporter for a transcript of the trial proceedings. After the jury reached its verdict, Ms. Lacher did not contract with the reporter to obtain a transcript. When she substituted into the case on January 9, 2013, she did not contract with the reporter for a transcript. As of the time counsel filed her motion for reconsideration of her continuance request on January 25, 2013, she had not ordered a transcript. At the February 14, 2013, hearing on the reconsideration motion, counsel still had not ordered a transcript and claimed her funding had dried up. Testimony at trial indicated that more than $600,000 had been spent on defendant's representation, suggesting that the refusal to fund the motion for new trial was yet another attempt to manipulate and delay the proceedings in this case.

16cv0721-AJB (MDD)

"In the instant, Second Motion for Reconsideration of counsel's continuance request, filed March 8, 2013, counsel relates she has now ordered the transcript of the trial proceedings. Counsel also states she has 'barely made a dent' in her review of the case, fully 3 months after the verdict and 2 months after she formally substituted in as counsel. Counsel has not proposed a date for her motion for new trial. Based on the fact she has 'barely made a dent' in her review and the transcript of the trial has yet to be prepared, the Court anticipates a request toward the end of the year.

"[¶] . . . [¶] Trial counsel (i.e., Mr. Pacello) was not appointed by the Court; he was retained by defendant. Trial counsel was not removed by the Court; he was fired by defendant. The Court did not inquire of defendant as to the reasons for his dissatisfaction with trial counsel as defendant has the right to hire and fire anyone he chooses. (Citations.)

"Consistent with his pattern of obstructing the progress of this case, defendant retained new counsel to further delay the case by proposing to present issues more properly brought in a petition for habeas corpus in the guise of a motion for new trial. The Court granted a 3 month continuance to craft a new trial motion on those issues which would be the proper subject of a motion for new trial in this case. The Court denied the Motion to Reconsider its prior ruling and for the reasons stated in this order(,) denies defendant's second motion to reconsider."

(Lodgment No. 11, <u>People v. Pawlicki</u>, No. D063728, slip op. at 3-16 [ECF No. 51-63].)

## III. **PETITIONER'S CLAIMS**

(1) Petitioner's trial counsel was so ineffective it amounted to a complete denial of his right to counsel within the meaning of <u>Cronic</u> because attorney Pacello: (a) misled Petitioner and the trial judge regarding his experience in handling felony criminal trials and the capability of his law office to handle this case; (b) failed to hire a second expert witness because he was unaware he could request public funding, could not be bothered to do so, or misunderstood the process; (c) lacked experience with the rules of evidence which resulted in the admission of evidence excluded in pretrial motions; (d) failed to prepare for trial because he did not personally review the discovery or the pretrial rulings, and did not hire paralegal Callington to organize and review the discovery until 17 days before trial despite having been retained four and one-half months before trial; (e) had a conflict of

interest which caused him to show extreme antagonism to Petitioner arising from attorney Lacher having been hired and paid $70,000 while Pacello was only paid $9000, and because Pacello said his conscience did not permit him to represent a person he did not think was innocent against charges of child molestation; and (f) failed to pay attention during trial because he was sleeping and using his cell phone to manage his law practice and his social life.  (SAP at 6; SAP Mem. at 8-43.)

(2)  The refusal of the trial judge to permit Petitioner to replace attorney Pacello with attorney Lacher two weeks before the scheduled trial date was based on actual or apparent judicial bias which amounted to judicial misconduct.  (SAP at 7; SAP Mem. at 3-4.)

(3)  Prosecutorial misconduct occurred when: (a) the prosecutor presented irrelevant and inflammatory testimony of five jailhouse informants; (b) the police seized the hard drive from Petitioner's computer without a warrant and falsely told Petitioner's friends and neighbors that they "had his DNA and he had been a child molester for years"; and (c) the prosecutor withheld a statement by Dr. Marilyn Kaufhold that Bonnie was never sexually abused, medical and criminal records showing Christina C. and Michael S. "were of bad character and should not be believed," and evidence that Christina C. had recanted her allegations.  (SAP at 8; SAP Mem. at 4-6.)

(4)  Petitioner is actually innocent under Schlup v. Delo, 513 U.S. 298 (1995), which qualifies as a gateway to overcome any procedural bar.  (SAP at 9; SAP Mem. at 7.)

(5)  To the extent the allegations of ineffective assistance of trial counsel in claim one do not rise to the level of a complete denial of counsel under Cronic, they amount to ineffective assistance of trial counsel under Strickland.  (SAP Mem. at 8-43.)

(6)  Petitioner was denied his right to his choice of counsel by the denial of his pretrial motion to substitute attorney Lacher for attorney Pacello.  (SAP Mem. at 44-56.)

(7)  Petitioner was denied his rights to due process and equal protection by the admission of uncharged sexual misconduct with minors, introduced for the sole purpose of showing he had a propensity to commit the charged crimes.  (SAP Mem. at 56-68.)

/ / /

## IV. **DISCUSSION**

For the following reasons, the Court recommends rejecting Respondent's contention that Petitioner's claims are unexhausted, untimely, or procedurally defaulted. The Court finds federal habeas relief is unavailable because the state court adjudication of claims one, six and seven is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. With respect to claims two through five, the reasons they were denied by the state court are unclear, and therefore the level of deference this Court must afford the state court adjudication is also unclear, but the Court finds it unnecessary to resolve that issue because the claims clearly fail under de novo review. The Court therefore recommends the Petition be denied.

### A. **Standards of Review**

Title 28, United States Code, § 2254, as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to a claim adjudicated on the merits in state court, that in order to obtain federal habeas relief a petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state

court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy § 2254(d)(2), the petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

When a federal habeas court addresses a claim which has not been adjudicated on the merits in state court, pre-AEDPA de novo review is required. Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). The state court's reasoning on any related claim must be considered. Frantz, 533 F.3d at 738 (holding that where the reasoning of the state court is relevant, it must be part of a federal habeas court's consideration even under de novo review).

### B.   Procedural Bars

Respondent argues that claims two, three and five are procedurally defaulted, and that claims two through six are unexhausted and untimely, but that all these claims can all be denied as meritless irrespective of those procedural bars. (Ans. Mem. at 3-9, 12-22.) Petitioner replies that he has exhausted his state court remedies by presenting all of his claims to the state supreme court in a habeas petition, that he can overcome any procedural bars by showing he is actually innocent under Schlup, and that his claims merit habeas relief. (Traverse at 1-10.)

16cv0721-AJB (MDD)

### 1) Procedural Default

Respondent first contends that claim two (judicial misconduct), claim three (prosecutorial misconduct), and claim five (ineffective assistance of trial counsel under Strickland), are procedurally defaulted because they were denied by the state supreme court on habeas on the basis that they should have been, but were not, raised on direct appeal. (Ans. Mem. at 3-4.) Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003). If Respondent is successful, the burden shifts to Petitioner to challenge the independence or adequacy of the procedural bar. Id. If Petitioner makes a sufficient showing, the ultimate burden falls on Respondent. Id.

Respondent contends claims one, two and five were presented to the state supreme court for the first and only time in the habeas petition filed in that court. (Ans. Mem. at 3-4.) The petition was denied in an order that stated: "The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759; In re Swain (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, In re Pawlicki, No. S234957, order at 1 [ECF No. 51-67].)

When a state court applies multiple procedural bars to multiple claims but does not indicate which procedural bar is applied to which claim, as here, there can be no procedural default in federal court unless every procedural bar cited constitutes an adequate and independent ground to preclude federal habeas review. Washington v. Cambra, 208 F.3d 832, 834 (9th Cir. 2000); Calderon v. Bean, 96 F.3d 1126, 1131 (9th Cir. 1996). Respondent correctly notes that the citation to Waltreus has no effect on whether a claim is defaulted. See Ylst v. Nunnemaker, 501 U.S. 797, 804 n.3 (1991) (observing with respect to California's Waltreus rule: "Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil – which is precisely the effect accorded by the 'look-through' presumption.") Respondent also correctly notes that the citation to page 759 of the Dixon case, which refers to a procedural

16cv0721-AJB (MDD)

bar to raising claims on habeas which could have been but were not raised on direct appeal, is clearly established and consistently applied. See Johnson v. Lee, 578 U.S. ___, ___, 136 S.Ct. 1802, 1805-06 (2016). Respondent incorrectly argues Bennett found the Dixon bar independent of state law, an issue not addressed in Johnson. (Ans. Mem. at 4.) Rather, Bennett involved California's timeliness bar, see Bennett, 322 F.3d at 581, and the independence of the Dixon bar appears to be an open question.

Respondent also incorrectly contends that this Court can divine from the state court order it applied the Dixon bar to claims two, three and five simply because, according to Respondent, those claims should have been but were not raised on direct appeal. (Ans. Mem. at 4.) Claim five, Petitioner's Strickland claim, was raised on direct appeal, and the state appellate court specifically informed Petitioner that it must be brought on habeas rather than on appeal. Even if Respondent is correct that claims two and three should have been raised on appeal rather than habeas, that is, if they do not require consideration of matters outside the record, see e.g. People v. Mendoza Tello, 15 Cal.4th 264, 266-67 (1997), and could show that the Dixon bar was meant for them, it is unclear whether the Duvall and Swain citations were applied to these claims.

As Respondent correctly notes, the citation to page 474 of the Duvall case represents a procedural bar against failing to include copies of the relevant documentary evidence supporting the claims, and the citation to page 304 of the Swain case represents a bar against failing to state claims with sufficient particularity. (Ans. Mem. at 5-6.) Respondent argues that Petitioner can still return to state court with claims two, three and five because the Swain and Duvall citations were applied to them, and retains the right to argue the claims are procedurally defaulted in this Court if Petitioner is then found to be procedurally barred from proceeding in state court. (Id. at 6.) However, Respondent does not argue that Swain and Duvall represent adequate and independent procedural bars, and has not carried its burden of alleging that all the state court citations constitute adequate and independent grounds to preclude federal habeas review. See Cross v. Sisto, 676 F.3d 1172, 1177 (9th Cir. 2010) (finding that a citation to Swain was a dismissal without prejudice and with

leave to amend to plead facts with particularity and therefore did not signify claims were procedurally barred as a matter of state law).

Because the Court cannot ascertain which citations in the state supreme court order were meant for which claims, and Respondent has not alleged that all citations constitute adequate and independent grounds to preclude federal habeas review, Respondent has not shown that a procedural default precludes the Court from reaching the merits of any claim presented in the state court habeas petition. Washington, 208 F.3d at 834; see also Koerner v. Grigas, 328 F.3d 1039, 1053 (9th Cir. 2003) ("When either ground is a possibility, the choice between them is wholly arbitrary. It is not our role to make such a choice.") Respondent has failed to carry its initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. Bennett, 322 F.3d at 586. The Court recommends rejecting Respondent's contention that claims two, three and five are procedural defaulted.

### 2) Exhaustion

Respondent next contends Petitioner has not exhausted his state court remedies as to claims two through six in the Second Amended Petition because the only state court to which they were presented is the state supreme court in the habeas petition, and they were presented in such an abbreviated manner in the state habeas petition that the state court was not given a fair opportunity to pass on the merits of the claims. (Ans. Mem. at 5-7, 12-20.) Respondent contends the citations to Swain and Duvall by the state supreme court means the claims in the state habeas petition (other than claim one which was exhausted through direct appeal and claim seven which is not presented in the state habeas petition) were not "fairly presented" for exhaustion purposes because they lack the detail and specificity of the claims presented in the Second Amended Petition. (Id. at 5-7.)

In order to exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition. 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). A claim is "fairly presented" to a state court if it is presented

in a manner which allows the court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." Picard v. Connor, 404 U.S. 270, 275-76 (1971).

Petitioner cited to California Rules of Court, Rule 8.508(b)(3) in his state habeas petition. (Lodgment No. 14, Petition at 1 [ECF No. 51-66]; Lodgment No. 14, Mem. of P&A in Supp. of Petition at 1-2 [ECF No. 51-66].) That Rule provides: "After a decision by the Court of Appeal in a criminal case, a defendant may file an abbreviated petition for review in the Supreme Court for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief," and requiring a brief statement of the factual and legal bases of the claims. Cal.R.Ct. Rule 8.508; see In re Reno, 55 Cal.4th 428, 519 (2012) (approving of abbreviated state court habeas exhaustion petition procedure and finding it did not conflict with United States Supreme Court limitation of federal habeas review to the record before the state court which adjudicated the claim on the merits in Cullen v. Pinholster, 563 U.S. 170 (2011)). The state supreme court denied that petition with an order which stated: "The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759; In re Swain (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, In re Pawlicki, No. S234957, order at 1 [ECF No. 51-67].) As set forth above, the citation to Dixon represents a state bar against raising claims on habeas which should have been raised on appeal, the Waltreus citation represents a state bar against relitigating claims which were decided on appeal, the Swain citation represents a bar against presenting claims without sufficient particularity, and the Duvall citation represents a bar against failing to attach relevant documentary evidence.

This Court must liberally construe Petitioner's pro se pleadings both here and in the state court, especially with regard to the determination as to which claims are presented. Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001). Under a liberal construction of Petitioner's pro se state court habeas petition and his pro se Second Amended Petition, it is clear that the factual and legal bases of the claims raised here, other than claim seven,

were presented to the state supreme court in the habeas petition.  (<u>Compare</u> SAP Mem. at 1-68 <u>with</u> Lodgment No. 14, Mem. of P&A in Supp. of Petition at 1-6 [ECF No. 51-66].) Respondent has failed to identify any allegation supporting claims two through six which is not common to both petitions, and only claim seven is missing from the state habeas petition, although claim five relies on and refers to the allegations on direct appeal.  Claim seven was presented to and adjudicated on the merits by the appellate court on direct appeal, but was not raised in any state court thereafter, and, as discussed below, is technically exhausted because Petitioner does not have state court remedies remaining as to that claim.  Although Respondent contends the <u>Swain</u> and <u>Duvall</u> citations may mean Petitioner has state court remedies remaining as to the claims presented in the state habeas petition, claim seven was not presented in that petition.  As to claims two through six, California Rule of Court 8.508 permitted Petitioner to file "an abbreviated petition for review in the Supreme Court for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief," and requiring "[a] brief statement of the factual and legal bases of the claims." Cal.R.Ct. Rule 8.508.  Petitioner complied with that Rule, and Respondent does not address its implication, but relies on an incorrect reading of the state habeas petition as not containing the same allegations supporting claims two through six as are presented in the Second Amended Petition.

The Court finds that Petitioner satisfied the exhaustion requirement by presenting claims one through six to the state supreme court in a manner which permitted that court to reach the merits of the claims.  <u>See</u> <u>Picard</u>, 404 U.S. at 275-76 (in order to exhaust state judicial remedies, a claim must be "fairly presented" to the highest state court, that is, in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.")  As discussed below in claim seven, the exhaustion requirement is also technically satisfied in that it is now too late for Petitioner to return to state court with any claim he has already presented in his various state court pleadings, which includes all claims presented here.  Thus, to the extent Petitioner had state court remedies remaining with respect to claims two through six when the state supreme

court issued the order with the <u>Swain</u> and <u>Duvall</u> citations, those claims would also now be technically exhausted for the same reason as claim seven. The Court recommends rejecting Respondent's contention that any claim is unexhausted.

### 3) Timeliness

Finally, Respondent contends that the claims in the Second Amended Petition which were presented to the state supreme court for the first and only time in the state habeas petition are untimely because they do not relate back to claim one, the only claim Respondent contends is timely. (Ans. Mem. at 7-9, 12-20.) Petitioner argued in his state habeas petition that the claims presented therein are predicated on the same common core of operative facts as the claims he presented on direct appeal, and therefore relate back for timeliness purposes. (Lodgment No. 14, Mem. of P&A in Supp. of Petition at 1 [ECF No. 51-66], citing <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005) (holding that when claims "are tied to a common core of operative facts relation back will be in order.").)

The one-year statute of limitations applicable to this action began to run on September 9, 2015, one day after expiration of Petitioner's 90-day period to file a petition for a writ of certiorari in the United States Supreme Court following the June 10, 2015, denial of his petition for review by the California Supreme Court. <u>Bowen v. Roe</u>, 188 F.3d 1157, 1158-60 (9th Cir. 1999); <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1246 (9th Cir. 2001). The limitations period ran for 261 days until it began to be statutorily tolled when Petitioner constructively filed his state habeas petition on May 27, 2016.[2] <u>See</u> 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.") Tolling continued until the habeas petition was denied on July 27, 2016. <u>Nino v. Galaza</u>, 183 F.3d 1003, 1006 (9th Cir. 1999), overruled in part by <u>Carey v. Saffold</u>, 536 U.S. 214, 225 (2002).

---

[2]  Petitioner is entitled to the benefit of the "mailbox" rule which provides that his pro se filings are considered to have been constructively filed as of the date he hands them to prison authorities for mailing to a court. <u>Anthony v. Cambra</u>, 236 F.3d 568, 574-75 (9th Cir. 2000).

16cv0721-AJB (MDD)

There were 104 days remaining on the one-year limitations period when tolling ended, and it was therefore set to expire on November 8, 2016.  Petitioner constructively filed his original Petition in this action on March 17, 2016, nearly eight months before expiration of the limitations period, although the original Petition contained only claim one.  (Pet. at 11 [ECF No. 1].)

On June 2, 2016, over five months before the statute of limitations was set to expire, Petitioner constructively filed a First Amended Petition in this Court, which consists of a duplicate of the state supreme court habeas petition containing claims one through six here, and a restatement of his appellate court brief containing claims one, five, six and seven here.  (First Amended Petition [ECF No. 13 at 13-109].)  The First Amended Petition contains all but two of the claims raised in the Second Amended Petition, the operative pleading in this action.[3]

The First Amended Petition was accompanied by a motion for stay and abeyance.  (ECF Nos. 10, 15.)  Respondent did not oppose a stay (ECF No. 23 at 17), but at the same time moved to dismiss the First Amended Petition on the basis that it was a mixed petition, that is, of the claims presented therein only claim one was exhausted.  (ECF No. 24.)  On August 2, 2016, the Court denied both motions as moot because the state supreme court denied the habeas petition on July 27, 2016, before this Court could rule on the motions.  (ECF No. 28.)  Although the Court could have then proceeded with the fully-exhausted and timely-filed First Amended Petition, Petitioner was ordered to file a Second Amended Petition on or before September 2, 2016.  (Id.)

When Petitioner failed to file a Second Amended Petition by September 2, 2016, the Court issued a scheduling order which stated that the unique procedural posture of the case

---

[3]  The claims raised in the First Amended Petition which are omitted from the Second Amended Petition allege: (1) an improper refusal to excuse a juror who Petitioner only recognized as someone he knew at a late stage of the trial, and (2) that the prosecutor misled the jury regarding how long the victims lived with Petitioner, and misrepresented that the photographs of a woman seized during a search of his house depicted a prostitute Petitioner had photographed, whereas according to Petitioner they depicted his son Sean's girlfriend.  (ECF No. 13 at 22-23.)

may have confused Petitioner, and directed a Second Amended Petition to be filed by January 3, 2017. (ECF No. 30.) The Second Amended Petition was filed on January 3, 2017, almost two months after the expiration of the limitations period on November 8, 2016. (SAP at 12.)

Thus, the First Amended Petition includes all claims presented in the Second Amended Petition, which is the operative pleading in this action. The First Amended Petition was filed prior to expiration of the one-year statute of limitations, and was the operative pleading when Petitioner's claims became exhausted. It was unnecessary for Petitioner to file a Second Amended Petition, and he only did so because he was ordered to by the Court. In any case, the Second Amended Petition does not contain any claim which is not in the First Amended Petition, and all claims in the Second Amended Petition clearly relate back to their nearly exact counterparts in the timely-filed First Amended Petition. The Court therefore recommends rejecting Respondent's contention that any claim is untimely.

## C. Claim One

Petitioner alleges in claim one that his trial counsel was so ineffective it rose to the level of a complete denial of his Sixth Amendment right to counsel within the meaning of Cronic. (SAP at 6; SAP Mem. at 3, 8-43.) He argues, as he did in state court, that:

> Petitioner went through a series of counsel prior to trial before finally hiring Raymundo Pacello, Jr., AKA "The Legal Baller." Petitioner met Pacello at the jail while Petitioner was in custody. Pacello convinced Petitioner that he was the best attorney for his defense. [¶] Petitioner could not possibly have made a worse choice. Pacello was certainly arrogant and egotistical, qualities that arguably make for a good trial attorney. He was, however, given to espousing Latin homilies, qualities which made him look silly. [¶] Silly was not his fatal quality however; a complete lack of experience, despite representations to the contrary, was his downfall. That lack of experience may not, in itself, have doomed Petitioner's defense, but if it did not then surely the almost complete absence of preparation and the extreme antagonism demonstrated towards Petitioner completed what can only be described as the constructive denial of counsel.

(Id. at 8.)

Petitioner lists numerous incidents of alleged deficient performance of his trial counsel (id. at 12-43), which the Court analyzes next in claim five under Strickland.[4]

Respondent answers that the denial of this claim by the state appellate court is neither contrary to, nor involves an unreasonable application of, clearly established federal law as set forth in Cronic, and is not based on an unreasonable determination of the facts. (Ans. Mem. at 9-12.)

Petitioner presented this claim to the state supreme court in his petition for review. (Lodgment No. 12 [ECF No. 51-64).) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 13 [ECF No. 51-65].) The same claim was presented to the state appellate court on direct appeal. (Lodgment No. 8 [ECF No. 51-60].) The appellate court denied the claim in a written opinion. (Lodgment No. 11 [ECF No. 51-63].)

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 803-06. The Court will look through the silent denial by the state supreme court to the last reasoned state court decision which addressed this claim, the appellate court opinion on direct appeal, which stated:

> As noted, defendant contends his retained counsel, Raymundo Pacello Jr. (Pacello), was ineffective per se despite the fact the defense presented 14 trial witnesses and a expert in biomechanics.

> A. *Additional Background*

> As noted *ante,* the court on March 12, 2013 denied defendant's second motion for reconsideration of his request for additional time to investigate and prepare a new trial motion. In response, defendant on March 25, 2013 moved under Code of Civil Procedure section 170.3 to disqualify the trial judge,

---

[4] The allegations supporting claims one and five are identical, but claim one relies on Cronic and claim five on Strickland. As discussed in claim one, the state appellate court in its Cronic analysis correctly addressed only the allegations that trial counsel was sleeping and using his cell phone during trial so often that it amounted to a constructive denial of counsel under Cronic, and this Court will do the same in claim one, reserving for claim five the other allegations of deficient performance.

Honorable Louis R. Hanoian, on several grounds including: 1) the court's denial of his October 19, 2012 motion to substitute in Lacher for Pacello as counsel of record; 2) the court's refusal to give defendant's new counsel sufficient time to investigate and file a new trial motion; 3) comments made by the court that suggested defendant was improperly delaying the proceedings, which allegedly showed the court had lost its "objectivity and impartiality"; and 4) comments made by the court that Lacher was allegedly not working diligently to prepare a new trial motion on behalf of defendant. The court in its March 26, 2013 order found there were no grounds for disqualification and struck the verified statement of Lacher. [Footnote: Defendant wisely has not appealed the March 26, 2013 order.]

The record shows that on March 25, 2013, Lacher also moved (yet again) for a continuance of defendant's sentencing hearing. At the March 29 hearing on this motion, the record shows Pacello's former paralegal, Joshua Callington, was seated at counsel table with Lacher and defendant. On questioning by the court, Lacher noted that Callington had assisted Pacello throughout defendant's trial and that Callington was then assisting Lacher on "some of the issues relating to the motion for new trial." The court noted defendant also had filed a partial motion for new trial and a motion seeking identifying information of the jurors in his case.

With respect to the request for continuance of the sentencing hearing, the court at the March 29 hearing (again) noted that Lacher had been retained by defendant "well before" his trial ended and that she nonetheless had not ordered trial transcripts, which the court further noted anyone could order. The court also recognized, as it did in its March 12, 2013 order denying defendant's second motion for reconsideration, that Lacher had almost three months to work on and file a new trial motion on behalf of defendant, as she officially substituted into the case in early January 2013, for a case involving about 13 days of trial testimony.

The record shows Lacher in response stated that she was still waiting to receive all the trial transcripts from the reporter; that Pacello did not provide her with all the discovery; and that she needed at least another two and a half months to complete her investigation and file a complete, as opposed to a partial, new trial motion.

In response, the prosecutor noted that at the October 19, 2012 hearing, Lacher stated on the record that she and defendant had been in discussions about her substituting into the case "weeks" before that hearing; that before Lacher sought to substitute into the case, Pacello had no idea defendant was

16cv0721-AJB (MDD)

seeking to fire him and retain new counsel; that because there was a protective order in place, Pacello was forbidden by court order to give Lacher certain discovery, including photographs; that as a result of that order, the People prepared a separate protective order for Lacher to sign to prevent any further delay in the proceedings, which Lacher signed in early to mid-January 2013; that the People had almost 8,800 pages of discovery put on a CD in mid-January 2013 and another 600 or so pages from a related case on which defendant was charged, put on a second CD [footnote: The record shows defendant was also charged with, and pled guilty to, fleeing the jurisdiction. Defendant is not challenging that conviction in this appeal]; and that as of March 25, 2013, Lacher had *not* picked up the CD with the 8,800 pages but had picked up the CD with the 600 or so pages. The prosecutor thus argued Lacher had not been diligent in obtaining the information she needed to complete the new trial motion and in fact suggested her "hands" were not "clean."

At the conclusion of the March 29 hearing, the court once again denied defendant's request for a continuance. The court found that Lacher had adequate time to prepare a new trial motion; that, in any event, Lacher did not need a full trial transcript because she consistently had stated her need for the trial transcripts was based on her ineffective assistance of counsel claim, which the court noted it repeatedly had found "needs to be flushed out in a full habeas corpus hearing where we can take evidence outside of what happened in front of the jury to make a determination on Mr. Pacello's actual conduct of the case and whether or not it constitutes ineffective assistance of counsel"; that even if the trial transcripts were needed, they were available after the jury reached its verdict on or about December 10, 2012; and that it appeared to the court there was some "gamesmanship" by defendant with respect to the funding to obtain such transcripts, because first Lacher represented she had the funding to obtain the transcripts and then weeks later, disclosed that funding had been pulled.

After a break, the record shows the court next heard defendant's partial new trial motion. The court stated it would hear evidence in connection with that motion, but reiterated it would *not* "take evidence from outside of the court's view" in connection with the ineffective assistance of counsel claim because the proper proceeding to consider such evidence was a habeas corpus proceeding.

Before any evidence was introduced, Lacher asked the court to make a finding that Pacello was sleeping "during a substantial portion of the trial." The court refused to make such a finding as a matter of law, noting counsel's

sleeping was "something that (the court) personally did not observe." The court further noted that at no time did defendant, Callington or anyone else involved in the case alert the court to this issue during the trial.

Callington testified at the evidentiary hearing in support of defendant's new trial motion. Callington testified he sat at defense counsel's table during the entire trial. Among other duties, Callington took notes during the trial, provided a summary of his notes to Pacello at the end of each day of trial and also assisted Pacello by providing him information and/or evidence for upcoming witnesses. After the jury verdict, Callington reached out to Lacher, seeking to assist her in defendant's defense.

Callington testified he observed Pacello during the trial "sleeping in court." Although Callington could not recall the number of times he saw Pacello sleeping, he estimated Pacello slept at least "three days" each week during trial, and further estimated that on the days Pacello slept, he usually did so at least three times each day. At one point during the trial, Callington told defendant to "kick" Pacello under the table to awaken Pacello.

Callington could not recall having to provide Pacello any information Pacello might have missed while allegedly sleeping. Callington also never heard Pacello snoring or making any other noises indicating that Pacello was actually sleeping, as opposed merely to listening to the proceedings with his eyes closed. According to Callington, defendant was also aware Pacello was sleeping during the trial.

Callington testified he also observed Pacello "text" messaging, using social media and sending and receiving e-mails "every day" during the trial. Callington estimated that on any given morning, Pacello spent 65 to 70 percent of his time "sleeping, texting and emailing." Callington further estimated Pacello spent between one and three minutes on his cell phone each time Pacello used it to send and/or receive test messages and/or e-mails.

Callington testified he was not currently working for Lacher, but would consider doing so if such employment was offered. He also testified he had sued Pacello, claiming he was in Pacello's employment as a "litigation paralegal," and was therefore entitled to overtime wages. Callington sought to recover about $14,000 in unpaid wages, excluding statutory penalties.

Callington testified he never informed the court that Pacello was sleeping and/or using his cell phone to send and receive text messages and e-mail during the trial. Callington also never saw the trial court attempt to

awaken Pacello while he was allegedly sleeping during the trial and he never once saw Pacello delay cross-examination and/or fail to stand up to do so because Pacello was sleeping. Callington also never saw Pacello delay in calling any of the defense's witnesses because Pacello allegedly was asleep.

Callington testified that before defendant's trial began, Pacello said he wanted to be recused from the case because Pacello had two daughters of his own and the case against defendant involved sexual misconduct. Callington admitted on cross-examination that he was placed under arrest in September 2011 for stealing chips and a soda from a grocery store, although he denied stealing those items.

On questioning by the court, Callington stated he owed a duty of loyalty to, and to perform services competently on behalf of, defendant, as opposed to Pacello.

Pacello also testified at the evidentiary hearing. Pacello then noted he had been an attorney for about 13 years; had been practicing criminal defense for about a year and a half; and had completed two criminal trials (one of which was defendant's trial). Pacello stated absent an emergency or similar circumstance, he normally would not use his cell phone to manage his law office or other affairs once trial began. Pacello used the text messaging feature on his cell phone during the trial, and potentially may have used social media as a means to communicate with some of his other clients. However, Pacello testified he instructed his office not to contact him during the trial unless the matter was urgent.

Pacello testified that he never slept during the defendant's trial; that such allegations were "ludicrous"; and that he took his responsibility as a trial attorney seriously. Pacello noted at one point during the trial the court even admonished him to "tone it down" due to the vigorousness of his defense.

With regard to the use of his cell phone, Pacello testified he took calls and handled his affairs during breaks in the trial, including during the morning and afternoon recesses and during the lunch break.

With respect to Callington, Pacello testified he initially hired him to review and prepare summaries of documents. Callington also sat at counsel's table during the trial to provide Pacello with "another set of ears" to ensure nothing was missed. Pacello often consulted with Callington during the trial, including before and during cross-examination, to make sure nothing was overlooked and to help his effectiveness on cross-examination. Pacello stated

defendant also continuously gave him notes during the trial and was thus an active participant in his own defense. Pacello stated to the extent he used his cell phone during the trial, it was "de minimis."

Pacello testified he was paid $9,000 to represent defendant. When Pacello learned that defendant had consulted with Lacher "behind (Pacello's) back" and that defendant's family allegedly had given her $70,000 to substitute into the case, Pacello believed a "conflict" arose because of what he termed "dirty dealing." Specifically, Pacello thought it was unfair of Lacher to surreptitiously meet with defendant on the eve of trial when Pacello was actively preparing to try the case. Pacello testified he addressed this issue with the court during the October 19, 2012 hearing—in what was previously a "sealed" chambers conference—when Pacello unsuccessfully sought to withdraw as counsel of record.

Pacello further testified that during the October 19, 2012 chambers conference, he also informed the court that he had begun to question defendant's "veracity and credibility," after defendant sought to substitute Lacher into the case without first informing him, and that he began to question whether his own conscience would allow him to represent defendant under such circumstances and when defendant was accused of sexual misconduct. Pacello noted at the time he found it "very confounding" defendant and/or his family members were "cinching" on defendant's defense, including the retention of expert witnesses, while at the same time were willing to pay a new lawyer (i.e., Lacher) a substantial sum of money even before she had been substituted into the case.

With respect to his conscience and the allegations of sexual abuse against defendant, Pacello testified it did *not* affect his representation of defendant. After the court in the October 19, 2012 hearing refused to allow Pacello to withdraw from defendant's representation, Pacello testified from "that point forward, it was my duty to zealously represent my client within the bounds of the law." Pacello testified he "had a job to do" and he "did it" to the best of his ability, even after Lacher was paid money by defendant and/or his family that Pacello felt should have been paid to him.

Because the court at the October 19, 2012 hearing refused to continue the trial and/or to substitute in Lacher as newly retained counsel, Pacello testified he was unable to seek ancillary financing from the government to help offset the costs of defense. Nonetheless, Pacello noted that he retained an expert in the field of biomechanics who testified on behalf of the defense and that, in any event, he vigorously defended defendant.

Toward the conclusion of the evidentiary hearing, one of the jurors in defendant's case took the witness stand. The juror—No. 8—testified there were a total of six jurors from the trial in attendance at the hearing because of defendant's motion to unseal the juror's personal information. Juror No. 8 testified there was concern among some of the jurors over privacy because, before the evidentiary hearing, one juror had been contacted by a defense investigator. Juror No. 8 also testified that none of the jurors said they saw Pacello sleeping during the trial, as defendant contended.

As discussed *post,* the court denied the motion for new trial.

B. *Guiding Principles*

Ordinarily, a defendant alleging ineffective assistance of counsel """"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."' (Citation.) Prejudice occurs only if the record demonstrates 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (Citation.)" (*People v. Lucero* (2000) 23 Cal.4th 692, 728.) However, where counsel's conduct is so egregiously poor, prejudice may be presumed. (*United States v. Cronic* (1984) 466 U.S. 648, 661–662 (*Cronic*).) The presumption of prejudice arises "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing. . . ." (*Id.* at p. 659, italics added.) "When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." (*Id.* at p. 656, fn. omitted.)

"(T)he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. (Citation.) It is for this reason that we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction." (*Cronic, supra,* 466 U.S. at p. 657, fn. 21.)

In *Cronic,* defendant was charged with mail fraud involving a "check kiting" scheme. Shortly before trial, defendant's retained counsel withdrew. The court in response appointed a "young lawyer with a real estate practice to represent respondent, but allowed him only 25 days for pretrial preparation, even though it had taken the Government over four and one-half years to investigate the case and it had reviewed thousands of documents during that

investigation." (*Cronic, supra,* 466 U.S. at p. 649.) After defendant was convicted, he challenged the competency of trial counsel.

In reversing defendant's conviction, the court of appeals did not find defense counsel had made any specific errors or that his representation prejudiced defendant. Instead, the court of appeals rested its reversal on the ground that no such showing was necessary "'when circumstances hamper a given lawyer's preparation of a defendant's case.'" (*Cronic, supra,* 466 U.S. at p. 650.) In so doing, the court of appeals used five criteria to *infer* defendant's constitutional right to effective assistance of counsel had been violated: "'"(1) (T)he time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel."'" (*Cronic, supra,* 466 U.S. at p. 652.)

The *Cronic* court reversed the court of appeals. The court concluded the court of appeals erred in utilizing an inferential approach (*Cronic, supra,* 466 U.S. at p. 653) and noted that these factors were "relevant to an evaluation of a lawyer's effectiveness in a particular case, but neither separately nor in combination (did) they provide a basis for concluding that competent counsel was not able to provide this (defendant) with the guiding hand that the Constitution guarantees" (*id.* at p. 663).

The *Cronic* court instead identified three categories of cases that constitute per se violations of the Sixth Amendment right to counsel where prejudice is presumed: (1) the "complete denial of counsel" at a critical stage in the proceedings (*Cronic, supra,* 466 U.S. at p. 659); (2) counsel's failure to "subject the prosecution's case to meaningful adversarial testing" (*ibid.*); and (3) the "likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small (under the particular circumstances) that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial" (*id.* at pp. 659–660).

In the first category (i.e., complete denial of counsel), the Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding. (Citations.)" (*Cronic, supra,* 466 U.S. at p. 659, fn. 25; *Bell v. Cone* (2002) 535 U.S. 685, 695–696 (*Bell* ) (noting an arraignment would constitute an example of a critical stage of a criminal proceeding where counsel cannot be denied).)

In the second category (i.e., the absence of meaningful adversarial testing), the Court has clarified that the attorney's failure must be *complete*. (*Bell, supra,* 535 U.S. at pp. 696–697.)  Briefly in *Bell,* a capital defendant contended *Cronic* governed his ineffective assistance of counsel claim because defense counsel failed during the sentencing phase to present mitigating evidence and waived final argument.  (*Id.* at p. 692.)

In rejecting this contention and reversing the court of appeals' decision to apply *Cronic,* the *Bell* court concluded that *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*)—decided the same day as *Cronic*—governed his ineffective assistance claim: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete.  We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic, supra,* 466 U.S. at 659 (emphasis added).  Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points.  For purposes of distinguishing between the rule of *Strickland* and that of *Cronic,* this difference is not of degree but of kind. (Footnote omitted.)

"The aspects of counsel's performance challenged by (defendant)—the failure to adduce mitigating evidence and the waiver of closing argument— are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components.  In *Darden v. Wainwright,* 477 U.S. 168, 184 (1986), for example, we evaluated under *Strickland* a claim that counsel was ineffective for failing to put on any mitigating evidence at a capital sentencing hearing.  In *Burger v. Kemp,* 483 U.S. 776, 788 (1987), we did the same when presented with a challenge to counsel's decision at a capital sentencing hearing not to offer any mitigating evidence at all.

"We hold, therefore, that the state court correctly identified the principles announced in *Strickland* as those governing the analysis of (defendant's) claim.  Consequently, we find no merit in (defendant's) contention that the state court's adjudication was contrary to our clearly established law. (Citation.)" (*Bell, supra,* 535 U.S. at pp. 696–698; see *Wright v. Van Patten* (2008) 552 U.S. 120, 124 (concluding that defense counsel's decision to participate by speakerphone at a plea hearing where defendant pled guilty to first-degree reckless homicide was not tantamount to a "'complete denial of counsel'" on par with total absence, as required for the narrow exception announced in *Cronic* to apply); cf. *Davis v. Alaska* (1974) 415 U.S.

308, 318 (noting defendant was not required to show prejudice to establish ineffective assistance of counsel when defendant "had been 'denied the right of effective cross-examination' which '"would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it"'"), cited with approval in *Cronic, supra,* 466 U.S. at p. 659.)

In the third category (i.e., the likelihood is so small that any lawyer, even a competent one, could provide effective assistance under the circumstances), the *Cronic* court cited to *Powell v. Alabama* (1932) 287 U.S. 45 (*Powell*). (*Cronic, supra,* 466 U.S. at pp. 659–660.) The defendants in *Powell* were young, ignorant and illiterate. Six days before trial in a "highly publicized capital offense" case, the trial court "appointed 'all the members of the bar'" to represent defendants. (*Id.* at p. 660, quoting *Powell, supra,* 287 U.S. at pp. 55–58.) On the day of trial, a lawyer from "Tennessee appeared on behalf of persons 'interested' in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure." (*Ibid.*) The "problem was resolved when the court decided that the Tennessee lawyer would represent the defendants with whatever help the local bar could provide." (*Ibid.*)

The *Powell* Court concluded defendants presumptively received ineffective assistance of counsel because "under these circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair." (*Cronic, supra,* 466 U.S. at pp. 660–661; cf. *Avery v. Alabama* (1940) 308 U.S. 444, 450–453 (noting that mere refusal to postpone a criminal trial does not give rise to a presumption of ineffectiveness and noting that appointment of counsel in a capital case only three days before trial does not create such a presumption because the circumstances of that case did not make it unreasonable to expect that counsel could be ready).)

C. *Analysis*

1. *Claims Not Decided under* <u>Cronic</u>

At the outset, we note defendant raised four issues in his new trial motion: 1) whether Pacello had a conflict of interest that created what defendant refers to as "an informed speculation of prejudice"; 2) whether Pacello was per se ineffective under *Cronic* because Pacello was allegedly inattentive and/or sleeping during a majority of the trial; 3) whether the court erred when, shortly before trial, it refused to allow Pacello to withdraw and Lacher to substitute in as defendant's counsel of choice; and 4) whether the

court erred in striking defendant's request to recuse itself for lack of impartiality.

In his opening brief on appeal, other than the issues of (i) refusing to allow Lacher to substitute into the case as defendant's retained counsel and (ii) admitting under Evidence Code section 1108 defendant's alleged commission of other sexual acts, defendant addresses all other issues from his new trial motion under the *Cronic* standard.  As discussed, however, *Cronic* recognized only three *narrow* exceptions to the *Strickland* prejudice requirement.

Here, we conclude defendant raises and discusses specific instances of alleged misconduct that fall outside *Cronic* and its exception to the *Strickland* standard for evaluating an ineffective assistance of counsel claim. Specifically, we conclude the following contentions of defendant must be addressed under *Strickland*: Pacello's alleged failure to inform fully defendant and the court of his alleged lack of criminal trial experience, which defendant contends led to the admission of testimony from witnesses on cross-examination that damaged his case; Pacello's alleged lack of experience with the rules of evidence, which defendant contends led Pacello to make myriad unnecessary objections and/or ask several objectionable questions; Pacello's alleged lack of trial preparation; and Pacello's alleged conflict of interest with defendant.

Because the *Cronic* exceptions are narrow and because neither the partial motion for new trial nor the trial court nor defendant on appeal raised and/or decided these specific claims under *Strickland,* we decline in this opinion to address them.  Our decision in this case, therefore, is without prejudice to defendant raising such claims by way of writ of habeas corpus. (See *People v. Doolin* (2009) 45 Cal.4th 390, 417–421 (recognizing that the U.S. Supreme Court in *Mickens v. Taylor* (2002) 535 U.S. 162 "confirmed that claims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under (*Strickland*) generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different," and further recognizing that in situations *not* involving an attorney's representation of adverse clients, such as when appointed counsel is compensated under an agreement where counsel receives a lump sum fee that also includes costs for investigative and expert services, our own high court has "never eliminated (its) general requirement that a defendant demonstrate outcome-determinative prejudice from a

violation of his (or her) state constitutional right to conflict-free counsel in order to obtain relief").)

Our conclusion to defer a discussion of these specific claims of ineffective assistance of counsel is also supported by the fact that defendant's new trial motion allegedly was incomplete and by the court's decision to limit the introduction of evidence in connection with that motion to alleged misconduct that occurred in the courtroom (i.e., in the court's presence). (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (noting the general rule that a claim of ineffective assistance of counsel on a less than complete record is "more appropriately decided in a habeas corpus proceeding").)

### 2. *Constructive Absence of Pacello During Trial*

We conclude the only issue properly before us based on *Cronic* is Pacello's alleged lack of attention to the trial, which defendant contends rendered him constructively "absent" during critical stages of the case. (See *Cronic, supra,* 466 U.S. at p. 659, fn. 25; see also *Javor v. United States* (9th Cir. 1984) 724 F.2d 831, 833–834 (noting no prejudice is required to support an ineffective assistance of counsel claim when an attorney for a criminal defendant "sleeps through a substantial portion of the trial").)

Defendant contends Pacello spent a substantial period of time during trial "sleeping, texting and emailing." The record shows Pacello absolutely denied sleeping during trial, but admitted he did occasionally use his cell phone to send and receive text messages and emails he claimed required his immediate attention. The court in denying the new trial motion on this issue found as follows:

"Next issue is the question about whether or not Mr. Pacello's conduct at the trial was ineffective assistance of counsel per se. And here we get to the question about what was it that Mr. Pacello was doing during the course of the trial. Was he sleeping? Did he get a good eight hours every day while he was in court? Did he get one to three minutes (of sleep, as Callington estimated,) at a time while he was in court three times a day? Was he sleeping at all? Then for 60–60 to 65 or 65 to 70 percent of the time, I think Mr. Callington's testimony was that Mr. Pacello was doing something not associated with the case. . . ." Callington estimated Pacello spent between one and three minutes each time Pacello used his cell phone or whatever it is that people that have smart phones utilize them for. And that, in fact, he was doing something else, whether it's sleeping or texting or going on (social media) or

whatever the heck he was doing during that time, 65 to 70 percent of the time is what my notes say.

"I don't find that testimony to be credible at all. To the extent it's an observation that Mr. Pacello may have been shutting his eyes at various points during the trial, I believe that. Whether that constitutes sleeping, it certainly doesn't. People close their eyes all the time.

"(¶) . . . That he was working while his eyes were shut and so—and that's common, lots of people do that. That's the one way that some people concentrate.

"As far as using his phone 65 percent of the time, see, we have a maximum of ten minutes with his eyes shut which means out of the six hours that we were in sessions most days, six hours is 360 minutes, 70 percent of those would be somewhere around the area of almost three hours, that's way more than three hours, 4.2 hours of the time would have been done texting, (using social media), all these kinds of things, and that just didn't happen. I never observed that. I observed Mr. Pacello doing stuff on his phone on occasion. He may have been doing stuff on his phone all the time, but that doesn't mean he was not doing things that were associated with the case.

"Now, he testified that there were times where he answered an e-mail or did something with regard to an emergency. And at that time he was not doing exactly the same thing that we are expecting people to do. Here in the 21st century there is a term called multi-tasking that is utilized. It's, for example, it's where I'm looking at my notes right now while I'm issuing a ruling, and I'm doing two things at the same time, and I'm working on jury instructions while I'm listening to testimony during the trial. I do that 100 percent of the time. I'm multi-tasking at all times. I may be even looking at an e-mail that's coming in. I don't think that means I'm not paying attention to the case, and I don't think that that has anything to do with ineffective assistance of counsel, which is required for per se ineffective assistance of counsel.

"I do not find that Mr. Pacello was absent while he was here in court, that's not the case. I do not find that he was sleeping. He denied sleeping. I never saw sleeping. I was never advised of sleeping. And, consequently, for a factual finding in connection with this motion, I'm finding that there is no proof that he was sleeping.

"As for the texting, that's basically multi-tasking. It's something that is done by everybody. In a prior time, before electronic devices, they might have called it daydreaming. They didn't have any way of quantifying it. Of course, we have no idea anyway of quantifying it in this case because, while Mr. Callington certainly could see that Mr. Pacello might have been manipulating his phone in some way, from his vantage point he sure can't see what's on the screen. Maybe Mr. Pawlicki could have seen what was on his screen, but Mr. Pawlicki never complained about that either.

"So due to basically the facts, the court does not find those facts to be true, and the motion for new trial based upon the absence of counsel for reversible per se is also not something that will be successful."

It is axiomatic that upon appeal from the denial of a new trial motion based on a nonstatutory claim of ineffective assistance or other denial of constitutional rights, we defer to the trial court's factual findings if supported by substantial evidence, but we exercise de novo review over the ultimate issue of whether the defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.) Once the court makes these factual findings, it also "should make other pertinent findings based upon its own observations and the evidence presented to it. On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences." (*Ibid.*)

Here, we conclude the record contains ample evidence to support the finding that Pacello was not sleeping during the trial. The court specifically found Callington's testimony on this issue was not "credible at all." The court also noted that it never observed Pacello sleeping or otherwise was made aware during the 13 days of testimony that Pacello was sleeping or otherwise inattentive, and that Pacello himself denied he was sleeping. In addition, the record shows the prosecutor never observed Pacello sleeping and juror No. 8 testified the jury did not tell defendant it saw Pacello sleeping, as alleged.

Moreover, the record supports the finding that Pacello was not "daydreaming" or otherwise using his cell phone improperly during the trial. Pacello himself testified during trial he used his cell phone "de minimis," and then to respond to clients and/or his office on exigent matters. Pacello also testified that he instructed his office not to interrupt him during the trial unless it was an emergency and that he typically responded to other clients and/or his office during breaks/recesses in the trial. We conclude this evidence supports

16cv0721-AJB (MDD)

the finding that Pacello was merely "multitasking" when he occasionally used his cell phone during the trial.

Based on these findings, which, as noted, are supported by substantial evidence in the record, we independently conclude that Pacello was not constructively absent at any point during the trial, much less at a critical point, to render his assistance to defendant ineffective per se under the first category of cases identified in *Cronic*. Because we further independently conclude neither the second nor third category of cases identified in *Cronic* apply in this case, we reject defendant's contention he received per se ineffective assistance of counsel. (See *Bell, supra,* 535 U.S. at pp. 696–697.) [Footnote: In light of our conclusion that none of the three categories of cases discussed in *Cronic* apply here and that defendant's other specific claims of ineffective assistance must be evaluated under *Strickland*, we deem it not only unnecessary, but *also* improper, to address in this opinion the People's alternate contention that defendant's ineffective assistance claim fails for lack of prejudice.]

(Lodgment No. 11, People v. Pawlicki, No. D063728, slip op. at 17-37 [ECF No. 51-63].)

Clearly established federal law provides that a criminal defendant has a right to be represented by counsel at all critical stages of his or her trial. Cronic, 466 U.S. at 658-59. Violation of the right to be represented by counsel at a critical stage of the trial mandates reversal, without any inquiry into prejudice. Id.; see also Musladin v. Lamarque, 555 F.3d 830, 838 (9th Cir. 2009) (confirming that Cronic constitutes "clearly established federal law" under AEDPA); see also Javor v. United States, 724 F.2d 831, 833 (9th Cir. 1984) ("Today we conclude that when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary.")

The trial court conducted a post-trial evidentiary hearing where Pacello testified that he never slept and his use of his cell phone during trial was de minimis. (Lodgment No. 7 at 80-87, 107-11, 119 [ECF No. 50-59].) Juror No. 8 testified that there were six jurors in the courtroom during the evidentiary hearing, including himself, and one additional juror in the hallway earlier when all seven jurors agreed that none of them ever saw Pacello sleeping. (Id. at 155, 160.) During argument on the motion, the prosecutor indicated he

never saw defense counsel sleeping. (RT 7948.) The trial judge stated that he never saw Pacello asleep, and at every break he asked the parties if there was anything anyone wanted to put on the record but no one ever indicated that Pacello was sleeping or otherwise inattentive, despite the fact that Petitioner often spoke up at trial, frequently out of order. (RT 7954-56, 7972.)

The only evidence Pacello was distracted or not paying attention was the testimony of his contract paralegal Callington, who testified that he sat at the defense table with Petitioner between him and Pacello all day, every day during the trial. (Lodgment No. 7 at 22 [ECF No. 50-59].) He testified he saw Pacello sleeping a minimum of three times a day, three days a week. (Id. at 27.) He saw Pacello use his cell phone during trial to send and receive text messages and emails, and to update his Facebook page. (Id. at 30.) He estimated that Pacello was sleeping and using his cell phone "between 65 and 70 percent" of the time "every day" when "testimony was happening." (Id. at 30, 34.)

Callington was impeached by the lack of observation of any trial participant to substantiate his extravagant allegation that Pacello was preoccupied over 65 percent of the time during testimony. The trial judge stated: "[T]hat didn't happen. That couldn't have happened without me knowing it." (RT 7961.) That finding is supported by the statements of the prosecutor, the trial judge, and more than half the jurors that they never saw Pacello asleep, and by the fact that Pacello called 16 witnesses, cross-examined all but two of the prosecution's 44 witnesses, and made 818 objections during trial. On the other hand, there was evidence of Callington's bias against Pacello. Callington admitted he was pursuing a civil suit against Pacello for $14,000 which he claimed to be owed for overtime, and had reached out to Lacher after trial about Pacello but never informed anyone during trial that Pacello was inattentive. (Lodgment No. 7 at 41-43, 46 [ECF No. 50-59].) His testimony is marked by evasive answers, including to questions about his arrest for stealing potato chips and a soda. (Id. at 49-52, 65-66.) In light of the fact that no one else noticed Pacello was distracted for more than a few moments at a time, the record supports the trial judge's rejection of Callington's account of how much time Pacello was preoccupied.

Accordingly, the state court finding that Pacello was not distracted during the trial is not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2000) (holding that a federal habeas court cannot second guess a state court's fact-finding process unless, after review of the state court record, it determines that the state court was not merely wrong, but actually unreasonable), abrogated on other grounds, Murray v. Schiro, 745 F.3d 984, 999-1000 (9th Cir. 2014). The state court finding Pacello was not so inattentive during trial so as to rise to the level of being constructively absent, is objectively reasonable, and therefore neither contrary to, nor involves an unreasonable application of, clearly established federal law. Williams, 529 U.S. at 405-07.

In addition, the state court determination that Cronic did not require an examination of the other allegations of ineffective assistance of counsel (which are analyzed next in claim five under Strickland), is also neither contrary to, nor involves an unreasonable application of, clearly established federal law. The Supreme Court in Cronic identified three "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. at 658. These are: (1) "the complete denial of counsel . . . at a critical stage," (2) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," and (3) "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60. As set forth immediately below in the discussion of claim five, Petitioner's allegations of ineffective assistance do not implicate the second Cronic circumstance because his trial counsel did not entirely fail to subject the prosecution case to adversarial testing. Rather, he called 16 witnesses, cross-examined all but two of the prosecution's 44 witnesses, and made 818 objections.

Petitioner appears to allege that the third Cronic circumstance is implicated because Pacello was forced to go to trial without sufficient time to prepare. See Cronic, 466 U.S.

at 660, citing <u>Powell v. Alabama</u>, 287 U.S. 45, 56-59 (1932) (holding that prejudice was presumed where out-of-state lawyer was appointed on the day of trial without an opportunity to familiarize himself with local procedure). That circumstance is not implicated here, where retained counsel Pacello made his first appearance two months before trial, at which time he indicated that he had already "spent a lot of time with" Petitioner, was "intimately familiar with the details of the case," was an experienced trial attorney, and was "ready, willing and able to proceed" to trial as scheduled. (ART 416-21.) Although, as discussed immediately below in claim five, Petitioner contends Pacello was not prepared for trial, Petitioner has not substantiated that allegation. Accordingly, there is no support in the record to implicate the third <u>Cronic</u> circumstance. <u>See</u> <u>Cronic</u>, 466 U.S. at 666 n.40 (noting that to satisfy the third circumstance, "counsel's representation [must be] so inherently inconsistent with a reasonably effective defense as to justify a presumption" the trial was unfair.); <u>see also</u> <u>Toomey v. Bunnell</u>, 898 F.2d 741, 744 n.2 (9th Cir. 1990) (cautioning that the <u>Cronic</u> presumption of prejudice is to be applied "very sparingly.") Thus, the state court determination that only the first <u>Cronic</u> circumstance was implicated, and that the remaining allegations of deficient performance were properly analyzed under <u>Strickland</u>, is objectively reasonable.

The Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). The Court recommends habeas relief be denied as to claim one on that basis.

### D. Claim Five

Petitioner alleges in claim five that, to the extent his allegations of ineffective assistance of trial counsel do not rise to the <u>Cronic</u> level of a breakdown of the adversarial process to the point where prejudice is presumed, he was denied his Sixth Amendment right to the effective assistance of counsel within the meaning of <u>Strickland</u> based on the same allegations. (SAP Mem. at 8-43.) He alleges that his trial attorney: (a) misled

Petitioner and the trial judge regarding his experience in handling felony criminal trials and the capability of his law office to handle this case; (b) failed to hire a second expert witness because he was unaware he could request public funding, could not be bothered to do so, or misunderstood the process; (c) lacked experience with the rules of evidence which resulted in the admission of evidence excluded in pretrial motions, and was shown by 120 of his 818 objections being sustained (15%) while 756 of the prosecutor's 952 objections (79%) were sustained; (d) failed to prepare for trial because he did not personally review the discovery or the pretrial rulings, and despite having been retained four and one-half months before trial he did not hire paralegal Callington to organize and review the discovery until 17 days before the scheduled trial date; (e) had a conflict of interest which caused him to show extreme antagonism to Petitioner which arose from attorney Lacher having been hired and paid $70,000 while Pacello was only paid $9000, and because Pacello said his conscience did not permit him to represent a person he did not think was innocent against charges of child molestation; and (f) failed to pay attention during trial because he was sleeping and using his cell phone to manage his law practice and social life. (Id.) Respondent answers that Petitioner "utterly fails to allege how he was prejudiced" under Strickland by these alleged deficiencies. (Ans. Mem. at 18-19.)

Petitioner presented this claim to the trial court in his new trial motion. (CT 1286-1481.) The trial judge held an evidentiary hearing which was limited to the claim that trial counsel was sleeping and using his cell phone so often during trial as to amount to a complete absence of counsel under Cronic. (Lodgment No. 7 [ECF No. 51-59].)

After finding that Pacello did not act under a conflict of interest and was not ineffective per se under Cronic (RT 7966-74), the trial judge stated:

> Subsumed within that is the question about whether or not the second prong of Strickland has occurred. And I know, Ms. Lacher, you were at a disadvantage in connection with that case, and I knew that at the time when I ruled on the motion for the continuance so you can get the transcript. And the reason why I ruled as I did is because the second prong of Strickland was not available based upon the record of the trial as I saw it. And that record meant that the jury was entitled to and did believe the testimony of Michael and

Christina, especially once it was corroborated by Mr. Fichter, Mr. Bradbury, and by [Petitioner]'s own statements and [Petitioner]'s flight from prosecution in this particular case, all of which allowed for inferences of consciousness of guilt, all of those things that, even if the court were to find that Mr. Pacello's conduct at the trial fell below the standard that was required, it would be prong 1 of Strickland, prong 2 would not be met in connection with this case. I'm not finding necessarily that Mr. Pacello's conduct fell below prong 1, but I am finding that there is no prong 2.

(RT 7974-75.)

The claim was then presented to the state appellate court on direct appeal. (Lodgment No. 8 at 28-70 [ECF No. 51-60].) The appellate court stated:

> Our conclusion to defer a discussion of these specific claims of ineffective assistance of counsel is also supported by the fact that defendant's new trial motion allegedly was incomplete and by the court's decision to limit the introduction of evidence in connection with that motion to alleged misconduct that occurred in the courtroom (i.e., in the court's presence). (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (noting the general rule that a claim of ineffective assistance of counsel on a less than complete record is "more appropriately decided in a habeas corpus proceeding").)

(Lodgment No. 11, People v. Pawlicki, No. D063728, slip op. at 32 [ECF No. 51-63].)

Petitioner filed a petition for review in the state supreme court in which he acknowledged the appellate court's parsing of the ineffective assistance of trial counsel claim between Cronic and Strickland, and requested the court review all allegations of deficient performance under both standards. (Lodgment No. 12 at 2-11 [ECF No. 51-64].) That petition was summarily denied without a statement of reasoning or citation of authority. (Lodgment No. 13 [ECF No. 51-65].)

The Ylst presumption provides that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 804. The Strickland aspect of Petitioner's ineffective assistance of trial counsel claim was not "rejected" by the appellate court, merely deferred to state habeas. Thus, if the last "reasoned state judgment rejecting" this claim is the trial court order denying the new trial motion, there is a

presumption that the state supreme court denied the <u>Strickland</u> claim on that basis. Before examining whether that presumption applies or has been rebutted, the Court must also consider that Petitioner accepted the appellate court's invitation to present the claim on state habeas. <u>See</u> <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005) ("Before we can apply [the] standards [of § 2254(d)], we must identify the state court decision that is appropriate for our review. When more than one state court has adjudicated a claim, we analyze the last reasoned decision.")

Petitioner presented his <u>Strickland</u> claim to the state supreme court in his habeas petition, specifically citing to California Rules of Court, Rule 8.508(b)(3), and referencing and incorporating the identical allegations supporting his <u>Cronic</u> claim. (Lodgment No. 14, Mem. of P&A in Supp. of Petition at 2-3 [ECF No. 51-66].) That Rule provides that: "After a decision by the Court of Appeal in a criminal case, a defendant may file an abbreviated petition for review in the Supreme Court for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief," and requiring "[a] brief statement of the factual and legal bases of the claims." Cal.R.Ct. Rule 8.508. The state supreme court denied that petition with an order which stated: "The petition for writ of habeas corpus is denied. (See <u>People v. Duvall</u> (1995) 9 Cal.4th 464, 474; <u>In re Waltreus</u> (1965) 62 Cal.2d 218, 225; <u>In re Dixon</u> (1953) 41 Cal.2d 756, 759; <u>In re Swain</u> (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, <u>In re Pawlicki</u>, No. S234957, order at 1 [ECF No. 51-67].)

The denial by the state supreme court on habeas involves a citation to <u>Dixon</u>, a state bar against raising claims on habeas which should be raised on appeal (which could not have been applied to the <u>Strickland</u> claim since the trial judge and the state appellate court instructed Petitioner to raise the claim on habeas), a citation to <u>Waltreus</u> representing a state bar against relitigating claims which were decided on direct appeal (which would apply if the silent denial by the state supreme court on direct appeal can be read as accepting Petitioner's invitation to reach the <u>Strickland</u> aspect of the claim and silently denying it on the merits for the reasons given by the trial judge, rather than adopting the appellate court's

determination that it should be brought on habeas), a <u>Swain</u> citation which represents a bar against presenting claims without sufficient particularity (unlikely to apply considering the detailed nature of the claim as repeatedly presented to the state courts), and a <u>Duvall</u> citation representing bars against failing to attach relevant documentary evidence (perhaps the most likely to apply due to the abbreviated nature of the habeas petition which did not include record citations or have transcripts attached, but, as with <u>Swain</u>, seemingly in conflict with Rule 8.508(b)(3) of the California Rules of Court).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 89. There are several state law principles at play with respect to claim five. First is that it was presented to the state supreme court on direct appeal in the petition for review, and that court had the discretion to address the claim on the merits. <u>See</u> <u>People v. Braxton</u>, 34 Cal.4th 798, 809 (Cal. 2004), quoting Cal. Rules of Court, Rule 29(b)(1) (noting that the California Supreme Court "may decide 'any issues that are raised or fairly included in the petition or answer.'") Second, Petitioner was instructed by the state appellate court to raise his <u>Strickland</u> claim on habeas, which he did. Third, California Rule of Court 8.508 permitted Petitioner to file "an abbreviated petition for review in the Supreme Court for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief," and required "a brief statement of the factual and legal bases of the claim." Cal. Rules of Court, Rule 8.508. Petitioner utilized that rule in the state supreme court when he raised his <u>Strickland</u> claim on habeas, after the claim had been adjudicated on the merits in the trial court (albeit in a manner which did not permit Petitioner to fully argue or support the claim), and then deferred to habeas by the appellate court on direct appeal. (Lodgment No. 14, Petition at 1, 3, 5 [ECF No. 51-66]; Lodgment No. 14, Mem. of P&A in Supp. of Petition at 7-9 [ECF No. 51-66].)

It does not appear appropriate to apply the <u>Richter</u> presumption to the state supreme court order denying habeas relief because the state law principles discussed above are

inconclusive regarding whether the state supreme court habeas decision was a denial on the merits of the Strickland claim or for procedural reasons.  In fact, one of those procedural reasons may have been because the claim had already been adjudicated on the merits.  See Ylst, 501 U.S. at 804 n.3 (observing with respect to California's Waltreus rule: "Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil – which is precisely the effect accorded by the 'look-through' presumption.")  Also, the Supreme Court has limited the Richter presumption to where there is no reasoned lower court decision.  Brumfield v. Cain, 576 U.S. ___, ___, 135 S.Ct. 2269, 2282-83 (2015), citing Wiggins v. Smith, 539 U.S. 510, 534 (2003) (reviewing de novo the question whether petitioner suffered Strickland prejudice where the state court adjudication of the claim was predicated only on the Strickland deficient performance prong) and Richter, 562 U.S. at 98 (requiring deference to hypothetical reasons for silent denial where there is no "opinion explaining the reasons relief has been denied.")  Here, there is the trial judge's order denying relief under the Strickland prejudice prong, albeit in a new trial motion where the claim was not permitted to be fully explored.

Thus, the Richter presumption does not appear to be appropriate.  However, if the Court were to apply the Ylst presumption and find that the silent denial of the Strickland claim by the state supreme court on direct appeal was based on the denial by the trial judge, the Court would apply the provisions of 28 U.S.C. § 2254(d) to an opinion rendered after Petitioner was precluded from arguing or supporting his Strickland claim.  It is unlikely such a decision would be entitled to deference in this Court.  See e.g. Milke v. Ryan, 711 F.3d 998, 1008 (9th Cir. 2013) (holding that § 2254(d) deference is not applicable where a state court "has before it, yet apparently ignores, evidence that is highly probative and central to a petitioner's claim.")  The Court need not determine what level of deference should be accorded to the state court adjudication of this claim, however, because, for the following reasons, the claim clearly fails under a de novo review.  See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (holding that when it is unclear whether AEDPA

deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one). Nevertheless, even under a de novo review, the adjudication of this claim by the trial court must be part of this Court's consideration of the claim. Frantz, 533 F.3d at 738.

Respondent argues that Petitioner is unable to show, and in fact has never alleged, he was prejudiced within the meaning of Strickland by any of Pacello's alleged errors. (Ans. Mem. at 17-19.) Petitioner replies he would not have been convicted if Pacello had provided effective assistance, and that Pacello was involved in only one other criminal jury trial in his career and has since been disbarred.[5] (Traverse at 2-4.)

For ineffective assistance of counsel to provide for relief, Petitioner must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. He must also show that counsel's deficient performance was prejudicial, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the errors. Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. He must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. Id. at 687. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "The standards created by Strickland" . . . are . . . highly deferential," Richter, 562 U.S. at 105, and "difficult to meet." Pinholster, 563 U.S. at 181.

---

[5] On December 9, 2014, Pacello was suspended from the practice of law for three years, the suspension was stayed and he was placed on probation for three years subject to a two-year suspension from the practice of law. In re Pacello on Discipline, No. S222096 (Cal. Dec. 9, 2014). The suspension was based on findings (unrelated to this case but based on actions taken while he was representing Petitioner here), that he failed to competently perform legal services, among other things. See www.members.calbar.ca.gov/fal/Member/Detail/207694, case no. 12-0-16456 (last visited Oct. 12, 2017).

Petitioner first alleges that Pacello misled him and the trial judge regarding his experience in handling felony criminal trials and the capability of his law office to handle this case.  (SAP Mem. at 30-32.)  Prior to being allowed to substitute in and appear on behalf of Petitioner, Pacello was questioned on the record regarding his experience and his ability to handle this case.  (ART 412-23.)  Petitioner points out that when Pacello was asked how many felony cases he had tried to a verdict that calendar year, he correctly answered none, but when asked that question as to the previous year, he said "if you want me to go through the annals of my case files and articulate that, I can."  (ART 423.)  Petitioner contends that was a dishonest answer because at the new trial hearing Pacello admitted he had tried only one felony <u>criminal</u> case to verdict in his career before this case. (Lodgment No. 7 at 79 [ECF No. 51-59].)  However, he was never asked how many <u>civil</u> cases he had tried, and therefore did not misrepresent his experience to the trial judge as alleged by Petitioner.  Rather, when asked if he had ever tried a criminal case like this one, he answered: "No, but I've been trying cases for 12 years, your Honor.  If you're a true trial lawyer, your skill set transfers to any courtroom on any issue.  Genuinely, that is my firm belief."  (ART 423.)  He said: "I am a trial attorney.  I've been doing it since 2000.  I tried my first jury trial six months after getting my license to practice law.  I'm not afraid of a jury."  (<u>Id.</u>)

Petitioner was present at that hearing, had previously met with Pacello, and was able to determine for himself if he needed additional information to make his decision whether to retain Pacello.  In addition, Petitioner was experienced in retaining counsel, as Pacello was the fifth counsel Petitioner retained in this case at that time, following Armstrong, Matthews, Lorandos, and Pride, in addition to his attempt to retain Bajaj.  There is no merit to his contention that he or the trial court were misled regarding Pacello's experience.

Petitioner next contends Pacello misrepresented the ability of his law firm to handle the case.  He contends Pacello lied at the October 2, 2012 pretrial hearing when he said had an "enormous staff" and had hired a paralegal who had "spent hundreds of hours on the case."  (RT 1102, 1106.)  Although Pacello apparently ran his law office from his loft

apartment at the time, he retained two contract paralegals to assist him in this case, including one who sat at the defense table every day of the trial. Pacello also said he had an investigator named Ernie Encinas. (Lodgment No. 20 at 467 [ECF No. 58-5].) And even assuming Petitioner is correct that Pacello did not hire paralegal Callington to organize and review the discovery until October 2, 2012, which was over a month before trial started, it does not preclude the possibility that he had another paralegal working on the case prior to that date. In fact, paralegal Ahlering worked in Pacello's office, and Pacello made the statement to the trial judge about a paralegal spending hundreds of hours on the case almost two months after he had received the discovery in the case. Even if Ahlering had not been organizing discovery, Pacello may have been referring to other work to prepare for trial. Likewise, Petitioner provides no information regarding the number of staff available to Pacello. Thus, the allegations that Pacello lied about the amount of work his staff had performed or the size of his staff is speculative, conclusory, and without support in the record. Speculative and conclusory allegations are insufficient to prove counsel provided ineffective assistance. Blackledge v. Allison, 431 U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

Petitioner next alleges that Pacello failed to hire a second expert witness because he was unaware he could request public funding, could not be bothered to do so, or misunderstood the process. (SAP Mem. at 35-36.) Petitioner relies on an email from his brother-in-law Larry Green who informed Pacello that San Diego County would provide a free investigator if he applied for one, to which Pacello replied: "I know the procedural rules but thank you for the heads up. [¶] . . . I prefer not to have the County know what the fuck I'm doing on [Petitioner]'s behalf." (CT 1479.) Pacello emailed Green requesting additional funds to hire "2 experts to show reasonable doubt from a scientific and medical perspective," stating that "no criminal defense attorney in town would ever 'front' $10,000 in expert fees." (CT 1473.) When Pacello was asked at the new trial evidentiary hearing if those emails made him aware that he could have obtained expert fees from the County, he replied: "Yes. Ancillary costs on a $22 million budget deficit I think are highly unlikely.

But yes, it's a possibility." (Lodgment No. 7 at 91-92 [ECF No. 51-59].) When asked if he had attempted to obtain those funds, he replied that his primary concern was getting ready for trial, that he had requested funding from Petitioner's family and been denied, and said: "And If I may, I came up with a creative way to use an expert in the area of biomechanics and human factors, which would basically help [Petitioner] on a shoe string budget because that is what I had to work with." (<u>Id.</u> at 92.)

Pacello hired an expert witness, Dr. Peter Francis, a professor emeritus at San Diego State University specializing in biomechanics and mechanical engineering, who testified that based on Petitioner's height and the height of victim Bonnie P., the act of sexual intercourse between Petitioner and Bonnie P. as described by Michael S. at trial, was, to a biomechanical certainty, anatomically improbable. (RT 5627-28, 5647-55.) Thus, Pacello hired an expert witness who challenged the evidence as to victims Bonnie P. and Michael S., and the credibility of Michael S., involving half the charged counts. In addition, Petitioner admits that Pacello knew he could seek funding for an additional expert witness from the County, and that Pacello sought funding from Petitioner's family instead. Even assuming Petitioner could show Pacello was deficient in failing to actually request funding from the County, he cannot establish prejudice under <u>Strickland</u> because he has failed to identify what second expert was needed. <u>See</u> <u>Wildman v. Johnson</u>, 261 F.3d 832, 839 (9th Cir. 2001) (speculation that counsel could have retained an expert does not establish prejudice where there was no evidence that an expert would testify favorably to petitioner).

Petitioner next alleges Pacello failed to prepare for trial because he did not personally review the discovery or the pretrial rulings, as demonstrated by the following three trial errors. (SAP Mem. at 36-38.) First, when Pacello cross-examined Petitioner's son Sean, he asked him if he knew whether Petitioner is homosexual, and his son answered that he did not know but "had suspicions" based on the "way Brad [Holt] is," although "more so Brad than" Petitioner. (RT 4602-04.) That issue was broached earlier when Christina C. was asked on cross-examination what her "understanding of Brad Holt's relationship with" Petitioner was, and she replied she thought Petitioner and Brad Holt were gay because they

slept together. (RT 2094-96.) Although Petitioner contends the issue of his sexuality was precluded pre-trial, the trial judge had merely ruled inadmissible evidence that Petitioner had a homosexual relationship in 1985 with a 27 year old man named William M. when Petitioner was 36 years old. (RT 35.) Second, Mindy McFarland, the ex-wife of Petitioner's son Sean, testified on direct that Petitioner came up behind her on one occasion, pressed himself against her where she could feel his erect penis and whispered something sexual in her ear, and on another occasion grabbed her by her waist and pushed her against the wall when she exited the bathroom in a robe after showering. (RT 1618-23.) Those two instances were ruled admissible in a pretrial motion. (RT 637-38.) On cross-examination, Pacello asked her if there were any other instances where Petitioner tried to force himself on her sexually beside those two, and she answered that once he walked in on her when she was dressing, and once he placed his crotch in her face while she was sitting on a couch, which Pacello attempted to show were not listed in her police report. (RT 1648.) Those two instances had been ruled inadmissible in a pretrial motion. (RT 637-38.) In the third instance, Deputy Sheriff Heather Czerwinski testified on direct that she searched Petitioner's home pursuant to a warrant and found 21 photographs and negatives of a woman in various stages of undress. (RT 4109-17.) When Pacello asked her on cross-examination if she had recovered any other items while executing the search warrant, she replied "a magazine containing nude photographs as well as a dildo," which had not been elicited by the prosecution on direct and not the subject of a pretrial exclusion order. (RT 4121.) Pacello then elicited from the deputy that the dildo might have been a plastic injection mold from Petitioner's workshop, and pointed out that the prosecution had not presented a photograph or other evidence of those items having been found in the search. (RT 4122.) Petitioner argues that Pacello's lack of experience with the rules of evidence, and failure to be familiar with the pretrial rulings and the search of Petitioner's home, resulted in the admission of that evidence. (SAP Mem. at 34.) He also contends the lack of experience is shown by only 120 of Pacello's 818 objections being sustained (15%) while 756 of the prosecutor's 952 objections (79%) were sustained. (Id.)

Petitioner must overcome a strong presumption that Pacello had tactical reasons for eliciting that testimony from those witnesses. See Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect."), citing Strickland, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment). Even assuming Petitioner could make that showing, he has not established prejudice as a result of these three alleged trial errors. As discussed below in claim seven: (a) the victims testified and described the sexual abuse committed by Petitioner against them, and described additional instances of his inappropriate sexual behavior; (b) Petitioner's friends and family testified that he admitted sexually molesting Christina C., and in fact bragged and joked about doing so, and often conducted himself in a sexually inappropriate manner, such as showing pornography to children and speaking to children about sex; (c) Petitioner showed a consciousness of guilt by fleeing the jurisdiction, and by soliciting others to destroy evidence and murder witnesses; and (d) Petitioner has a lifetime history of sexually inappropriate behavior. In light of that evidence, the introduction of evidence that his son suspected he was homosexual (which had already been testified to and was not the subject of a pretrial exclusion order), the two additional instances of inappropriate conduct with his son's ex-wife (which had been excluded but were very mild compared to numerous other such incidents), and the discovery of a dildo and a magazine with nude photographs in the search of his home (the magazine at least was cumulative to the testimony regarding pornography at his house), does not establish "a probability sufficient to undermine confidence in the outcome" of the trial. Strickland, 466 U.S. at 694; see also Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686.

Petitioner's allegation that Pacello never reviewed the discovery is also not supported by the record. Although Petitioner complains that Pacello waited too long to hire paralegal Callington to review the discovery and prepare summaries on October 12,

2012, that was nearly a month before trial started on November 7, 2012. In addition, Petitioner's retained counsel, Matthews, in his motion to withdraw, stated: "I instructed my staff to begin the laborious process of copying all the discovery material in the case, to be able to provide the defendant with a 'trial ready' set of binders, sixteen in all, all tabbed and cross-sectioned, including several binders containing confidential material provided by the defendant and his family, also tabbed and cross-sectioned," which Petitioner picked up on July 22, 2010. (Lodgment No. 3 at 5 [ECF No. 51-12].)

Petitioner next contends Pacello had a conflict of interest which caused him to show extreme antagonism which arose from Lacher having been hired and paid $70,000 while Pacello was only paid $9000, and because Pacello said his conscience did not permit him to represent a person he did not think was innocent against charges of child molestation. (SAP Mem. at 38-39.) In order to show a conflict of interest, Petitioner must identify an "actual conflict," and show it "adversely affected" counsel's performance by showing counsel's performance was significantly worsened by the conflict. Cuyler v. Sullivan, 466 U.S. 335, 348 (1980). "There is an actual, relevant conflict of interests if, during the course of the representation, the defendant's interests do diverge with respect to a material factual or legal issue or to a course of action." Id. at 356 n.3. Petitioner has not identified a conflict of interest arising from Pacello's distaste for child molestation or his reaction to Petitioner hiring and paying Lacher $70,000 while Pacello was representing him for $9000, because he has failed to show they had any effect whatsoever on Pacello's representation, much less that they significantly worsened his representation. See United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (holding that to establish an "adverse effect" a defendant must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.") Petitioner alleges Pacello was antagonistic because he was upset by the hiring of Lacher and his distaste for child molestation, but does not identify any manifestation of that antagonism, nor any strategy or tactic Pacello pursued or failed to undertake arising from the alleged conflicts.

Finally, Petitioner alleges Pacello failed to pay attention during trial because he was sleeping and using his cell phone to manage his law practice and his social life so often it amounted to a constructive absence from trial. (SAP Mem. at 40-43 [ECF No. 34].) As discussed above in claim one, this claim lacks a factual basis, and the brief use of a cell phone during trial is neither deficient nor prejudicial. Strickland, 466 U.S. at 687, 694.

In sum, although Petitioner regrets choosing Pacello to represent him, he admits Pacello had "qualities that arguably make for a good trial attorney" (SAP Mem. at 8), and does not identify any deficiencies in his representation which prejudiced the defense. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Rather, Petitioner chose Pacello after hiring and firing several other attorneys, and, as discussed next in claim six, was not deprived of his Sixth Amendment right to his choice of counsel. The Court finds that, to the extent the manner in which claim five was presented to or adjudicated in the state court makes it unclear whether AEDPA deference applies to the state court disposition of the claim, it is clear for the reasons set forth above that the claim fails under a de novo review. The Court therefore recommends habeas relief be denied as to claim five.

### E.     Claim Six

Petitioner alleges in claim six that he was denied his Sixth Amendment right to the choice of counsel by the denial of his motion to substitute attorney Lacher for attorney Pacello on the eve of trial. (SAP Mem. at 43-56.) Respondent answers that the request for substitution of counsel was untimely and would have further prolonged an already delayed proceeding. (Ans. Mem. at 19-20.)

Petitioner presented this claim to the appellate court on direct appeal. (Lodgment No. at 71-85 [ECF No. 51-60].) The appellate denied the claim, stating:

> Defendant next contends the court abused its discretion and thus erred when it refused to allow Lacher to substitute in as retained counsel during the October 19, 2012 hearing, just a few weeks before trial was to commence.

16cv0721-AJB (MDD)

Generally, a nonindigent criminal defendant has the right to discharge a retained attorney with or without cause. However, the right to discharge retained counsel is not absolute: "The trial court, in its discretion, may deny such a motion . . . if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' (citations). . . . (T)he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily (limited by] . . . the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time."'" The trial court, however, must exercise its discretion reasonably: 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' (Citation.)" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983–984.)

We apply an abuse of discretion standard in reviewing an untimely motion to discharge retained counsel. (See *People v. Lara* (2001) 86 Cal.App.4th 139, 152–155.) "(D)iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

As noted *ante*, from the time this case was initially filed in October 2009 through the denial of his (partial) new trial motion, defendant was represented by 10 different attorneys. In addition, between trial continuances and defendant fleeing the state, at least eight separate trial dates were set and subsequently vacated by the court. Indeed, the court specifically found in its March 12, 2013 order denying defendant's second request for reconsideration of its order denying defendant six months to investigate and file a new trial motion, that defendant purposefully "endeavored to delay the processing of this case at every possible stage" and that his "primary tool( )" for doing so was his "hiring and firing" of counsel, thus necessitating myriad continuances of the trial to allow new counsel to come up to speed on the case.

The record also shows at the October 19, 2012 hearing, the court specifically asked Lacher if she was prepared to go to trial on or about November 7 or 8, 2012. Lacher responded, "No." The court therefore noted it would not allow Lacher to substitute in as counsel because it would "result in a substantial delay in this case," which the court in turn found would disrupt the orderly administration of justice.

The record further shows that in August 2012, when Pacello moved to substitute into the case, the court specifically told Pacello and defendant that no further continuances of the trial would be granted and that trial would

16cv0721-AJB (MDD)

commence on October 29, 2012.  Nonetheless, Pacello subsequently moved for a trial continuance.  The court at the October 2, 2012 hearing on that motion reluctantly "granted" that request and set the trial for November 8, 2012.

At the April 2, 2013 hearing in connection with the new trial motion, the court noted that at the October 2, 2012 hearing when Pacello sought the trial continuance, defendant then had no objection to proceeding to trial with Pacello.  The court at the April 2 hearing also noted that defendant generally had no problem speaking up, including when he was dissatisfied with his attorney(s), and that defendant on multiple occasions "spoke( ) over his attorneys," even when defendant was "not supposed to be speaking."

In any event, things ostensibly changed between October 2 and October 19, 2012 when Lacher (defendant's 10th attorney) appeared at the October 19 hearing and sought to substitute in as defendant's retained counsel.  As noted *ante*, not surprisingly Lacher's request was accompanied by yet another request to continue the trial date, which as also noted *ante*, the court denied.

The record also shows that at its core, this case was relatively straightforward, as defense counsel (i.e., Lacher) later admitted during the new trial motion.  There were three alleged victims—Christina C., Michael S. and Bonnie P., although Bonnie P., because of disability, could not speak (and thus testify).  It was up to the jury to evaluate the credibility of the victims and the other witnesses who testified in the case, including the 14 witnesses and expert witness called by the defense, and determine whether or not defendant was guilty as charged.

On this record, we conclude there is more than sufficient evidence to support the finding that defendant intentionally delayed the processing of his case and as a result, obstructed the orderly administration of justice.  Our own detailed review of the record confirms that defendant continually hired, and then subsequently "fired" (including by not paying) retained counsel shortly before trial was set to begin.  This hiring and firing of retained counsel in turn led to myriad trial continuances, as also noted.

As such, we further conclude the court properly exercised its broad discretion when, at the October 19, 2012 hearing, it rejected defendant's last-minute request to substitute in Lacher as his tenth counsel of record, as doing so would have necessitated yet another trial continuance, pushed the case out more than three years from its original filing and further delayed the administration of justice.  (See *People v. Keshishian* (2008) 162 Cal.App.4th

425, 429 (noting the right to discharge retained counsel is not absolute, the right must be balanced "'against the disruption, if any, flowing from the substitution'" and therefore, the court did not err when it denied defendant's last-minute attempt to discharge counsel because the case had been pending for two and a half years and because myriad defense requests for trial continuances already had been granted); cf. *Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1475 (noting in connection with a habeas petition that substitution of appointed for retained counsel should have been granted by state court when retained counsel previously had been found in contempt for failing to appear for trial and when retained counsel again failed to appear after the trial was continued, claiming he allegedly had made a calendaring "mistake," when the trial had been continued only once at the time defendant sought to substitute in appointed counsel and when the court postponed the trial for several more weeks after denying defendant's substitution request), overruled on another ground as stated in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025.)

(Lodgment No. 11, <u>People v. Pawlicki</u>, No. D063728, slip op. at 37-41 [ECF No. 51-63].)

Petitioner did not thereafter present the claim to the state supreme court in his petition for review of the appellate court opinion. Rather, he presented this claim to the state supreme court in his habeas petition, incorporating and relying on his allegations on direct appeal and citing <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140 (2006). (Lodgment No. 14, Memo. of P&A in Supp. of Petition at 4 [ECF No. 51-66].) The Supreme Court in <u>Gonzalez-Lopez</u> stated that the Sixth Amendment right to counsel of choice:

> [C]ommands, not that a trial be fair, but that a particular guarantee of fairness be provided-to wit, that the accused be defended by the counsel he believes to be best. "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause." *Strickland*, *supra*, at 684-685. In sum, the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation "complete."

<u>Gonzalez-Lopez</u>, 548 U.S. at 146.

The Supreme Court was careful to point out that: "Nothing we have said today casts any doubt or places any qualifications upon our previous holdings that limit the right to

counsel of choice." Id. at 151. The Court noted: "We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, Wheat [v. United States, 486 U.S. 153, 159 (1988)], and against the demands of its calendar. Morris v. Slappy, 461 U.S. 1, 11-12 (1983)." Id. at 152. The Court in Slappy stated:

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances, only an unreasonable and arbitrary "insistence upon expeditiousness in the fact of a justifiable request for delay" violates the right to the assistance of counsel. Ungar v. Sarafite, 376 U.S. 575, 589 (1964).

Id. at 11-12.

The state appellate court's determination that an adequate hearing was held with respect to the motion to substitute counsel, and that the motion was properly denied as an exercise of the trial court's discretion, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. The trial court held a detailed inquiry into Petitioner's reasons for wanting to substitute Lacher in for Pacello, including hearing from both attorneys in camera. (Lodgment No. 18 [ECF No. 58-3]; Lodgment No. 19 [ECF No. 58-4].) Petitioner retained Pacello while represented by the alternate public defender, after having retained Armstrong, Matthews, Lorandos and Pride, and after attempting to retain Bajaj. Only then, on the eve of trial, did he retain Lacher and attempt to substitute her in for Pacello, which Lacher indicated would require another delay.

Although Petitioner alleges there was a need for a delay because Pacello was not prepared to go to trial and was not experienced or capable of defending him, he has not substantiated any of those allegations. Rather, his pattern of hiring and firing attorneys supports the appellate court's finding that the trial judge properly "rejected defendant's last-minute request to substitute in Lacher as his tenth counsel of record, as doing so would have necessitated yet another trial continuance, pushed the case out more than three years from its original filing and further delayed the administration of justice." (Lodgment No.

11, <u>People v. Pawlicki</u>, No. D063728, slip op. at 40.)  That finding is amply supported by the record which shows Petitioner caused a nearly three-year delay when he: (1) replaced Armstrong with Matthews who was given a continuance to prepare for trial; (2) forced Matthews to withdraw over allegations of misconduct which Matthews denied and were never substantiated; (3) retained Lorandos who was given a continuance to prepare for trial; (4) skipped bail; (5) fired Lorandos over allegations of misconduct which Lorandos denied and were never substantiated; (6) caused the public defender to conflict out by asking their clients to kill witnesses and destroy evidence; (7) attempted to retain Bajaj before retaining Pride who was given a continuance to prepare for trial; (8) forced Pride to withdraw by failing to pay him as promised; (9) retained Pacello; and (10) attempted to create another delay by retaining Lacher while being represented by Pacello.  The court finally stopped the delays after finding Pacello could adequately represent Petitioner and Lacher was not ready to go to trial despite having been contacted by Petitioner seven weeks before trial. Moreover, it cannot be presumed that Petitioner would have been content to go to trial represented by Lacher.  Even if she had been allowed to substitute in, Petitioner may have continued his pattern and retained counsel to replace her, or concocted allegations of misconduct against her to attempt to engineer another delay.

In light of that record, Petitioner has failed to show "an unreasonable and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" in connection to the denial of his motion to substitute Lacher for Pacello, and has therefore failed to establish a violation of his right to counsel of his choice.  <u>Slappy</u>, 461 U.S. at 11-12, quoting <u>Ungar</u>, 376 U.S. at 589.  The state appellate court adjudication of this claim for essentially that reason, is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Petitioner has also failed to show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. <u>Miller-El</u>, 537 U.S. at 340.  Even to the extent the manner in which claim six was presented to or adjudicated in the state court makes it unclear whether AEDPA deference applies to the state court disposition of the claim, it is clear for the reasons set forth above that the

claim fails under a de novo review.  See Berghuis, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).  The Court recommends denying claim six.

## F.   Claim Two

In a claim closely related to claim six, Petitioner alleges in claim two that "judicial misconduct was prevalent throughout petitioner's trial when the court refused to dismiss an obvious ineffective counsel who was representing petitioner even when the counsel begged the court to dismiss him, but the court refused to dismiss the ineffective counsel." (SAP Mem. at 3-4.)  He claims Pacello realized almost immediately that he had made a mistake in representing a child molester because he had two daughters of his own, and wept when he begged the trial judge to remove him from the case on that basis, but the prosecutor "gleefully left the matter alone, realizing he had another victory in hand," and the trial judge "had his own opinion about 'child molesters' being tried in his own court, and took advantage of the wholly incompetent, ineffective trial counsel."  (Id.; Traverse at 2.)  Petitioner claims that Pacello did not believe he was innocent, did not bother to prepare for trial, had little criminal trial experience, and just sat at the defense table sleeping and using his cell phone.  (SAP Mem. at 3-4.)  He contends actual and apparent judicial bias existed and rose to the level of judicial misconduct because the trial judge was or should have been aware Petitioner was denied his right to effective assistance of counsel.  (Id.)

Respondent answers that the trial court's decision not to permit substitution was proper for the reasons set forth in claim six.  (Ans. Mem. at 12-13.)  Respondent also contends this claim is without merit because an adverse ruling on a motion to substitute counsel, without more, cannot constitute judicial misconduct.  (Id. at 13.)

Petitioner presented a judicial misconduct claim to the state supreme court in his habeas petition in the following manner: "Judicial misconduct was prevalent throughout petitioner's trial and when the court refused to dismiss ineffective defense counsel even when counsel begged to be dismissed, counsel's performance resulted in petitioner's conviction."  (Lodgment No. 14, Mem. of P&A in Supp. of Petition at 3 [ECF No. 51-66].)

The claim was prefaced with allegations similar to the allegations presented in his ineffective assistance of trial counsel claim, that attorney Pacello was unprepared, unskilled, inexperienced, and did not know what he was getting himself in for accepting Petitioner as a client. (Id. at 1-3.) The state supreme court denied the petition with an order which stated: "The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759; In re Swain (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, In re Pawlicki, No. S234957, order at 1 [ECF No. 51-67].)

This Court must liberally construe Petitioner's pro se pleadings both here and in the state court, especially with regard to the determination as to which claims are presented. Zichko, 247 F.3d at 1020. In his state habeas petition, Petitioner informed the state supreme court that his appellate counsel "raised only the one issue regarding the right to effective counsel, and labored on that issue," that the habeas petition was abbreviated because it was intended to exhaust his state court remedies as to the claims he is raising in this Court, that his claims share a common core of operative facts with the claims raised on direct appeal, and, prior to articulating his individual claims, provided a narrative of why he thought his trial counsel was ineffective. (Lodgment No. 14, Petition at 5 [ECF No. 51-66]; Mem. of P&A in Supp. of Petition at 1-3 [ECF No. 51-66].) Attorney Lacher raised allegations of judicial misconduct in the trial court, alleging that the trial judge: (a) treated her discourteously when he refused to accommodate her schedule, commented on her failure to file papers when she was not given an opportunity to do so, and refused to hear oral argument on her second motion for a continuance of the new trial motion, (b) formed an opinion that Petitioner hired and fired attorneys as a ploy to delay the proceedings without an adequate inquiry into the reasons for substitution of counsel, some of which occurred before he was assigned to the case, (c) was aware that Pacello was unprepared, inexperienced and unqualified yet denied Lacher's pretrial motion to substitute for Pacello, and (d) refused to give Lacher sufficient time to prepare a motion for a new trial. (CT 1112-1241.) On March 26, 2013, the trial judge issued an order striking Lacher's

verified statement of disqualification and finding no basis for disqualification. (CT 1242-46.) The trial judge stated: "The facts presented do not show any bias on the part of this Court, nor do they support any reasonable and objective conclusion this Court is or could reasonably be believed to be biased against defendant or his counsel." (CT 1246.)

On direct appeal, Petitioner's appellate attorney argued that it was or should have been obvious to the trial judge that Pacello was not ready or competent to try the case, and detailed the trial judge's pretrial interaction with Pacello, including Pacello's admission he was not prepared, his lack of experience, his emotional plea to be relieved because he did not want to represent a child molester he knew to be guilty, and his anger at Lacher being retained and paid, as well as the trial judge's interaction with Lacher who provided evidence that Pacello was not prepared or competent. (Lodgment No. 8 at 34-47, 72 [ECF No. 51-60].) As quoted above in claim one, the state appellate court reviewed the allegations of judicial misconduct in its preface to its discussion of claim one, and then stated that Petitioner "wisely has not appealed the March 26, 2013 order." (Lodgment No. 11, People v. Pawlicki, No. D063728, slip op. at 17 n.4 [ECF No. 51-63].)

Thus, the allegations that the trial judge committed misconduct by being blind to Pacello's obvious inability to effectively represent Petitioner due to judicial bias were raised in the trial court, were presented to the appellate court but "wisely" not as a separate claim, and finally presented to the state supreme court on habeas under a procedure which permitted Petitioner to file "an abbreviated petition for review in the Supreme Court for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief," and requiring a brief statement of the factual and legal bases of the claims. Cal.R.Ct. Rule 8.508. Under a liberal construction of Petitioner's pleadings, it is clear that the claim of judicial misconduct in the Second Amended Petition was presented to and adjudicated on the merits by the trial court, acknowledged but not addressed by the appellate court on direct appeal, and then presented to the state supreme court on habeas. It appears impossible to determine which of the citations, Waltreus, Dixon, Duvall or Swain, were applied to the claim by the state supreme court when it denied the habeas

16cv0721-AJB (MDD)

petition.  Although the manner in which this claim was adjudicated to the state court makes it unclear whether AEDPA deference applies to the state court disposition of the claim, it is clear for the following reasons that the claim fails under a de novo review.  See Berghuis, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

There can be no claim of judicial misconduct based merely on challenges to adverse trial court rulings.  In re Complaint of Judicial Misconduct, 650 F.3d 1370, 1371 (9th Cir. 2011).  In addition, "There is a strong presumption that a judge is not biased or prejudiced." Rhoades v. Henry, 598 F.3d 511, 519 (9th Cir. 2010).  The Ninth Circuit has stated that the question on federal habeas "is not simply whether the trial judge committed misconduct . . .  Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995).

The state appellate recognized that a federal constitutional violation can arise from a failure to substitute counsel.  (Lodgment No. 11, People v. Pawlicki, No. D063728, slip op. at 41, citing Schell, 218 F.3d at 1025 ("it is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward."))  As discussed above in claim six, the state appellate court found that the trial judge did not abuse his discretion in denying the motion to substitute, stating in part:

> On this record, we conclude there is more than sufficient evidence to support the finding that defendant intentionally delayed the processing of his case, and as a result, obstructed the orderly administration of justice.  Our own detailed review of the record confirms that defendant continually hired, and then subsequently "fired" (including by not paying) retained counsel shortly before trial was set to begin.  This hiring and firing of retained counsel in turn led to myriad trial continuances, as also noted.
>
> As such, we further conclude the court properly exercised its broad discretion when, at the October 19, 2012 hearing, it rejected defendant's last-minute request to substitute in Lacher as his tenth counsel of record, as doing so would have necessitated yet another trial continuance, pushed the case out

more than three years from its original filing and further delayed the administration of justice. (See *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 (noting the right to discharge retained counsel is not absolute, the right must be balanced "'against the disruption, if any, flowing from the substitution'" and therefore, the court did not err when it denied defendant's last-minute attempt to discharge counsel because the case had been pending for two and a half years and because myriad defense requests for trial continuances already had been granted); cf. *Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1475 (noting in connection with a habeas petition that substitution of appointed for retained counsel should have been granted by state court when retained counsel previously had been found in contempt for failing to appear for trial and when retained counsel again failed to appear after the trial was continued, claiming he allegedly had made a calendaring "mistake," when the trial had been continued only once at the time defendant sought to substitute in appointed counsel and when the court postponed the trial for several more weeks after denying defendant's substitution request), overruled on another ground as stated in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025.)

(Lodgment No. 11, <u>People v. Pawlicki</u>, No. D063728, slip op. at 40-41 [ECF No. 51-63].)

As set forth above in claim six, the trial court held a detailed inquiry into Petitioner's reasons for wanting to substitute Lacher for Pacello, including hearing from both attorneys in camera, and took into consideration Petitioner's history of substituting counsel as an apparent (and effective) ploy in delaying the trial. There is no reason to believe Petitioner would not have continued his pattern and later sought to replace Lacher if she had been given a continuance to prepare for trial. For the reasons discussed above in claim six, Petitioner has failed to demonstrate an error in the trial judge's ruling, or that it involved bias or misconduct by the trial judge, and has failed to show he received an unfair trial as a result. <u>Duckett</u>, 67 F.3d at 740; <u>Schell</u>, 218 F.3d at 1017; <u>see also</u> <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.")

Although the manner in which claim two was adjudicated in the state court makes it unclear whether AEDPA deference applies to the state court disposition of the claim, it is clear for the reasons set forth above that the claim fails under a de novo review. <u>See</u>

16cv0721-AJB (MDD)

Berghuis, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one). Accordingly, the Court recommends habeas relief be denied as to claim two.

## G. Claim Three

In claim three Petitioner alleges prosecutorial misconduct by: (a) the presentation of irrelevant and inflammatory testimony of five jailhouse informants; (b) the seizure of the hard drive from his computer without a warrant; (c) the investigating officer falsely telling Petitioner's friends and neighbors that the police "had his DNA and he had been a child molester for years"; and (d) "Brady-like violations" (Brady v. Maryland, 373 U.S. 83 (1963) (recognizing a duty of the government to disclose to the defense exculpatory evidence which is material to guilt or punishment)), in withholding a statement by Dr. Kaufhold that Bonnie was never sexually abused, medical and legal records of Christina C. and Michael S., and evidence that Christina C. recanted. (SAP Mem. at 4-6.)

Petitioner presented this claim in his state habeas petition. (Lodgment No. 14, Mem. of P&A in Supp. of Petition at 3-6 [ECF No. 51-66].) The state supreme court denied the petition with an order which stated: "The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759; In re Swain (1949) 34 Cal.2d 300, 304.)" (Lodgment No. 15, In re Pawlicki, No. S234957, order at 1 [ECF No. 51-67].)

Because the only state court to which claim three was presented is the state supreme court on habeas, which denied the claim with citations to Duvall, Waltreus, Dixon and Swain but without indicating which citations applied to which claims, it appears impossible to determine how the claim was adjudicated by the state supreme court. The state supreme court could have applied the Dixon citation, a state bar against raising claims on habeas which should have been raised on appeal, if this is the type of claim which could have been raised on direct appeal, that is, if it does not require consideration of matters outside the record. See e.g. Mendoza Tello, 15 Cal.4th at 266-67. It could not have applied the Waltreus citation, representing a state bar against relitigating claims which were decided

on direct appeal, because this claim was not presented on direct appeal. It may have applied the <u>Swain</u> and <u>Duvall</u> citations representing bars against failing to allege claims with particularity or attach relevant documentary evidence because the claim was presented in a somewhat summary fashion and without the record citations and supporting documents Petitioner presents here, although that would arguably appear to be inconsistent with the state rules of court. However, the Court need not make that determination because claim three clearly fails on the merits under a de novo review. <u>See</u> <u>Berghuis</u>, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

"To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987), quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). The alleged misconduct must be reviewed in the context of the entire trial. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

Petitioner first contends the prosecutor committed misconduct by presenting the testimony of five jailhouse informants, "which had no relevance to the case except that the informants shared the same jail space that their mere presence was to inflame a prejudicial effect." (SAP Mem. at 5-6.) Four men who had been jailed with Petitioner testified at trial, along with the father of one of those men. Thomas Craig testified that Petitioner said Petitioner's wife was the reason Petitioner was in jail, asked Craig to discredit her by putting methamphetamine in her food, said he would like to kill her, and told Craig she did not trust banks and kept her money in her house and he could take it easily. (RT 2194-2200.) Kevin M. Foster testified that Petitioner offered to pay him $1000 to take computers and hard drives from his house, offered to pay him $2500 to burn down his house, gave him directions to his house, and told him he would pay $10,000 to anyone who would kill his wife. (RT 4148-61.) Keven G. Foster, Kevin M. Foster's father, testified that Petitioner called from jail, confused him for his son, and offered to pay $1000 to steal two laptop computers from Petitioner's house. (RT 4129-36.) Victor Austin testified that Petitioner

talked about having sex with a 14-year old in a brothel in the Philippines, and wanted Austin to make his wife disappear. (RT 4658-61.) Finally, Steven Broyles testified that Petitioner offered to bail him out of jail and pay him $100,000 to kill his wife Judy and the two complaining witnesses Christina C. and Michael S.[6] (RT 4630-35.)

The allegations of misconduct by the prosecutor in presenting the testimony of these witnesses is without merit because the testimony was relevant and admissible. See Greer, 483 U.S. at 765 ("To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"), quoting Bagley, 473 U.S. at 676; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.") The new allegation that the prosecutor suborned perjury from Broyles is not properly before the Court because it has never been presented to the state court. See Pinholster, 563 U.S. at 181 (holding that federal habeas court's review under 28 U.S.C. § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits.") It is in any case without merit. Broyles did not recant his testimony that Petitioner asked him to kill the complaining witnesses, as Broyles merely said Petitioner "never asked me to do anything with his wife." (ECF No. 59-1 at 1.) His testimony was cumulative to the other jailhouse informants, and the allegation of perjury is not "of sufficient significance to result in the denial of [his] right to a fair trial." Bagley, 473 U.S. at 676 ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."); Reis-Campos v. Biter, 832 F.3d 968, 977 (9th Cir. 2016) (finding allegation prosecutor suborned perjury was not material because petitioner received "a trial resulting in a verdict worthy of confidence."), quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995).

---

[6] Petitioner presents an affidavit from Broyles dated September 8, 2017, stating that Petitioner "never asked me to do anything to his wife," and that he was approached by the prosecutor, coached and pressured into testifying at trial. (ECF No. 59-1 at 1.)

Petitioner next contends his computer's hard drive was seized without a warrant when a Sheriff's investigator persuaded the owner of a computer repair shop where his computer was in for servicing to turn over a copy of the hard drive. (SAP Mem. at 6.) A motion to suppress the hard drive pursuant to California Penal Code § 1538.5 was litigated in the trial court prior to trial. (RT 102-50.) It was denied on the basis that the hard drive had been lawfully obtained by law enforcement. (RT 200-03.)

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976). Under California law, a defendant can move pretrial to suppress evidence on the basis that the evidence was obtained in violation of the Fourth Amendment. See Cal. Penal Code § 1538.5 (West 2011). In Gordon v. Duran, 895 F.2d 610 (9th Cir. 1990), the Ninth Circuit found it unnecessary to reach the issue of whether or not the petitioner's Fourth Amendment claim was, in fact, fully and fairly litigated, and held that the mere fact that the state of California provides an opportunity to fully and fairly litigate Fourth Amendment claims through Penal Code § 1538.5 precludes federal habeas review, irrespective of whether or not the petitioner availed himself of the opportunity. Gordon, 895 F.2d at 613-14. Because California provides a means by which defendants can challenge the constitutionality of searches and seizures, this Court is precluded from granting habeas relief on a Fourth Amendment claim. Id.; Stone, 428 U.S. at 494.

In any case, defense counsel argued that the investigating officer Detective Reden harassed and intimidated the person who turned over the hard drive, but that person testified at the suppression hearing that the detective did not threaten or intimidate her, and merely told her she was investigating allegations Petitioner had been molesting his daughter with Down syndrome. (RT 133.) Petitioner has identified no misconduct in connection to the seizure whatsoever, much less "of sufficient significance to result in the denial of [his] right to a fair trial." Bagley, 473 U.S. at 676.

Petitioner next contends the prosecutor's investigating officer Detective Reden "told all of the Petitioner's neighbors and friends" that "she had his DNA and he had been a child molester for years," which was untrue because he "had never been accused or charged with crimes of any kind in all 62 years of his life." (SAP Mem. at 6.) He contends this is the type of police behavior that "shocks the conscience" within the meaning of <u>Rochin v. California</u>, 342 U.S. 165 (1952) (recognizing that although the federal system generally commits to the states the administration of criminal justice, a federal due process violation can arise in rare circumstances, even where state law is followed, by conduct which "shocks the conscience" or "offend[s] the community's sense of fair play and decency.") (<u>Id.</u>) Respondent answers that Petitioner presents no citations, declarations, or any support whatsoever for this allegation, and argues that conclusory allegations are insufficient to provide for federal habeas relief. (ECF No. 50-1 at 26.)

Defense counsel filed a pretrial motion to dismiss the charges based on prosecutorial and investigative misconduct based on the same actions Petitioner complains of in this aspect of claim three, essentially arguing that Detective Reden convinced the people she spoke to that Petitioner was guilty. (CT 223-46.) The prosecutor opposed the motion, arguing that even if Detective Reden was untruthful when interviewing witnesses it was a legitimate investigative tool which had no bearing on the testimony of any witness, who in any case would be available for cross-examination at trial. (RT 247-49.) A hearing was held on the motion (RT 205-56), during which defense counsel admitted he had obtained no evidence that the actions of Reden had affected any witness in any way. (RT 224.)

As set forth in detail below in claim seven, Petitioner's friends and family testified at trial that Petitioner spoke of molesting children and admitted he had molested one of the victims here. The witnesses were available for cross-examination regarding what impact, if any, Reden's remarks had on their testimony. Although there was no DNA evidence in this case, because Petitioner has come forward with no evidence that when the investigating officer told his family and friends "she had his DNA and he had been a child molester for years" it had any effect on their testimony or the evidence they gave, and because those

witnesses were subject to cross-examination at trial, Reden's remarks were not so shocking, or so offensive to the notions of fair play and decency, as to amount to a due process violation. See e.g. Amaya-Ruiz v. Stewart, 121 F.3d 486, 495 (9th Cir. 1997) ("Misrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary"), overruled on other grounds by United States v. Preston, 751 F.3d 1008, 1010 (9th Cir. 2014).

Petitioner next contends the "prosecution committed 'Brady-like' violations by withholding evidence that may have been critical to the defense when Dr. Marilyn Kaufhold stated that the alleged victim named 'Bonnie' was never sexually abused, but the doctor was not available for trial, and the prosecution pushed for conviction of the crime." (SAP Mem. at 4-5.) Respondent answers that this is a conclusory allegation without support that any such statement or opinion was made or available or ever in the possession of the prosecution. (Ans. Mem. at 14.) Petitioner replies by lodging what purports to be copy of discovery Bates Stamp 004565, a document indicating that Dr. Kaufhold had reviewed a 2009 examination of Bonnie P., the victim with Down syndrome, and stated that the suspected abuse for which she was being examined (which took place between 2003-05), was too remote in 2009 to expect to find evidence of abuse. (Pet.'s Notice of Lodgment, Ex. D [ECF No. 56 at 24].) Thus, it appears that this information was disclosed to the defense during discovery. Nevertheless, Petitioner contends the prosecutor committed misconduct by not making a motion to stay the trial proceedings until Dr. Kaufhold returned from her vacation in Africa, and continued "the proceedings without the proof that 'Bonnie' was never sexually abused." (SAP Mem. at 4.)

Setting aside the obvious conclusion that it was Petitioner who caused the trial to be delayed so as to take place during Dr. Kaufhold's vacation, Petitioner has not supported his allegation that Dr. Kaufhold would testify that Bonnie was never abused, merely that Bonnie's 2009 examination took place too late to provide any evidence of abuse from 2003-05. Petitioner can demonstrate materiality under Brady only if the suppression of the evidence deprived him of a fair trial. Bagley, 473 U.S. at 678; see Kyles, 514 U.S. at 433-

34 (holding that prejudice under <u>Brady</u> is shown when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.")  The prosecution called Dr. Cynthia Kuelbs to testify at trial because Dr. Kaufhold was unavailable due to her vacation in Africa.  (RT 4261.)  Dr. Kuelbs testified that she held the same opinion as Dr. Kaufhold, that the 2009 examination of Bonnie P. was inconclusive and was not clear evidence that Bonnie had been sexually abused.  (RT 4246-50.)  Because there is no showing of suppression or a reasonable probability of a different result had Dr. Kaufhold been available to testify, Petitioner's allegation does not support habeas relief.

Petitioner contends the prosecution failed to provide confidential records "which would have proved the unlawful backgrounds of both of the prosecution witnesses Christina and Michael, that they were of bad character and should not be believed." (SAP Mem. at 5.)  Respondent answers that this is a conclusory allegation without support that any such statement or opinion was made or available or ever in the possession of the prosecution.  (Ans. Mem. at 14.)  Petitioner replies by stating that the prosecutor and defense counsel were aware that between the ages of six and eighteen, Christina C. "had made almost identical accusations against ten (10) other men which resulted in several convictions," and that Christina C. and Michael S. "had dozens of run-ins and altercations with the Willoughby Police before the age of 12.  They were prescribed over 30 different Psychotropic drugs as well as illegal drugs such as Crystal Meth with embalming fluid and Marijuana starting at eight (8) years old.  They were under the influence of a variety of these drugs during their allegations, sheriff detective interviews, and testimony in court. Christina and Michael spent much of their lives in five different mental hospitals in Ohio between the ages of eight (9) and eighteen (18) with years of weekly psychotherapy sessions."  (Pet.'s Notice of Lodgment at 2 [ECF No. 56 at 2].)  Petitioner has lodged documents which purport to be police reports from Willoughby, Ohio, where Christina C. and Michael S. grew up, and San Diego County Health and Human Services records of Bonnie P.  (<u>Id.</u> Exs. B, E [ECF No. 56 at 11-12, 30-35].)

The issue of the admissibility of the medical and mental health records of the minor victims was litigated in pretrial motions. Defense counsel filed a motion to compel disclosure of the psychological records of Christina C. and Michael S., indicating they had a history of mental illness, commitments to mental hospitals and past instances of abuse and neglect, as well as a motion to compel a psychological examination which listed their prescribed medications and their past use of illegal drugs. (CT 169-98.) The prosecutor opposed both motions. (CT 407-54.) The defense subpoenaed those records and were in possession of some of the medical records (CT 745-86), the trial judge granted in part and denied in part the motion to compel, and ordered some records released and some not released. (CT 1534-38; RT 58-80.) Defense counsel said "literally thousands of pages of psychiatric records" of Christian C. and Michael S. were turned over during discovery, including hospitalization and prescription drug records. (Lodgment No. 16 at 95 [ECF No. 58-1].) Petitioner's trial counsel cross-examined a social worker and the medical and mental health professionals who testified at trial regarding the medical and mental health histories of Christina C. and Michael S., including any past incidents of reported abuse in Ohio. (RT 3532-56, 3561, 3563, 3579-96, 3615-19, 4410-11.) Petitioner's contention that any relevant and admissible records were withheld by the prosecution is conclusory and speculative. The court finds this aspect of claim three is without merit because such speculative and conclusory allegations are insufficient to demonstrate entitlement to habeas relief. Blackledge, 431 U.S. at 74; Borg, 24 F.3d at 26.

Petitioner alleges the prosecution "withheld critical evidence that the witness Christina had recanted her accusations which stated that Petitioner had molested her and her brother, as well as her step-sister, stating, 'We just made up this whole thing.' The prosecutor ignored this statement as if it were never stated." (SAP Mem. at 6.) Respondent answers that this is a conclusory allegation without support that any such statement was ever made or available to or in the possession of the prosecution. (Ans. Mem. at 17.)

Petitioner has lodged an excerpt from the preliminary hearing transcript in this case in which Christina C. was asked: "You felt like people were telling you what to say, right?,"

and she responded: "No. We just made up this thing, and it was after I felt that my – if he did what was wrong, then what I'm doing is wrong by not saying anything. And that was it." (Pet.'s Notice of Lodgment, Ex. A [ECF No. 56 at 8].) Petitioner argues that the prosecutor, trial judge or his attorney should have immediately stopped the proceedings and dismissed the case when Christina C. made that statement. (Id. [ECF No. 56 at 1].) However, the testimony is taken out of context. It appears likely that Christina C. may have been indicating that she felt like her teachers and other people who were pressuring her to report the abuse may have thought she might be making up the allegations. (Id. Ex. A [ECF No. 56 at 8].) Her statement certainly does not constitute a clear admission that she and Michael S. made up their allegations, and the prosecutor was under no obligation to immediately dismiss the charges rather than to continue with the preliminary hearing and clarify the testimony. Petitioner has not alleged that the evidence presented at the preliminary hearing was insufficient to bind him over for trial, and has not alleged any prosecutorial misconduct in this respect. Reviewing the alleged misconduct in the context of the entire proceedings, DeChristoforo, 416 U.S. at 643, it is clear there is no misconduct in this respect, and that the alleged misconduct is not "of sufficient significance to result in the denial of the defendant's right to a fair trial." Bagley, 473 U.S. at 676.

The Court finds that that federal habeas relief is unavailable as to claim three because the claim fails under a de novo review. Even to the extent any particular item of evidentiary support for any aspect of the claim discussed above was not presented to the state court, and it would render that aspect of the claim unexhausted, the Court recommends denying those aspects of three as entirely lacking merit. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

## H.    Claim Four

Petitioner alleges in claim four that he is actually and factually innocent under Schlup v. Delo, 513 U.S. 298 (1995), which should serve as a gateway to overcome any procedural default or untimeliness. (SAP at 9; SAP Mem. at 7.) Respondent does not

address this claim, other than indicating that it is an insufficiently supported attempt to avoid the untimeliness of the claims. (Ans. Mem. at 8 n. 4.)

The only state court to which this claim was presented is the state supreme court on habeas. (Lodgment No. 14, Mem. of P&A in Supp. of Petition at 5 [ECF No. 51-66].) The state supreme court denied the petition with citations to Waltreus, Dixon, Swain and Duvall without indicating which citation applied to this claim. (Lodgment No. 15, In re Pawlicki, No. S234957, order at 1 [ECF No. 51-67].) The Court need not determine what level of deference if any is to be given the state court adjudication of this claim because it clearly fails on the merits under a de novo review. See Berghuis, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

A federal habeas petitioner can make a showing of legal innocence to satisfy the Schlup actual innocence gateway to avoid a procedural default. Vosgien v. Persson, 742 F.3d 1131, 1135-36 (9th Cir. 2014). It is an open question whether a freestanding claim of actual innocence, as opposed to its use as a gateway to avoid a procedural default, is cognizable on federal habeas. See Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceedings in the non-capital context, although we have assumed that such a claim is viable."), citing McQuiggin v. Perkins, 569 U.S. ___, ___, 133 S.Ct. 1924, 1931 (2013) (noting that it is, as yet, unresolved whether a freestanding actual innocence claim is cognizable on federal habeas) and Herrera v. Collins, 506 U.S. 390, 417 (1993) (acknowledging the possibility that a freestanding actual innocence claim would exist in the capital context). The Jones Court did not resolve the issue, finding the petitioner had not made a sufficient showing of actual innocence. Jones, 763 F.3d at 1246.

The United States Supreme Court has limited Schlup to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327. "[A] petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting Schlup, 513 U.S. at 327. "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that '"a court cannot have confidence in the outcome of the trial.'" Majoy, 296 F.3d at 776, quoting Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting Schlup, 513 U.S. at 316.

Petitioner has failed to meet the Schlup standard for the reasons set forth throughout this Report. The victims of his crimes testified at trial, Petitioner admitted he committed offenses against Christina C., and admitted he was disposed to commit such offenses. His failure to appear while released on a one million dollar bail bond, which according to him took place while he was represented by an attorney who believed he was innocent, showed a consciousness of guilt, as did his solicitation of numerous people to destroy evidence and murder his wife and the complaining witnesses. He presents no new evidence whatsoever, and has failed to demonstrate that this Court "cannot have confidence in the outcome of the trial." Schlup, 513 U.S. at 316.

Accordingly, the Court recommends denying habeas relief as to claim four on the basis that the claim fails under a de novo review.

## I.    Claim Seven

Petitioner alleges in his seventh and final claim that he was denied his right to due process and equal protection by the admission of uncharged sexual misconduct with children as propensity evidence, and argues that California Evidence Code § 1108 which permits such evidence violates the Equal Protection Clause of the Fourteenth Amendment. (SAP Mem. at 56-68.) Respondent answers that there is no clearly established supreme court precedent precluding the use of propensity evidence, and that California Evidence Code § 1108 does not violate equal protection. (Ans. Mem. at 20-22.)

At a pretrial motion to admit evidence of prior acts, the trial judge excluded as irrelevant or overly prejudicial evidence of: (1) a 1962 incident where Petitioner, while 13 years old, exposed his penis to an 8 year old female and a 15 year old female; (2) sexual

contact he had with a 15 year old female in 1966 when he was 17; (3) a 1970 incident where he watched his brother fondle a 12 year old male while watching pornography; (4) a 1973 incident with a minor female where he supplied her alcohol and inappropriately touched her; (5) a 1981 incident of sexual intercourse with a 17 year old female when he was 32 years old; (6) a statement where he admitted having sex with underage prostitutes in the Philippines and China, and said there were places there you could have sex with a 9 year old; (7) sexual comments he made to Alina Zentz when she was 13 or 14 years old and he was 41 years old, and pushing her onto a bed; (8) an incident where he opened the door while his daughter-in-law Mindy McFarland was dressing, and an incident where he placed his crotch in her face; (9) a claim of a homosexual relationship with William M. in 1985 when Petitioner was 36 and William M. was 27; (10) a 1992 incident where Petitioner asked his wife Lucie to have a threesome with him and Brad Holt; (11) a 1995-96 comment to a 16 year old babysitter that she was "chesty"; (12) a 1999 statement when he was 50 years old to a 16 year old babysitter proposing a threesome with his wife; (13) testimony that he asked a 17 year old babysitter to model skimpy clothes; (14) sexual comments he made to a 16 year old female in 2002-05 about other women; (15) a 2003-04 incident where he stroked a dog's genitals and inserted a finger in the dog's anus; (16) a 2006-07 incident where he made a sexual comment to an 11 year old female; and (17) a statement by Petitioner upon his return from China that "it sure is nice to slide your dick in and out of young girls." (RT 17-18, 32-36, 605-13, 617-44, 645-49, 651-54.) The trial judge ruled admissible instances where: (1) Petitioner showed pornography to victims Christina C. and Michael S.; (2) made a statement to his son Sean that he had sex with an 18 year old female prostitute who appeared to be 16 years old; (3) testimony from Alina Zentz that Petitioner attempted to kiss her when she was 13-14 years old; (4) the two instances of sexual battery in 1992 on Mindy McFarland previously discussed; (5) testimony from Heather Draper that when she was 17 years old Petitioner looked at her in a sexual manner and made inappropriate comments; (6) incidents in 2006-07 where he showed pornography to 11 and 12 year old children; (7) testimony from Joy Burke that she saw Petitioner kiss his daughter,

victim Bonnie P., when she was 13 or 14 years old in a manner not expected between a parent and a child; and (8) a statement by his ex-wife during divorce proceedings that Petitioner habitually placed their daughter Bonnie P.'s face in his crotch to simulate oral sex, and once asked his ex-wife "what would you do if, when Bonnie turns 14, she caught Bonnie sucking [Petitioner's] dick." (RT 614, 630-34, 636-37, 641, 646-58.)

Petitioner presented this claim to the state the appellate court on direct appeal. (Lodgment No. 8 at 86-100 [ECF No. 51-60].) He contended that the testimony of Heather Draper, Teresa Hilty, Alina Zentz, Mindy McFarland, Madison Cozart, Justine Stout, Joy Bourke, Dameon Cunningham, Brad Holt and Sean Pawlicki rendered his trial fundamentally unfair and violated his rights to due process and equal protection. (Id. at 86.) Heather Draper testified that when she was 17 years old she worked for Petitioner about a month, and that Petitioner looked at her body several times in a manner which made her feel uncomfortable. (RT 1495-1502.) Teresa Hilty testified that she was 11 years old in 1966, that Petitioner was her sister Jan's boyfriend at the time, and that Petitioner and Jan married in 1969 and had two children, Sean and Chris. (RT 1510-14.) She said that at times when she was alone with Petitioner from 1965 to 1969, he talked to her about having sex with her, about touching her, and about showing her his penis. (RT 1514-15.) Anytime he could find an opportunity Petitioner would trap her against a wall, tell her "this is going to feel good," touch her breasts through her clothes and try to put his hands down the back of her pants. (ET 1516-18.) Petitioner kissed her and put his tongue in her mouth several times when she was ten years old, and forced her hand on to his crotch where she could feel his erect penis through his clothes. (RT 1517-19.) She said that from the time he married her sister until she was married in 1975, Petitioner's actions "became more of the adult version, [requests for] getting together, pornography, wanting to make love to me, have sex with him," and frequently asking her and her husband to have group sex with him. (RT 1522, 1546.)

Alina Zentz testified that she dated Petitioner's son Sean when she in junior high school, and when she was 13 years old she often spoke to Petitioner at his house. (RT

1569-72.) She said Petitioner was always very sexually provocative in their conversations, discussing "crude stuff that children should not hear." (RT 1572-74.) Petitioner tried to kiss her on the lips when she was 13 or 14 years old, and once pushed her on to a bed, which made her uncomfortable, but she said: "I was used to him being a pervert already at that point, so it was – it was just something that was normal." (RT 1576-78, 1592.)

Mindy McFarland, the ex-wife of Petitioner's son Sean, testified that in 1993 when she was 21 years old, Petitioner came up behind her, pressed himself against her where she could feel his erect penis, and whispered something sexual in her ear, and on another occasion grabbed her by her waist and pushed her against the wall while in a robe after showering. (RT 1607, 1618-23.) She testified on cross-examination to two incidents which had been excluded pretrial, that he once walked in on her when she was dressing and once placed his crotch in her face while she was sitting on a couch. (RT 1648.)

Madison Cozort testified that when she was 11 years old, Petitioner was married to her aunt, Lucie Prince, and she went to visit them, where she played with her cousin Bonnie P., Petitioner's daughter, as well as Christina C. and Michael S., Petitioner's step-children. (RT 1688-95.) She said that during that visit Petitioner made sexual comments to her on five or six occasions which made her uncomfortable. (RT 1696-98.) She said Petitioner told her she needed to find a husband and needed to please a husband, showed pornography on a television to her, her sister Justine, and Bonnie P. a handful of times, and told her he had sex with his new wife who he bought on the internet. (RT 1697-1705.)

Justine Stout testified that she was 10 or 11 years old when she and her sister Madison Cozort visited Petitioner's house. (RT 1715.) During the visit Petitioner told her he put a video camera in his closet to catch his ex-wife and her partner having sex, said her grandfather had locked her aunt Lucie and her stepmother Dawn up and in a cage and sold them to old men for sex, and showed her and her sister pornography on a television with two naked adult women having sex. (RT 1722-27.) She overheard an argument between Petitioner and his wife Judy where Judy yelled at Petitioner "that she would not let [Justine] stay alone in a room with [Petitioner] because he had raped somebody's daughter." (RT

1732.)  Petitioner also told Justine that his ex-wife Tammy had made him have sex with her daughter Christina C.  (RT 1741.)

Joy Bourke testified that her mother worked with handicapped children and helped care for Petitioner's daughter Bonnie.  (RT 1745-47.)  Bourke observed Petitioner kiss Bonnie on the lips about five times in the same way Bourke kissed her boyfriend, and said: "The way they showed affection toward each other is what I would deem just a bit too intimate."  (RT 1750-52.)

Dameon Cunningham testified that he was formerly Megan Cunningham and had recently changed gender from female to male.  (RT 3625-26.)  Dameon met Petitioner and his wife Lucie in 1999 when Dameon was 16 years old; Dameon worked with Petitioner and lived with Lucie on and off for about five years after Dameon's parents "had thrown me out of home."  (RT 3627-28, 3637-39, 3648.)  Petitioner insinuated he would like to have a threesome with Dameon and Lucie, and told Dameon, who was lesbian at the time, that he could initiate Dameon into sex with men, which disgusted Dameon.  (RT 3630-33.) Petitioner told Dameon that he had drilled holes in the wall of the other house on his property and occasionally looked through the windows in hopes of catching the inhabitants having sex in order to attempt to join them.  (RT 3633-35.)  Dameon heard Petitioner make comments about the bible and other countries approving of women having sex as soon as they begin menstruation, and that "women who are 14 to 18 are in their prime."  (RT 3641-44, 3648-49.)

In 1999, when Dameon was female, Petitioner came up from behind and grabbed Dameon's breasts and made thrusting motions to Dameon's backside "more times than I can count."  (RT 3645-46.)  Dameon saw Petitioner shower with Bonnie P. when Bonnie was eight years old and thought it was inappropriate.  (RT 3651.)  Dameon saw Petitioner show pornography on a television on multiple occasions to his stepchildren Christina C. and Michael S., and his children Bonnie and Arron, and when Dameon objected Petitioner replied "they have to learn somehow," and said it was okay because "he did it when he was younger."  (RT 3659-61.)  Dameon testified that when Christina C. and Michael S. came

to live with Petitioner they were both happy and excited to have a father and a home, but when they left Christina said she hated Petitioner.  (RT 3664-68.)

Brad Holt testified that he met Petitioner at a trade show in 1988 or 1989, and they became good friends.  (RT 4417-18-21.)  Petitioner told Holt that he had sex with a 16 year old prostitute and sent him copies of photographs of the encounter (the originals were seized when the search warrant was executed at Petitioner's house), which Holt said he immediately destroyed.  (RT 4428-29.)  Petitioner telephoned Holt on one occasion, said he was in the Philippines with his wife Judy, and asked Holt to take power of attorney to sell his belongings.  (RT 4430.)  When Holt told him he could not do that without Petitioner being present, Petitioner said: "You better help me or I'll – I'll make up something that you were involved in the scene," referring to Christina C. being molested.  (RT 4432.) Prior to the accusations in this case having arisen, Petitioner told Holt that one night when he was in bed with his wife Tammy and her daughter Christina C., he felt somebody fondling his penis, and when he realized it was Christina C. he threw her out of the bedroom because he thought he was being set up by Tammy to be blackmailed.  (RT 4435-38.)  Holt said that Petitioner once mentioned having had sex with a "young looking" female prostitute in the Philippines, and Holt once saw Petitioner put methamphetamine in a woman's drink which Petitioner said would make her horny.  (RT 4439-42.)

Sean Pawlicki, Petitioner's son, testified that throughout Sean's life Petitioner often talked about sex with him and his girlfriends.  (RT 4546-48.)  Petitioner said he picked up a female who appeared to be 16 years old and took her to a motel where they had sex and he photographed her.  (RT 4550-56.)  Petitioner showed him photographs of the woman, which were later seized from his house pursuant to a search warrant.  (RT 4556-57.)

The appellate court denied this claim, stating:

> Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 (prohibiting the use of prior acts to prove criminal disposition), if the evidence is not inadmissible pursuant to Section 352 (as more prejudicial than probative)."

Here, the record shows the court ruled to admit and, in various instances, to exclude, under Evidence Code section 1108, subdivision (a) evidence of defendant's commission of other sexual acts. The record further shows the court did so after considering, pursuant to Evidence Code section 352, various factors including the "nature"; "relevance"; "possible remoteness"; "degree of certainty on its commission"; and the "likelihood of confusing, misleading (or) distracting the jurors" with respect to such evidence.

Defendant initially contends that admission of character or propensity evidence to prove criminal disposition under Evidence Code section 1108, subdivision (a) violated his due process rights. Defendant raises this contention to preserve it for federal review, as he acknowledges our high court has already upheld this statute against a due process challenge. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 907, 910–922 (*Falsetta*).) He also acknowledges that as an appellate court, we lack the authority to overrule our state's high court and are bound to apply the rule of law it pronounces. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As noted, defendant also raises an equal protection challenge to the admission of uncharged prior sexual acts. Although our high court has not directly addressed this issue, it wrote favorably of an appellate decision that had rejected an equal protection challenge. (*Falsetta, supra*, 21 Cal.4th at p. 918 (noting *People v. Fitch* (1997) 55 Cal.App.4th 172, 184 (*Fitch*) "rejected the defendant's equal protection challenge, concluding that the Legislature reasonably could create an exception to the propensity rule for sex offenses, because of their serious nature, and because they are usually committed secretly and result in trials that are largely credibility contests" and noting Fitch recognized the "'Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others'" (citations omitted)); see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310, 1312 [rejecting defendant's equal protection challenge to Evidence Code section 1109, a statute that is similar to Evidence Code section 1108 except that section 1109 applies to prior acts of domestic violence, in part based on *Falsetta's* approval of *Fitch*).)

Because our high court in *Falsetta* cited *Fitch's* equal protection analysis favorably and because, in any event, we conclude the reasoning of *Fitch* on this issue is sound, we reject defendant's contention that Evidence Code section 1108 violated equal protection.

(Lodgment No. 11, <u>People v. Pawlicki</u>, No. D063728, slip op. at 41-43 [ECF No. 51-63].)

16cv0721-AJB (MDD)

Petitioner did not present this claim to any other state court.  As set forth above, in order to exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition.  Picard, 404 U.S. at 275-76.  By failing to present the claim to the state supreme court, Petitioner failed to satisfy the exhaustion requirement.

Nevertheless, the exhaustion requirement is satisfied "if it is clear that (the habeas petitioner's) claims are now procedurally barred under (state) law."  Gray v. Netherland, 518 U.S. 152, 161 (1996); Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because a return to state court for exhaustion would be futile.")  Petitioner constructively filed his state supreme court habeas petition on May 27, 2016, nearly a year and a half ago, and filed his petition for review in the supreme court, when he should have presented this claim, on March 27, 2015, over two and one-half years ago.  He was required to present the claim to the state supreme court without "substantial delay."  See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied); Evans v. Chavis, 546 U.S. 189 (2006) (noting that substantial delay under California law does not differ significantly from the rule in other states which use 30 to 60 day rules, and that a six-month unexplained delay was presumptively unreasonable); In re Clark, 5 Cal.4th 750, 797-98 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied.")

It is clear that Petitioner no longer has state court remedies available to him with respect to claim seven, and the claim is therefore considered to be technically exhausted.  Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion;

there are no state remedies any longer 'available' to him."), quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 732 (1991); <u>Phillips</u>, 267 F.3d at 974 ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'") As a result, the claim is procedurally defaulted. [7] <u>Coleman</u>, 501 U.S. at 735 n.1 (holding that "there is a procedural default for purposes of federal habeas" when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); <u>see id.</u> at 729-30 (holding that a procedural default arises from a violation of a state procedural rule which is independent of federal law and is clearly established and consistently applied.) The Supreme Court has held that California's timeliness rule is clearly established and consistently applied. <u>Walker</u>, 562 U.S. at 312-21. It is also independent of federal law. <u>See</u> <u>Bennett</u>, 322 F.3d at 581 ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground.")

The Court may reach the merits of claim seven if Petitioner can demonstrate cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the claim. <u>Coleman</u>, 501 U.S. at 750. The Court need not determine whether Petitioner could make that showing because, as Respondent argues, claim seven is clearly without merit. The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002), citing <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.") Because claim seven clearly fails on the merits, the Court finds that the interests of

---

[7] In the unlikely event that state court remedies remain available as to claim seven, the Court has discretion to deny the claim notwithstanding any failure to exhaust. <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") Because the claim clearly fails on the merits, the result is the same.

16cv0721-AJB (MDD)

judicial economy support denying the claim on the merits without addressing whether Petitioner can overcome the procedural default.

The Ninth Circuit has held that because the United States Supreme Court in <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991), specifically reserved ruling on the issue regarding whether introduction of propensity evidence in a state trial could violate federal due process, and has denied certiorari at least four times on the issue since, there is no "clearly established federal law" recognizing such a claim, precluding habeas relief where 28 U.S.C. § 2254(d) applies. <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866 (9th Cir. 2006). Accordingly, the state appellate court adjudication of the propensity evidence aspect of claim seven is neither contrary to, nor involves an unreasonable application of, clearly established federal law. <u>See Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists). Neither is there any basis to show that the factual findings upon which the state court's adjudication of that aspect of the claim rests are objectively unreasonable. <u>Miller-El</u>, 537 U.S. at 340.

Even if Petitioner could avoid the restrictions of 28 U.S.C. § 2254(d) with respect to this claim, he would still have to demonstrate a federal due process violation arising from the introduction of the propensity evidence.[8] <u>See Holley</u>, 568 F.3d at 1101 ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991) ("[T]he evidence must be of such quality as necessarily prevents a fair trial.") In light of the testimony of his victims, and his own admissions, coupled with evidence of a consciousness of guilt, it is clear that the testimony of Heather Draper, Teresa Hilty, Alina Zentz, Mindy McFarland, Madison Cozart, Justine Stout, Joy Bourke, Dameon

---

[8] Whether AEDPA deference is applicable to claims which are technically exhausted and procedurally defaulted is unclear. <u>Slovik v. Yates</u>, 556 F.3d 747, 751 n.4 (9th Cir. 2009). Because the claim clearly fails under de novo review, the result is the same whether or not AEDPA deference applies. <u>See Berghuis</u>, 560 U.S. at 390 (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

16cv0721-AJB (MDD)

Cunningham, Brad Holt and Sean Pawlicki regarding Petitioner's prior sexual misconduct with minors and his history of inappropriate sexual conduct, did not render his trial fundamentally unfair or violate his right to due process.

Specifically, Christina C. testified that about a week after her mother married Petitioner he began to fondle her breasts and vagina and grab her hand and place it on his penis when they were in bed together, about three or four times a week.  (RT 2028-33.)  About a month or so after that, Petitioner began to have vaginal intercourse with her, and began to tell her that she was a better wife to him than her mother, all of which made her feel dirty.  (RT 2033-34.)  Christina C. testified that Petitioner often made sexual comments in her presence when she was 12 or 13 years old, including whether she had condoms in her purse and that she had a nice butt, that she saw Petitioner put his hands up Bonnie's skirt, and that Petitioner often took Bonnie into the bedroom alone, locked the door and came out about twenty minutes later in his underwear.  (RT 2036-40.)  Michael S. testified that on one occasion he walked into a bathroom and saw Petitioner having intercourse with Bonnie P. from behind, and when Petitioner saw Michael he hit him with a belt, knocked him down, pulled his pants to his ankles, "inserted his penis into my rectum," and warned him not to say anything.  (RT 1940-42.)  Justine Stout testified that Petitioner told her that his wife Tammy was a weird lady, and Tammy had told him to have sex with her daughter Christina C.  (RT 1740-42.)  Petitioner's friend Todd Fichter testified that Petitioner said he was in bed with his wife and her 12 year old daughter once when "somebody touched him, so he got aroused, and so he touched the person back, and, you know, he was feeling her breasts, and they were just, you know, fooling around for a little while, and eventually that led to sexual intercourse."  (RT 3868.)  Fichter said Petitioner was grinning and proud when he told the story, that "it was the best sex ever," and "was reliving the whole incident in a . . . sickening, sadistic way . . . like it was a conquest."  (RT 3868-70.)  Judy Pawlicki testified that when she was married to Petitioner he talked about sex all the time, including in front of other people, and that he played pornography on the television in the bedroom "all the time" "every day," exposing the children to it, to the point she purchased another

television for the living room.  (RT 3937-41.)  Petitioner's dentist Dr. Bradbury testified that Petitioner told him on several occasions that he was very interested in mother-daughter sexual relationships, wanted to have sex with Megan Cunningham, a patient Dr. Bradbury knew was lesbian, and wanted to grab Dr. Bradbury's wife's breasts.  (RT 4272-74.)  Dr. Bradbury's wife testified that Petitioner told her Christina C. slipped into bed with him and his wife, that he had sex with Christina C., and that "he enjoyed the mistake and he was a victim, how could he know?"  (RT 4306.)  On October 24, 2011, just before the court hearing Petitioner missed, he told her he was going to China where he could "live like a king."  (RT 4309.)  Brad Holt testified that Petitioner told him Christina C. had fondled his penis, he threw her out of the bed when he realized she was not his wife, and thought he was being set up for extortion by his wife.  (RT 4435-36.)  Petitioner's son Sean testified that Petitioner said he fondled Christina C.'s breasts while he made her fondle his penis, that Christina's breasts were firmer than those of his wife, and joked about having sex with Christina C.  (RT 4547-48.)

Thus, the trial included direct evidence of guilt through the testimony of the victims, which was substantiated by Petitioner's admissions, and a consciousness of guilt shown by jumping bail and soliciting people to destroy evidence and kill the complaining witnesses. In light of that evidence, and in light of the fact that much of the propensity evidence was cumulative to other evidence, the evidence of uncharged sexual offenses with minors, which as set forth above was limited under California Evidence Code §§1108(a) and 352 by the exclusion of irrelevant and overly prejudicial instances, was not of the quality which prevented a fair trial.  See Falsetta, 21 Cal.4th at 907 (holding that although admission of such evidence "represents a deviation from the historical practice of excluding such 'propensity' evidence, the provision preserves trial court discretion to exclude the evidence if its prejudicial effect outweighs its probative value.") (citations omitted); Holley, 568 F.3d at 1101 ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."); Jammal, 926 F.2d at 920 ("[T]he evidence must be of such quality as necessarily prevents a fair trial.")

Finally, Petitioner contends the admission of propensity evidence violated his equal protection rights. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 55 (1973) ("The constitutional standard under the Equal Protection Clause is whether the challenged state action rationally furthers a legitimate state purpose or interest.") Petitioner has not shown that the state court rule permitting evidence, after vetting to exclude irrelevant and overly prejudicial evidence, of prior sexual misconduct with children in a trial for child molestation does not rationally further a legitimate state interest in permitting a jury to determine the truth of the allegations against a defendant. See Falsetta, 21 Cal.4th at 918 (noting that Fitch concluded "the Legislature reasonably could create an exception to the propensity rule for sex offenses, because of their serious nature, and because they are usually committed secretly and result in trials that are largely credibility contests."), citing Fitch, 55 Cal.App.4th at 184. Petitioner has not shown that he is similarly situated to people on trial for crimes which do not involve allegations of child molestation. See City of Cleburne, 473 U.S. at 440 ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."); United States v. Harding, 971 F.2d 410, 413 (9th Cir. 1992) (holding that to prevail on an equal protection challenge, the petitioner "cannot merely show that the legislature was mistaken in creating the classification, but rather he must prove that there exist no legitimate grounds to support the classification.")

The Court finds that the adjudication of the equal protection aspect of claim seven is neither contrary to, nor involves an objectively unreasonable application of, clearly established federal law. City of Cleburne, 473 U.S. at 439; Rodriguez, 411 U.S. at 55. Neither is there any basis to show that the factual findings upon which the state court's adjudication of this aspect of the claim rests are objectively unreasonable. Miller-El, 537

U.S. at 340.  The Court would reach the same conclusion under a de novo review of this aspect of claim seven.

The Court recommends habeas relief be denied as to claim seven because the adjudication of the claim by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court alternately finds that claim seven fails under a de novo review.

**IV.**   **CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than <u>**November 17, 2017**</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**November 24, 2017.**</u>  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:   November 3, 2017

Hon. Mitchell D. Dembin
United States Magistrate Judge